Nos. 2025-1022, -1051, -1082

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

APPLE INC., GOOGLE LLC,

*Appellants*,

v.

SPACETIME3D, INC.,

*Cross-Appellant*.

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board, in Nos. IPR2023-00242, IPR2023-00577

**OPENING BRIEF FOR APPELLANTS APPLE INC. AND GOOGLE LLC**

Erika H. Arner, *Principal Attorney*
FINNEGAN, HENDERSON, FARABOW
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC  20001
(571) 203-2754

Daniel C. Tucker
Joseph M. Schaffner
FINNEGAN, HENDERSON, FARABOW
GARRETT & DUNNER, LLP
1875 Explorer St, 8th Floor
Reston, VA  20190
(571) 203-2793

*Counsel for Appellant Google LLC*

Brian A. Rosenthal, *Principal Attorney*
Allen Kathir
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
(212) 351-2339

Jaysen S. Chung
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA  94111
(415) 393-8271

*Counsel for Appellant Apple Inc.*

**Additional Counsel on Next Page**

Cory C. Bell
FINNEGAN, HENDERSON, FARABOW
GARRETT & DUNNER, LLP
2 Seaport Lane, 6th Floor
Boston, MA  02210
(617) 646-1641

Albert Suarez IV
Julia Tabat
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue Suite 2100
Dallas, TX  75201
(214) 698-3465

<div align="center">

**REPRESENTATIVE PATENT CLAIM**

</div>

**U.S. Patent No. 8,881,048 - Claim 1**

1.     A method for providing a three-dimensional (3D) graphical user interface, comprising:

receiving at least first and second inputs from an end user;

receiving first and second webpages from at least one server in response to said first and second inputs, wherein the first and second inputs are website addresses corresponding to said first and second webpages, respectively;

displaying at least a portion of the first webpage on a first object within a 3D space, and at least a portion of the second webpage on a second object within the 3D space, comprising;

rendering the first and second webpages;

capturing first and second images of the at least a portion of the first webpage and the at least a portion of the second webpage, respectively; and

texturing the first image on the first object and the second image on the second object, the first object being displayed in a foreground of the 3D space and the second object being displayed in a background of the 3D space; and

displaying additional information, comprising:

receiving an interaction by the end user on the first image;

replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes the rendered first webpage;

receiving an interaction by the end user on a link provided in the rendered first webpage, the link corresponding to the additional information;

rendering the additional information; and

displaying the rendered additional information in said window within the 2D space.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**  25-1022, 25-1051, 25-1082

**Short Case Caption**  Apple Inc. v. SpaceTime3D, Inc.

**Filing Party/Entity**  Apple Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/17/2025

Signature:  /s/ Brian Rosenthal

Name:  Brian Rosenthal

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Apple Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Andrew B. Patrick<br>Fish & Richardson P.C. | Kenneth W. Darby Jr.<br>Fish & Richardson P.C. | Usman Khan<br>Fish & Richardson P.C. |
| W. Karl Renner<br>Fish & Richardson P.C. | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1022, 25-1051, 25-1082

**Short Case Caption** Apple Inc. v. SpaceTime3D, Inc.

**Filing Party/Entity** Google LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/17/2025

Signature: /s/ Erika H. Arner

Name: Erika H. Arner

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Google LLC | | XXVI Holdings Inc. |
| | | Alphabet Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Yinan Liu<br>Finnegan, Henderson, Farabow, Garrett & Dunner, LLP | Yanyi Liu<br>Finnegan, Henderson, Farabow, Garrett & Dunner, LLP | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................1

STATEMENT OF THE ISSUES............................................................................3

STATEMENT OF THE CASE................................................................................4

I.    The '048 Patent..........................................................................................5

      A.    Technological Background ...............................................................5

      B.    The Appealed Claims of the '048 Patent ........................................6

II.   Procedural History....................................................................................10

      A.    *Inter Partes* Review Proceedings.................................................10

      B.    The Board's Hearing and Final Written Decision ..........................13

      C.    Apple's Request for Director Review .............................................17

SUMMARY OF ARGUMENT .............................................................................18

STANDARDS OF REVIEW ................................................................................20

ARGUMENT ........................................................................................................22

I.    The Board's Improperly Narrow Construction of "the Rendered First
      Webpage," and Corresponding Determination of No Unpatentability as
      to Claims 1–13, Should Be Reversed .......................................................22

      A.    "Rendered" in "the Rendered First Webpage" Is an Adjective
            Describing the Webpage's Display Format ......................................23

      B.    The Board Incorrectly Construed "the Rendered First Webpage"
            to Include a Temporal Restriction Having No Support in the
            Intrinsic Record ..............................................................................27

      C.    Reversal Should Be Granted Because SpaceTime Does Not
            Dispute Unpatentability Under the Correct Construction...................35

II.   Even If This Court Affirms the Board's Construction, Vacateur and
      Remand Is Nevertheless Warranted, Given the Board's Additional
      Errors ........................................................................................................36

      A.    As to Ground 1, the Board Violated the APA by Refusing to
            Consider Apple's Arguments That Responded to SpaceTime's
            New Claim Construction Arguments ................................................36

B.    As to Ground 2, the Board's Determination of No Obviousness Should Be Vacated and Remanded ......................................................44

CONCLUSION ...............................................................................................50

# TABLE OF AUTHORITIES

## Cases

*ABS Glob., Inc. v. Cytonome/St, LLC,*
84 F.4th 1034 (Fed. Cir. 2023) .................................................................20

*Apple Inc. v. Corephotonics, Ltd.,*
81 F.4th 1353 (Fed. Cir. 2023) .................................................................20

*Apple Inc. v. Omni MedSci, Inc.,*
No. 2023-1034, 2024 WL 3084509 (Fed. Cir. June 21, 2024)...................*passim*

*Axonics, Inc. v. Medtronic, Inc.,*
75 F.4th 1374 (Fed. Cir. 2023) .................................................................*passim*

*Beckson Marine, Inc. v. NFM, Inc.,*
292 F.3d 718 (Fed. Cir. 2002) .................................................................3, 47

*C.R. Bard, Inc. v. Medline Indus., Inc.,*
No. 2020-1900, 2021 WL 3574043 (Fed. Cir. Aug. 13, 2021) ........................48

*CIAS, Inc. v. All. Gaming Corp.,*
504 F.3d 1356 (Fed. Cir. 2007) .................................................................29

*Corning v. Fast Felt Corp.,*
873 F.3d 896 (Fed. Cir. 2017) .................................................................34

*Google LLC v. EcoFactor, Inc.,*
92 F.4th 1049 (Fed. Cir. 2024) .................................................................20, 27

*Graham v. John Deere Co. of Kansas City,*
383 U.S. 1 (1966).................................................................22

*GUI Glob. Prods., Ltd. v. Samsung Elecs. Co.,*
No. 2022-2156, 2024 WL 1564694 (Fed. Cir. Apr. 11, 2024)................3, 22, 48

*Haag-Streit AG v. Eidolon Optical, LLC,*
840 F. App'x 561 (Fed. Cir. 2021) .................................................................48

*Hill-Rom Servs., Inc. v. Stryker Corp.,*
755 F.3d 1367 (Fed. Cir. 2014) .................................................................34

*HTC Corp. v. Cellular Commc'ns Equip., LLC,*
877 F.3d 1361 (Fed. Cir. 2017) .................................................................20, 27

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
381 F.3d 1111 (Fed. Cir. 2004) .................................................................32

*Intel Corp. v. PACT XPP Schweiz AG*,
No. 2022-1139, 2023 WL 2198653 (Fed. Cir. Feb. 24, 2023) ..........................35

*IXI IP, LLC v. Samsung Elecs. Co.*,
903 F.3d 1257 (Fed. Cir. 2018) ...................................................................48

*Koninklijke Philips N.V. v. Google LLC*,
948 F.3d 1330 (Fed. Cir. 2020) ...............................................................3, 48

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)..............................................................................22, 48

*McCarty v. Lehigh Val R Co*,
160 U.S. 110 (1895)...................................................................................32

*In re Nuvasive, Inc.*,
841 F.3d 966 (Fed. Cir. 2016) ....................................................................21

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) .............................................................40, 42

*Polaris Innovations Ltd. v. Brent*,
48 F.4th 1365 (Fed. Cir. 2022) ...................................................................33

*Pulse Elecs., Inc. v. U.D. Elec. Corp.*,
860 F. App'x 735 (Fed. Cir. 2021) ..............................................................33

*Randall Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013) ..................................................................22

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
653 F.3d 1296 (Fed. Cir. 2011) ..................................................................32

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
8 F.4th 1285 (Fed. Cir. 2021) .....................................................................20

*Univ. of Strathclyde v. Clear-By Lighting LLC*,
17 F.4th 155 (Fed. Cir. 2021) .....................................................................48

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ....................................................................30

*Yita LLC v. MacNeil IP LLC*,
69 F.4th 1356 (Fed. Cir. 2023) ...................................................................21

## Statutes

5 U.S.C. § 554(b)(3)..................................................................................21

5 U.S.C. § 554(c)(1)..................................................................................21

35 U.S.C. § 103 .......................................................................................22

**STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5(a), counsel for Apple Inc. and Google LLC state that the following case will directly affect or be directly affected by this Court's decision in the pending case: *SpaceTime3D, Inc. v. Apple Inc.*, No. 1:23-cv-00553-ADA (W.D. Tex.) and SpaceTime3D, Inc. Reexamination Control No. 90/019,352 (P.T.O.).

**STATEMENT OF JURISDICTION**

This appeal arises from Final Written Decisions of the Patent Trial and Appeal Board in IPR2023-00242 and IPR2023-00577. Appx1–84. The Board had jurisdiction under 35 U.S.C. § 6. The Board issued its Final Written Decisions on June 13, 2024 (Appx1–84), and Apple Inc. and Google LLC (collectively "Appellants") timely appealed (Appx4903–5080). *See* 35 U.S.C. § 142; 37 C.F.R. § 90.3. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

# INTRODUCTION

This appeal focuses on the single limitation of claims 1–13 of U.S. Patent No. 8,881,048 that the Patent Trial and Appeal Board held was not disclosed in the asserted prior art: "the rendered first webpage." The Board's judgment should be reversed or vacated and remanded on three separate grounds.

*First*, the plain language of the claim and specification of the '048 patent confirm that the word "rendered" in the claim limitation "the rendered first webpage" is used as an adjective that merely describes the webpage's display format; that is, it requires the webpage to be in a *rendered* format as opposed to an *unrendered* format. If the webpage is rendered, the webpage's corresponding Hypertext Markup Language (HTML) code that defines the visual elements of the webpage has been processed or converted into visible content. If the webpage is unrendered, however, only the raw, unprocessed HTML code will be displayed.

The Board, however, incorporated an additional temporal limitation in to the term "the rendered first webpage," as SpaceTime proposed. Specifically, the Board held "the rendered first webpage" means "the 'old version' of the first webpage rendered, captured, and textured in other steps." Appx22–23. In other words, the Board held that the claim limitation requires (1) a previously rendered or "old" rendered version of the webpage and (2) that is specifically the result of earlier-

1

recited steps in the claims. Nothing in the claim language or specification supports this understanding of the plain claim language.

The Board's determination of no unpatentability hinged on this incorrect construction. SpaceTime presented no other argument as to why the claims were not unpatentable, and its only basis to dispute unpatentability of claims 1–13 was its incorrectly narrow construction that the Board adopted. Thus, under the correct interpretation of the claims, there is no dispute that the claims are unpatentable and the Board's judgment of no unpatentability should be reversed.

*Second*, even if the Board's construction of "the rendered first webpage" is affirmed, the Board violated the APA with respect to Ground 1 by refusing to consider Apple's arguments and evidence that explained why Ground 1 nevertheless disclosed "the rendered first webpage" even under SpaceTime's new claim construction. SpaceTime implicitly raised its incorrect claim construction for the first time post-institution, in SpaceTime's Patent Owner Response, and then clarified that construction in its Patent Owner Sur-Reply. The Board's conclusion that Apple forfeited its responsive arguments set forth in its Reply contravenes this Court's clear directive that a petitioner should be given the opportunity to respond to new claim construction and other arguments raised for the first time in a Patent Owner Response, and therefore was an abuse of direction. *Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374, 1384 (Fed. Cir. 2023); *see also Apple Inc. v. Omni MedSci, Inc.*, No.

2

2023-1034, 2024 WL 3084509, at *5 (Fed. Cir. June 21, 2024). Thus, this Court should vacate and remand for the Board to consider the arguments and evidence it ignored as forfeited in its analysis as to Ground 1.

*Third*, the Board applied an incorrect legal standard for obviousness, requiring *express* disclosure of the "the rendered first webpage" limitation for Ground 2 and ignoring the relevant knowledge of the skilled artisan. This Court has repeatedly held that a skilled artisan's knowledge must be considered when analyzing the similarities between the prior art and the claimed invention. *See, e.g.*, *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337 (Fed. Cir. 2020). This Court also has made clear that obviousness does not require an "express" disclosure in the prior art. *See, e.g.*, *Beckson Marine, Inc. v. NFM, Inc.*, 292 F.3d 718, 727 (Fed. Cir. 2002); *see also GUI Glob. Prods., Ltd. v. Samsung Elecs. Co.*, No. 2022-2156, 2024 WL 1564694, at *3 (Fed. Cir. Apr. 11, 2024). The Board therefore erred by ignoring this authority. Thus, this Court should vacate and remand for the Board to assess the evidence under the correct legal standard for obviousness as to Ground 2.

## STATEMENT OF THE ISSUES

**I.** Whether the Board's Final Written Decision holding that claims 1–13 of the '048 patent were not shown to be unpatentable should be reversed because the Board's conclusion was based on its incorrect construction of "the rendered first webpage" as incorrectly importing a temporal restriction untethered to the claims or

specification to narrowly limit it to "the rendered version [of the webpage] from which the corresponding image was captured," where the rendered version of the webpage is an "'*old version*' of the first webpage" or "the *previously* rendered first webpage."

**II.** Even if this Court affirms the Board's construction of "the rendered first webpage," whether the Court should nevertheless vacate and remand the Board's decision of no unpatentability concerning claims 1–13 on the basis that:

**A.** As to Ground 1—it violated the APA by contravening binding precedent in *Axonics* to ignore as forfeited Apple's Reply arguments and evidence that responded to SpaceTime's claim construction arguments regarding "the rendered first webpage" raised for the first time in SpaceTime's Patent Owner Response.

**B.** As to Ground 2—to prove obviousness, the Board applied the wrong legal standard to require that the asserted prior art references *expressly* disclose "the rendered first webpage" claim limitation, while ignoring the relevant knowledge of the skilled artisan.

## STATEMENT OF THE CASE

Apple filed a petition for *inter partes* review of SpaceTime's '048 patent, challenging all the patent's 18 claims on obviousness grounds. Appx141–252. Soon after, Google filed a substantively identical petition with a motion for joinder.

Appx2162–2275; Appx2289–2302. After instituting review and granting joinder (Appx3270–3326; Appx3345–3353), the Board held that claims 14–18, but not claims 1–13, would have been obvious. Appx1–84. The Board's decision with respect to claims 1–13 hinged on its determination that the prior art did not disclose a single limitation: "the rendered first webpage." SpaceTime's only argument that this limitation was not disclosed in the prior art was based on an implicit claim construction first advanced after institution and then further clarified in its Sur-Reply. That construction imported a temporal requirement into the claims, such that according to SpaceTime, "the rendered first webpage" means "the rendered version [of the webpage] from which the corresponding image was captured," where the rendered version of the webpage is an "'*old version*' of the first webpage" or "the *previously* rendered first webpage." Appx22; Appx73. The Board adopted this construction, Appx22–23, Appx45, Appx75, and held that the asserted prior art did not disclose "the rendered first webpage" under that interpretation. Appx47; Appx76–77. Apple Inc. and Google LLC (collectively, "Appellants") now appeal.

## I. The '048 Patent

### A. Technological Background

A graphical user interface ("GUI") allows a user to interact with visual elements (*e.g.*, icons and menus) on an electronic device (*e.g.*, a computer). Appx89

(Abstract). Relevant to the '048 patent here, a GUI may allow a user to interact with a webpage. *Id.*; *see also infra* I.B.

A user typically accesses a webpage on the Internet by entering a "Uniform Resource Locator" ("URL"), or address, for that webpage in a computer program called a web browser (*e.g.*, Internet Explorer). *See, e.g.*, Appx1040–41; Appx1047. Upon entry of that webpage's address in the web browser, an Internet server sends the web browser instructions that define the display format of the webpage, such as the structure and content on the webpage. Appx1040–41; Appx1048; Appx1049. Those instructions, or code, are written in Hypertext Markup Language (HTML). Appx1048. To display the visual elements of the webpage as defined by the "raw HTML code," that code must undergo a process called "rendering," which "convert[s]" the code "into visible content." Appx715 ¶ 104 ("the POSITA would have known that webpage rendering was a ubiquitous process for converting raw HTML code received from a web server into visible content."); Appx1047–51; *see also* Appx131 (22:61–66); Appx132 (23:2–6); Appx124 (8:1–5). If the raw HTML code is left *unrendered*, only those instructions—and not the visual elements of the webpage—will be shown. Appx1047–51; Appx715 ¶ 104.

B. **The Appealed Claims of the '048 Patent**

The '048 patent generally relates to a GUI that "uses the *two-dimensional display* of an end user's computer to display information," such as webpages, in a

"simulated real-time *3-D* immersive Cartesian space." Appx124 (7:59–63) (emphases added). For example, as shown in Figure 10 below, the GUI "creates the appearance of a 3-D space within a 2-D window" by mapping images of webpages onto 3D objects in the simulated 3D space. Appx124 (7:65–66); Appx104.



FIG. 10

Appealed claims 1–13 recite such a 3D GUI. *E.g.*, Appx139 (38:8–14). Independent claim 1, for example, recites:

> A method for providing a three-dimensional (3D) graphical user interface, comprising:
>
> receiving at least first and second inputs from an end user;
>
> receiving first and second webpages from at least one server in response to said first and second inputs, wherein the first and second inputs are website addresses corresponding to said first and second webpages, respectively;

displaying at least a portion of the first webpage on a first object within a 3D space, and at least a portion of the second webpage on a second object within the 3D space, comprising;

rendering the first and second webpages;

capturing first and second images of the at least a portion of the first webpage and the at least a portion of the second webpage, respectively; and

texturing the first image on the first object and the second image on the second object, the first object being displayed in a foreground of the 3D space and the second object being displayed in a background of the 3D space; and

displaying additional information, comprising:

receiving an interaction by the end user on the first image;

replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes ***the rendered first webpage***;

receiving an interaction by the end user on a link provided in the rendered first webpage, the link corresponding to the additional information;

rendering the additional information; and

displaying the rendered additional information in said window within the 2D space.

Appx139 (37:48–38:16) (emphasis added).

The first set of claim requirements focuses on depicting a "first webpage" and a "second webpage" in a "3D space." Appx131 (37:49–67). This is achieved by displaying "at least a portion of" the first and second webpages on "first and second

8

objects," respectively, in the 3D space, which requires: (a) "rendering" the webpages, (b) "capturing" images of at least a portion of each webpage, and (c) "texturing" those images onto the objects.

The second set of claim requirements pertains to what is displayed in a window in a 2D space as a result of a user's interaction. Appx131 (21:39–45). In response to receiving that user "interaction," the window in the 2D space replaces both the first and second objects (with the images of the first and second webpages textured onto the objects) in the 3D space. Of relevance to this appeal, each appealed claim requires that this window "includes *the rendered first webpage*."

Notably, the term "the rendered first webpage" was added to the claims during prosecution after three examiner rejections. Appx307–14. But the terms "rendered," "first webpage," and "the rendered first webpage," or any combination thereof, do not appear anywhere in the specification. Instead, the specification at most describes the process of "rendering" a webpage as processing "the language of [a] webpage (HTML)" (*e.g.*, code) so that the webpage can "be displayed and function properly" "in the operating system in a typical window on the 2-D desktop of an end user's computer." Appx131 (22:61–66); Appx132 (23:2–6); Appx124 (8:1–5); *see also* Appx127 (13:55–59). If left unrendered, the webpage will not "be displayed and function properly" and will instead be displayed in its raw HTML format. Appx131 (22:61–66); Appx715 ¶ 104. The specification does not describe or differentiate

between different versions of a webpage, such as an "old" or "previous" version as opposed to a "current" or "live" version. *See generally* Appx89–140.

## II. Procedural History

### A. *Inter Partes* Review Proceedings

#### 1. Apple's Petition and the Board's Institution Decision

On November 22, 2022, Apple filed a petition for *inter partes* review of the '048 patent on the basis that claims 1–18 are unpatentable as obvious on two independent grounds (Ground I: Robertson, Gralla, and Gettman; Ground II: Sauve and Tsuda). Appx160. On June 16, 2023, after SpaceTime and Apple each filed subsequent briefs, the Board instituted IPR proceedings as to all claims on both grounds. Appx3270–3326. Notably, in its pre-institution briefing, SpaceTime did not contend that "the rendered first webpage" limitation of claims 1–13 required construction. Appx2311–2379. Nor did SpaceTime (or Apple) raise any dispute about the term's plain meaning. *Id.*; *see also* Appx141–252. The Board's institution decision therefore also did not discuss any construction of the term. Appx3270–3326.

#### 2. SpaceTime's Construction of "the Rendered First Webpage" Raised for the First Time in Its Patent Owner Response

In its Patent Owner Response filed after institution of IPR proceedings, SpaceTime contended that the asserted grounds for unpatentability did not disclose "the rendered first webpage." Appx3414–3415. SpaceTime's sole basis for this

10

assertion, however, was a new argument based on a claim construction that it had not previously raised before institution.  *Id.*  In particular, SpaceTime argued that "the rendered first webpage" must mean "the version that was previously received and rendered (*e.g.*, stored in memory) from which the first image was captured.  It is not a 'live' webpage from the Internet that is 'retrieve[d], render[ed], and display[ed].'"  *Id.* (quoting Appx686–87).  In other words, SpaceTime contended, the claimed "the rendered first webpage" must be "the [previously] rendered first webpage."  Appx3413.  SpaceTime did not advance any other argument as to why the prior art did not disclose this limitation.  *See generally* Appx3413–3417.

### 3.    Apple Reply That Responds to SpaceTime's New Claim Construction Arguments

Apple then filed a Reply that responded to SpaceTime's new claim construction arguments with respect to "the rendered first webpage."  Appx3778–3815.

Apple argued that SpaceTime's "implicit[]" construction that "distinguish[es] between an 'older version' and a 'current version' of the webpage"—"diverges from the plain meaning of the Challenged Claims" and "improperly import[s] extraneous limitations without intrinsic support."  Appx3786; Appx3791.  Apple explained, for example, that "claim [1] does not say, for example, 'the rendered ***old version*** of the first webpage.'"  Appx3791.  Apple further explained that, contrary to SpaceTime's emphasis on "the antecedent basis of '***the*** rendered first webpage,'" these

11

"antecedent recitations simply say, 'receiving first and second webpages,' 'displaying at least a portion of the first webpage,' and 'rendering the first and second webpages.'" Appx3791–3792. Apple pointed out that "[n]one of these recitations require different 'versions'; just 'the first webpage.'" Appx3792. Apple stated that "[t]he claims require that the 'first webpage' of the 'replacing' step is the same 'first webpage' from the earlier recited 'receiving,' 'rendering,' and 'displaying' steps. Nothing more." Appx3792. Apple likewise contended that "the notion of different webpage 'versions'" is not only absent from the claims, "but it is also absent from the specification." *Id.*

In addition, Apple submitted supporting expert testimony and argued that "[e]ven if the Board adopted Patent Owner's construction (which it should not), doing so would not save the '048 patent." Appx3804 (citing Appx4113–15 ¶¶ 78–80). As to Ground 1, Apple explained that "the version of the webpage displayed to the user in the Robertson-Gettman browser would be the same version previously used to generate the corresponding object thumbnail in the 3D space, just as Patent Owner's flawed construction requires." Appx3804. As to Ground 2, Apple explained that a "POSITA would have understood that the content displayed upon selection of an object thumbnail is the same version of the webpage that was originally loaded and used to create the thumbnail." Appx3808.

### 4. SpaceTime Further Clarifies Its New Construction in Its Sur-Reply

In response to Apple's Reply, SpaceTime filed a Sur-Reply in which SpaceTime clarified its new construction of "the rendered first webpage." Appx4177. SpaceTime argued that "the rendered first webpage," as recited in claim 1, is "not referring to the webpage generally, but *the rendered version from which the corresponding image was captured*." Appx4177. As discussed below, SpaceTime's clarified articulation of its POR construction is what the Board adopted in its Final Written Decision. Appx20–23; Appx45; Appx75.

### B. The Board's Hearing and Final Written Decision

On March 18, 2024, the Board held a hearing regarding the Petition. At the hearing, the Board expressed concern that Apple had responded to SpaceTime's newly introduced claim construction. Appx4469 (30:14–19) ("I am a little bit concerned. We see this with Petitioners. When you come in your petition and say almost nothing about claim construction and then cry foul when Patent Owner raises a claim construction that you deem too late, and I'm concerned that that's what's happening now."); *see also* Appx4466 (27:13–15). On June 13, 2024, the Board issued its Final Written Decision, holding that claims 14–18 are unpatentable as obvious but concluding that claims 1–13 had not been shown to be unpatentable. Appx1–84. As to claims 1–13, the *only* claim element that the Board found not disclosed was "the rendered first webpage." Appx34–48; Appx72–77. As discussed

below, the Board's decision turned on its construction of "the rendered first webpage." Appx47; Appx76–77.

### 1. The Board Adopts SpaceTime's Sur-Reply Construction of "the Rendered First Webpage"

Although it stated that it was relying on the claims' "plain language," the Board adopted SpaceTime's Sur-Reply construction of "the rendered first webpage" as "***the rendered version [of the webpage] from which the corresponding image was captured***." Appx23. The Board provided three primary reasons for its interpretation. Appx20–23.

*First*, the Board assumed that "rendered" refers to a "version" of the "first webpage," stating that "claim 1 refers to replacing the first and second objects with 'the rendered first webpage,' which implies that the objects are not replaced *with just any version* of the first webpage." Appx20 (emphasis added). Based on this assumption, the Board concluded that because "rendered" "is in the past tense," it "suggest[s]" a version of the webpage "that *previously* has been rendered." Appx20–21 (emphasis added). The Board further concluded that the particular version of the "first webpage" that "previously has been rendered" is a specific rendered version that results from a step recited earlier in the claims. Appx21. The Board stated, "the 'rendered first webpage' is the 'old version' of the first webpage rendered, captured, and textured in other steps of claim 1, and not the new 'live' version." Appx22.

14

*Second*, the Board concluded that "if 'the rendered first webpage' were simply a reference to the first webpage generally, 'rendered' would be superfluous, as 'the first webpage' would identify that webpage generally." Appx22.

*Third*, the Board relied on a statement in the specification concerning one embodiment where "objects within the 3D space are replaced with 'the 2D version of the webpage that was initially hidden or drawn off screen.'" Appx22 (quoting Appx131 (21:39–49)). The Board held that this "2D version of the webpage that was initially hidden or drawn off screen" was "the 'old' version" of the webpage and "not the 'current' or 'live' version." Appx22; Appx131 (21:39–49). The Board further held that this passage of the specification "introduce[s] the notion of different webpage versions" and, accordingly, rejected Apple's argument that such a notion "is 'absent from the specification.'" Appx22–23 (quoting Appx3792). But the Board did not identify any disclosure in the specification that actually distinguished between an "old" version and a "live" version of the webpage in a 2D space. *See* Appx22–23.

Finally, the Board did not address the testimony of Apple's expert, Dr. Fuchs, that "the rendered first webpage" is simply a reference to "receiving first and second webpages," "displaying at least a portion of the first webpage," and "rendering the first and second webpages," and that "[n]one of these recitations require different 'versions' of the first webpage." Appx4108–4112 ¶¶ 70–76. The Board also did not

15

address prior testimony from Dr. Fuchs that the plain and ordinary meaning of the term "rendered" did not include a temporal element, and instead referred to "a ubiquitous process for converting raw HTML code received from a web server into visible content."  Appx734 ¶ 129.

### 2. The Board's Determination of No Unpatentability as to Claims 1–13

Based on its construction of "the rendered first webpage," the Board held that neither of Apple's two grounds disclosed the claim limitation and thus Apple had not met its burden of establishing that claims 1–13 are unpatentable.  Appx47; Appx76–77.

**a.**  As to Ground 1, the Board held that Apple's "argument was not presented in the Petition and relies on new evidence . . . that was not included in the Petition."  Appx46.  In particular, the Board held that the petition "did not argue that the browsers of Robertson and Gettman would, instead, present previously rendered and cached webpages in lieu of rendering those webpages."  Appx47.  The Board further stated that "Petitioner's Reply argument is an attempt to present a new prima facie case of obviousness, i.e., that a skilled artisan would have known that web browsers such as those in Robertson and Gettman could present cached webpages and that it would have been obvious to do so when such pages are 'fresh' and not 'stale.'"  *Id*.  The Board concluded that "Petitioner's new argument and new testimony is improper, has been forfeited, and will not be considered."  *Id*.  The

16

Board did not address *Axonics* in the Final Written Decision.  75 F.4th at 1384.  And the Final Written Decision issued before this Court's decision in *Omni Medsci*.  2024 WL 3084509, at *5.

**b.**     As to Ground 2, the Board held that Apple did not show the Sauve-Tsuda combination rendered the claims obvious because the combination did not "clearly specif[y]" or "expressly" disclose "the rendered first webpage."  Appx74–76.  The Board further stated that it "analyzed the parties' citations to Sauve, and none *clearly specifies* whether selecting a thumbnail causes a webpage to be rendered anew or whether a previously rendered version of the webpage is displayed."  Appx74 (emphasis added).  The Board, however, identified no legal authority in support of its requirement that, for obviousness, a prior art reference (or combination of prior art references) must *expressly* disclose a claim limitation.

**C.     Apple's Request for Director Review**

On July 15, 2024, Apple filed a Request for Director Review, contending that the Board (1) incorrectly construed the claim element "rendered first webpage"; (2) as to Ground 1, violated the APA by failing to consider Apple's Reply arguments and evidence that addressed SpaceTime's new construction of "the rendered first webpage" raised for the first time in its Patent Owner Response; and (3) as to Ground 2, applied an incorrect legal standard for obviousness requiring *express* disclosure of a claim element.  Appx4879–4897.  Apple's Request for Director Review was

17

denied without reasoning on August 6, 2024. Appx4900–4902.

## SUMMARY OF ARGUMENT

The Board held that Apple failed to meet its burden as to only a single limitation of claims 1–13 of the '048 Patent: "the rendered first webpage." The Board's judgment suffers from three particular errors.

**I.** The Board erred in adopting SpaceTime's sole basis to dispute whether the prior art rendered the claims unpatentable, a narrow and unsupported construction of "the rendered first webpage." The plain language of the claims and the specification confirm that "rendered" in "the rendered first webpage" simply requires that the webpage be in a rendered format as opposed to its unrendered format. When a webpage is rendered, its corresponding HTML code that defines the webpage's visual elements is processed and converted into visible content. Consistent with this understanding, the specification explains that this rendering process must occur so the webpage can "be displayed and function properly" according to the instructions in that HTML code. Appx131 (22:61–66); Appx124 (8:1–5); Appx127 (13:55–59); Appx132 (23:2–6). If the webpage is left unrendered, however, only its unprocessed, raw HTML code is shown.

The Board erred by adopting SpaceTime's narrow construction of "the rendered first webpage" to import a temporal limitation: that "the rendered first webpage" requires (1) a "previously rendered" or "old version" of the webpage that

18

is (2) the specific result of earlier-recited steps of the claims. There is no support in the claims or specification for this interpretation. Because SpaceTime's only dispute to unpatentability was based on this erroneous construction, there is no dispute that under the correct interpretation of the claims that the claims are unpatenable. Thus, this Court should reverse both the Board's construction and the Board's judgment of no unpatentability.

**II.** Even if the Board's construction of "the rendered first webpage" is upheld, vacatur and remand is nevertheless warranted for two separate and additional reasons.

*First*, with respect to Ground 1, the Board violated the APA and abused its discretion in rejecting as forfeited Apple's Reply arguments and evidence that responded to SpaceTime's "the rendered first webpage" construction that appeared for the first time in its Patent Owner Response. This Court's *Axonics* decision, which the Board did not even address, requires that the Board consider a petitioner's arguments that address arguments raised by a patent owner for the first time in its post-institution patent owner response. 75 F.4th at 1384. Accordingly, this Court should remand to the Board to consider this evidence that it ignored in its assessment of the Ground 1 challenge.

*Second*, as to Ground 2, the Board applied the wrong legal standard for obviousness by requiring *express* disclosure of the "rendered web first webpage"

limitation. In so doing, the Board disregarded clear and unrefuted testimony about how a skilled artisan would have understood the prior art in relation to this limitation. Thus, the Court should remand to the Board to analyze the Ground 2 challenge and corresponding evidence under the correct legal standard for obviousness.

## STANDARDS OF REVIEW

Where, as here, the Board relies solely on intrinsic evidence to construe the claims, the Board's determinations are afforded no deference, and this Court decides the proper claim construction *de novo*. *Apple Inc. v. Corephotonics, Ltd.*, 81 F.4th 1353, 1357–58 (Fed. Cir. 2023); *see also ABS Glob., Inc. v. Cytonome/St, LLC*, 84 F.4th 1034, 1040 (Fed. Cir. 2023); *see also Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021) (stating that "supporting determinations" based on intrinsic evidence are subject to *de novo* review).

In addition, a statement from the Board that it was not engaging in claim construction is not dispositive as to whether claim construction occurred. *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1367 (Fed. Cir. 2017). For example, in *HTC*, this Court held that "[d]espite no express construction of [a claim term] below, [the] Board['s] findings establish[ed] the scope of the patented subject matter." *HTC Corp.*, 877 F.3d at 1367. Those "findings," the Court concluded, amounted to claim construction. *Id.*; *see also Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1056 (Fed. Cir. 2024).

20

Furthermore, the APA imposes important limits on the Board's authority during *inter partes* reviews.  Under the APA, "[p]ersons entitled to notice of an agency hearing shall be timely informed of . . . the matters of fact and law asserted," 5 U.S.C. § 554(b)(3), and the Board "shall give all interested parties opportunity for . . . the submission and consideration of facts [and] arguments," *id.* § 554(c)(1).  For example, as this Court has explained, "before the Board decides a case under a construction adopted after the institution decision, it must give a petitioner an opportunity to respond to the new construction." *Axonics*, 75 F.4th at 1381.  In other words, "the petitioner must be afforded a reasonable opportunity in reply to present argument and evidence under that new construction." *Id.* at 1383; *see also Omni MedSci*, 2024 WL 3084509, at *6 (vacating and remanding when "the Board adopted a different claim construction in its Final Written Decision without giving the petitioner an opportunity to present argument under that construction").  The requirement that an argument must be advanced by a party stems from the statutory mandate that the petition govern the IPR proceeding, so "whether a ground the Board relied on [i]s 'new' . . . is a question of law, subject to *de novo* review." *In re Nuvasive, Inc.*, 841 F.3d 966, 970 (Fed. Cir. 2016).  The requirement that a party be given adequate opportunity to respond is grounded in the Board's regulations, compliance with which the Court reviews for abuse of discretion. *See Yita LLC v. MacNeil IP LLC*, 69 F.4th 1356, 1365–66 (Fed. Cir. 2023).

Finally, a claimed invention is unpatentable if the differences between the claimed invention and the prior art are such that the claimed invention would have been obvious to one of ordinary skill in the relevant art. 35 U.S.C. § 103. Whether a claimed invention would have been obvious is a question of law, based on factual determinations regarding the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and any objective indicia of non-obviousness. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 399–401 (2007) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966)); *see also GUI*, 2024 WL 1564694, at *3 (noting obviousness is "not limited to the express disclosures of the prior art but instead involves what 'a person of ordinary creativity, not an automaton,' would understand from the prior art" (quoting *KSR*, 550 U.S. at 421)).

On appeal, the Board's compliance with the governing legal standard regarding obviousness is reviewed *de novo* and its underlying factual determinations are reviewed for substantial evidence. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013).

## ARGUMENT

**I.  The Board's Improperly Narrow Construction of "the Rendered First Webpage," and Corresponding Determination of No Unpatentability as to Claims 1–13, Should Be Reversed**

At their core, claims 1–13 recite displaying a first webpage in a 3D space and

then displaying the first webpage in 2D space. The disputed claim term—"the rendered first webpage"—is recited in the second half of independent claims 1 and 8 and pertains to displaying the "first webpage" in a 2D space. *See supra* Statement of the Case - section I.B. This term relates to what occurs in the 3D space because the webpage being displayed in both the 3D and 2D spaces is the "first webpage." But the claim language does not impose any additional relationship between the "first webpage" appearing in the 3D and 2D spaces. Indeed, the term "the rendered first webpage" recites only that the first webpage is "rendered" when shown in the 2D space. That claim language recites no temporal limitation and says nothing about restricting the first webpage to a specific rendered "version" of the first webpage. As explained below, "the rendered first webpage" recites only what must be displayed in the 2D space (the first webpage) and the format in which it must be displayed (in a rendered format).

### A. "Rendered" in "the Rendered First Webpage" Is an Adjective Describing the Webpage's Display Format

The plain language of the claims and specification confirm that "the rendered first webpage" in claims 1–13 refers to the first webpage in a rendered display format.

1. In the claim term "the rendered first webpage" there are two adjectives describing characteristics of the webpage—namely, *which* webpage must be displayed and the *format* in which that webpage must be displayed: (1) the webpage

must be the "first" webpage, as distinguished from the "second" webpage recited in the claims; and (2) the webpage must be "rendered" rather than, for instance, remaining unrendered. Thus, under the claims' plain language, this webpage must simply be the "first" webpage and it must be "rendered." The claims do not specify any other restrictions, including temporal limitations that would require the "first webpage" to specifically be (1) the "*previously* rendered version" of the webpage that (2) resulted from the earlier "rendering" step of the claims.

The word "rendered" in "the rendered first webpage" is merely an adjective that describes the display format of the webpage. The webpage may be displayed in its *unrendered* format, where its unprocessed, raw HTML code or instructions are shown. Appx1047–51. The webpage may also be displayed in a *rendered* format, where its raw HTML code has been processed and converted into visible content according to the HTML instructions. Appx124 (8:1–5); Appx715 ¶ 104; Appx734 ¶ 129; Appx1047–1051. Thus, the plain meaning of "rendered" in "the rendered first webpage" simply requires that "the first webpage" be in a "rendered" format.

2. The specification's disclosures are consistent with this plain meaning. For instance, the specification explains that "for a webpage on the World Wide Web" "to be displayed and function *properly*" (*i.e.*, not its raw, unprocessed HTML code) "in the operating system in a typical window on the 2-D desktop of an end user's

computer, the language of that webpage (HTML) must be read by an operating system program or CONTROL" (*i.e.*, converting the raw HTML code into visible content). Appx131 (22:61–66) (emphasis added). The specification further states that a "Web Browser control" may be used to perform this rendering process; namely, "rendering HTML webpages and other content on the Windows desktop within a window" by processing the "language of that webpage (HTML)." Appx131–132 (22:61–23:6); Appx124 (8:1–5) ("The program can utilize a ubiquitous interactive and immersive 3D rendering browser or player which will process 3D drawing instructions based on higher-level language code (the program) written in the drawing language native to the browser."); *see also* Appx127 (13:55–59). This disclosure is consistent with the testimony of Apple's expert that the Board ignored: that a skilled artisan reading the specification would have understood "rendered" in "the rendered first webpage" as referring to the display format of a webpage that results from "a ubiquitous process for converting raw HTML code received from a web server into visible content." Appx715 ¶¶ 104–105; Appx686–687 ¶ 65; Appx734 ¶ 129; Appx717–718 ¶ 108. Notably, the specification never uses the word "rendered" as a verb—or at all. Instead, the specification only uses the verb "rendering" when discussing this process. Appx131–132 (22:61–23:6); Appx124 (8:1–5). Accordingly, there is no specification support for the Board's

holding that the term "rendered" as used in the claims should be interpreted as a verb.

Furthermore, as with the claims, the specification does not require that "the rendered first webpage" must specifically be the "*previously* rendered version" of the webpage that resulted from the earlier "rendering" step of the claims. For instance, the specification describes an example of a rendering "technique called 'Bind to the HUD'" that "involves bringing a file, document, webpage, application, desktop or other output into view by drawing it on" a "HUD" or "heads-up display," which is a "way of projecting information directly into a human's visual field." Appx131 (21:24–30). In this disclosure, and as further explained below, the specification does not require a particular "previously rendered version" of the webpage or other information, much less the specific result of the "rendering" step recited earlier in the claims.

Thus, the plain language of the claims and the specification require only that the webpage be displayed in a "rendered" format, as opposed to its unrendered format. Nothing in the claim language, specification, or elsewhere in the intrinsic record further restricts this "rendered" characteristic of the webpage.

**B. The Board Incorrectly Construed "the Rendered First Webpage" to Include a Temporal Restriction Having No Support in the Intrinsic Record**

The Board erred in narrowly construing "the rendered first webpage" as "the rendered version from which the corresponding image was captured," where that rendered version is "the 'old version' of the first webpage rendered, captured, and textured in other steps."[1] Appx22–23. There is no basis in the claim language or the specification to support these additional restrictions. The Board made numerous errors in concluding otherwise.

1. At the core of the Board's assessment of the claim language was an incorrect and unsupported conflation of the word "rendered" with "version," rather than a description of the webpage's display format. In particular, the Board first assumed that because "claim 1 refers to replacing the first and second objects with 'the rendered first webpage,'" it "implies that the objects are not replaced with just *any version* of the first webpage." Appx20 (emphasis added). Then, based on this

---

[1] The Board purported to rely on the plain meaning of the claim language to reach its conclusion. Appx23. This Court has held, however, that a mere statement by the Board that it is "not engaging in claim construction is not dispositive as to whether claim construction occurred." *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1055–56 (Fed. Cir. 2024). Even if there is no "express construction" of a term, a finding by the Board that "establishe[s] the scope of the patented subject matter" "amount[s] to claim construction." *Id.* (quoting *HTC*, 877 F.3d at 1367). That is precisely the case here, where despite representing it was relying only on plain meaning, the Board narrowed the scope of the phrase "the rendered first webpage" by restricting it to being the "previously rendered" or "old version" of the webpage.

27

assumption, the Board tried to divine what "version" of the webpage is required by the claims. The Board concluded that because "rendered" is in the past tense, the claims "*suggest[]* a webpage that *previously* has been rendered." Appx20–21 (emphasis added). The Board then compounded its error by holding that this "previously" rendered version must specifically be the result of the "rendering" step recited earlier in the claims. Appx21.

The claim language does not support the Board's conflation of "rendered" with "version," which pervaded the Board's analysis at every turn. As discussed, the claim language (and specification) support that "rendered" is used as an adjective that merely refers to the display format of the webpage—that is, the webpage must be *rendered* (in a format that "can be displayed and function properly" with its raw HTML code converted into visible content) as opposed to remaining *unrendered* (where the webpage's raw, unprocessed HTML code is displayed). *Supra* Argument - section I.A. The Board rejected this understanding based on its conclusion that "rendered" would be "superfluous" if "'the rendered first webpage' were simply a reference to the first webpage generally," "as 'the first webpage' [also] would identify that webpage generally." Appx22. As explained above, however, the word "rendered" does not simply refer to the first webpage *generally*. *See supra* Argument - section I.A. Instead, the word refers to the webpage's display format (rendered vs. unrendered). Indeed, the Board recognized how "rendering is a

28

prerequisite step to obtaining 'screen snapshots of actual webpages'" to display. Appx21 (citing Appx715 ¶ 105).

Furthermore, there is no basis in the claim language or specification to narrowly limit "the rendered first webpage" as the specific result of the "rendering" step recited earlier in the claims. The earlier-recited step ("rendering the first and second webpages") relates to the process by which webpages are displayed in a 3D space. *E.g.*, Appx139 (37:57–61). That process is separate and distinct from how a webpage is displayed in a 2D space. Indeed, the claims require that a webpage in a 3D space is rendered, an image is captured of the webpage, and then that image is textured onto an object in the 3D space. Appx139 (37:57–38:3); *see also* Appx132 (23:44–56). In contrast, in the 2D space, a webpage is depicted by displaying a window with a rendered webpage. Appx139 (38:4–10). Thus, "the rendered first webpage" in the context of the 2D space does not narrowly relate to the "rendering" step recited in the context of the 3D space.

Instead, "rendered" in "the rendered first webpage" simply requires that the webpage be displayed in a rendered format, which means that it has been rendered at some point, whether it is the previously rendered version that resulted from the earlier "rendering" step of the claims or some other previously rendered version.

Of course, to be in its "rendered" format, the webpage must have been previously rendered at some point. But because the claims are "comprising" claims,

there is no restriction that prevents the webpage having been rendered outside the express steps of the claimed method; for example, rendering of a webpage could happen just before it is displayed in the 2D space. *CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1361 (Fed. Cir. 2007) (holding that "comprising claims" do not "exclude the possible presence of additional elements or steps").

Nevertheless, the Board assumed that "the rendered first webpage" must refer to the specific result of the earlier claim step of "rendering the first and second webpages." It does not. As discussed above, "the rendered first webpage" merely identifies *which* webpage to display ("the . . . first webpage") and *how* to display it (in "rendered" format). To reach a contrary conclusion, the Board resorted to misconstruing the testimony of Apple's expert, Dr. Fuchs. Appx21–22. Specifically, the Board stated, "according to Dr. Fuchs' testimony, the 'capturing' and 'texturing' steps of limitations 1cii and 1ciii do require the prerequisite step of rendering a particular version of the first webpage; thus, they require the version of the first webpage rendered in the 'rendering' step of limitation 1ci." *Id*. (citing Appx715–718 ¶¶ 104–105, 107–108).

Dr. Fuchs' statement does not support the Board's construction.[2] As discussed, the claims recite two sets of requirements. *Supra* Statement of the Case

---

[2] To the extent the Board considered this extrinsic evidence before analyzing the intrinsic evidence, which "resolve[s] any ambiguity" about the meaning of "the

- section I.B.  The first set of claim requirements focuses on depicting a "first webpage" and a "second webpage" in a *3D space*, and involve (a) "rendering" the webpages, (b) "capturing" images of at least a portion of each webpage, and (c) "texturing" those images onto the objects.  The second set of claim requirements concerns what is displayed in a window in a *2D space* as a result of a user's interaction; namely, "replacing" those objects in the 3D space with a window in the 2D space, where the window "includes the rendered first webpage."  Notably, "capturing" and "texturing" are recited nowhere in this second set of claim requirements that involve "replacing" the objects in the 3D space with a window in the 2D space.  Thus, although Dr. Fuchs correctly observed that "rendering" is a prerequisite to "capturing" and "texturing" for the purpose of "displaying" the webpage on objects within the *3D space* (the first set of claim requirements), that testimony does not support the Board's conclusion that "replacing" those objects with a window in the *2D space* (the second set of claim requirements) "require[s] the version of the first webpage rendered in the 'rendering' step of limitation 1ci." Appx22.  Thus, the Board erred in its assessment of the claim language and

---

rendered first webpage," that too was error.  *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term.  In such circumstances, it is improper to rely on extrinsic evidence.").

misplaced its reliance on Dr. Fuchs' testimony to import a temporal restriction into "the rendered first webpage."

**2**.     The Board's restriction of the claims to a single embodiment in the specification was error, and, in any event, the Board's reading of that single embodiment was flatly incorrect.

In particular, the Board relied on a disclosed example in which "clicking an icon or bottom . . . triggers a change to the viewpoint of the end user within the virtual space so that the webpage is directly in an end user's visual field." Appx22 (quoting Appx131 (21:39–44)). In this "one embodiment," the specification explains, "this is accomplished by *revealing the 2D version of the webpage that was initially hidden or drawn off screen and positioning it in a layer that is in front of the 3D virtual space* such that the end user can interact with this layer in 2D." Appx22 (quoting Appx131 (21:39–44)) (emphasis as added in the Board's Final Written Decision). The Board concluded that "[h]ere, objects within the 3D space are replaced with 'the 2D version of the webpage that was initially hidden or drawn off screen,'" and that "[t]his is the 'old' version, and not the 'current' or 'live' version of the webpage." Appx22.

As an initial matter, even if the Board were correct in understanding this embodiment to be referring to a "rendered first webpage" that is the "old" rendered version of the webpage, there is no basis in the claims or specification to limit the

claims to this single embodiment. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("[W]e know of no principle of law which would authorize us to read into a claim an element which is not present" (quoting *McCarty v. Lehigh Val R Co.*, 160 U.S. 110, 116 (1895))); *see also Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("There is a fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims. In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention." (internal citations omitted)). As explained above, the claims are agnostic as to *when* the rendering of "the rendered first webpage" occurs or has occurred. Indeed, the claims do not use the words "old," "live," "version," or "previous version." The claims instead employ broader language than what this exemplary embodiment more narrowly describes. *See Polaris Innovations Ltd. v. Brent*, 48 F.4th 1365, 1377 (Fed. Cir. 2022) (rejecting as improper attempt to limit scope of claims and "import[] limitation from an embodiment in the figures"); *see also Pulse Elecs., Inc. v. U.D. Elec. Corp.*, 860 F. App'x 735, 737 (Fed. Cir. 2021) ("Embodiments in the specification—even if there is only one embodiment—cannot limit the scope of the claims absent the patentee's

33

'words or expressions of manifest exclusion or restriction.'" (quoting *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014))).

In any event, the Board misunderstood this embodiment. This embodiment is focused on allowing an end user to interact with a webpage that has become "skew[ed]" in "3D virtual space" by placing a "2D version of the webpage" in front of the 3D virtual space. Appx131 (21:36–49). Specifically, the rendering step appears within process for displaying an object "within [a] 3D space," while "the first rendered webpage" appears in "a window within a two-dimensional (2D) space." Appx131 (37:49–38:17).

The Board, however, added into the specification the notion of "versions." But contrary to the Board's conclusion, the specification says nothing about "live" and "old" rendered versions of a webpage, much less a contrast between those versions. The Board failed to appreciate that the specification was not making a distinction between an old rendered vs. a live rendered version—but instead, a 2D version vs. a 3D version. Appx131 (21:36–49).

Thus, because the Board incorrectly inserted into "the rendered first webpage" a temporal restriction found nowhere in the plain language of the claims and specification, its construction of "the rendered first webpage" should be reversed.

## C. Reversal Should Be Granted Because SpaceTime Does Not Dispute Unpatentability Under the Correct Construction

Reversal of the Board's determination of no unpatentability with respect to claims 1–13 is warranted. The only element that the Board found not disclosed for either ground was "the rendered first webpage" under the construction that SpaceTime proposed and the Board adopted. Appx47–48; Appx76–77. Indeed, this narrow interpretation of the limitation was SpaceTime's only basis to dispute the disclosure of the "the rendered first webpage." *See, e.g.*, Appx4175–4182.

Thus, if this Court reverses the Board's construction of "rendered first webpage," reversal of the Board's finding of no unpatentability should be granted.[3] *See, e.g.*, *Corning v. Fast Felt Corp.*, 873 F.3d 896, 901 (Fed. Cir. 2017) ("In this case, it is not necessary or appropriate to remand for the Board to reassess the evidence in light of the correct claim construction. On the evidence and arguments presented to the Board, there is only one possible evidence-supported finding: the Board's rejection of Owens Corning's challenge, when the correct construction is employed, is not supported by substantial evidence."); *see also Intel Corp. v. PACT XPP Schweiz AG*, No. 2022-1139, 2023 WL 2198653, at *6 (Fed. Cir. Feb. 24, 2023) ("[W]e construe claims 7, 9, 13, and 27 to cover reducing clock frequency according

---

[3] At a minimum, remand is warranted. As explained, however, reversal is appropriate as SpaceTime did not dispute the patentability of the challenged claims under the correct construction.

to a hysteresis characteristic, even if that characteristic is the result of, in whole or in part, a predetermined choice. The parties agree that, under such a construction, these claims are obvious . . . so we reverse the Board's contrary conclusion.").

## II. Even If This Court Affirms the Board's Construction, Vacatur and Remand Is Nevertheless Warranted, Given the Board's Additional Errors

Beyond the Board's erroneous construction of "the rendered first webpage," the Board made the following additional errors: (1) as to Ground 1, the Board violated the APA by refusing to consider Apple's arguments and evidence that responded to SpaceTime's new claim construction arguments concerning the term; and (2) as to Ground 2, the Board applied the wrong legal standard for obviousness, and instead required *express* disclosure of the claim element in the prior art. Thus, even if this Court upholds the Board's "the rendered first webpage" construction, reversal (or at a minimum remand) is nevertheless warranted.

### A. As to Ground 1, the Board Violated the APA by Refusing to Consider Apple's Arguments That Responded to SpaceTime's New Claim Construction Arguments

#### 1. The Board Abused Its Discretion by Refusing to Consider Apple's Arguments That Responded to SpaceTime's New Claim Construction Arguments Raised for the First Time in Its Patent Owner Response

The Board's determination that Apple forfeited its arguments and evidence that responded to SpaceTime's claim construction arguments concerning "the rendered first webpage," which were first raised only in SpaceTime's Patent Owner

Response, runs afoul of this Court's precedent in *Axonics* and *Omni MedSci*, violates the APA and is an abuse of discretion. The Board's additional rejection of Apple's expert testimony as not credible was also error.

**a.** This Court's precedent could not be clearer: "where a patent owner in an IPR first proposes a claim construction in a patent owner response, a petitioner must be given the opportunity in its reply to argue and present evidence of anticipation or obviousness under the new construction, at least where it relies on the same embodiments for each invalidity ground as were relied on in the petition." *Axonics*, 75 F.4th at 1384; *see also Omni MedSci*, 2024 WL 3084509, at *5 ("[T]he PTAB was required to consider the petitioner's new argument and evidence on anticipation and obviousness raised in the reply, since the patent owner had advanced a new claim construction position in its patent owner response and the new patentability argument was responsive to the construction.").

Here, the Board erred by ignoring the Court's directive and expressly refusing to consider Apple's Reply arguments and evidence that responded to SpaceTime's claim construction arguments raised for the first time in its Patent Owner Response.[4] Before institution of the IPR proceedings, neither party contended that "the rendered first webpage" required construction. Indeed, during claim construction proceedings

---

[4] While *Omni MedSci* issued after the Board's Final Written Decision, *Axonics* pre-dated the Board's Final Written Decision by ten months but the Board never addressed *Axonics*.

37

in the district court litigation—which also occurred before the IPR proceedings were instituted—the parties never disputed the meaning of the term or proposed a construction for it. Appx4885.

It was only in SpaceTime's Patent Owner Response that SpaceTime first *suggested* that the term be narrowly interpreted to require a *previously* rendered version of the first webpage. Appx3375. Although SpaceTime stated that claim terms other than those construed in the district court "should be given their plain and ordinary meaning," it then argued that the prior art did not render the claims unpatentable on the basis that "the rendered first webpage" is "the version that was previously received and rendered (*e.g.*, stored in memory) from which the first image was captured [and that i]t is not a 'live' webpage from the Internet that is 'retrieve[d], render[ed], and display[ed].'" Appx3380; Appx3414–3415.

Given SpaceTime's assertions and apparent construction of "the rendered first webpage," Apple submitted a Reply with argument and evidence explaining why such a construction is wrong. Apple explained that "[t]he claim does not say, for example, 'the rendered *old version* of the first webpage.'" Appx3791. Apple further argued that "the notion of different webpage 'versions'" is not only absent from the claims, "but it is also absent from the specification." Appx3792. Instead, Apple explained, "the rendered first webpage" simply requires that the webpage be the first webpage from the earlier claim steps. *Supra* Statement of the Case - section II.A.3.

It does not require that the webpage be the previously rendered version of that first webpage. Appx3791–3793; *see supra* Statement of the Case - section II.A.3. In addition, Apple submitted supporting expert testimony and argued that "[e]ven if the Board adopted Patent Owner's construction (which it should not), doing so would not save the '048 patent." Appx3804; *see supra* Statement of the Case - section II.A.3.

As to Ground 1, Apple explained that "the version of the webpage displayed to the user in the Robertson-Gettman browser would be the same version previously used to generate the corresponding object thumbnail in the 3D space, just as Patent Owner's flawed construction requires." Appx3804. As to Ground 2, Apple explained that with respect to Sauve, "[t]he POSITA would have understood that the content displayed upon selection of an object thumbnail is the same version of the webpage that was originally loaded and used to create the thumbnail." Appx3808.

Then, in response to Apple's Reply, SpaceTime filed a Sur-Reply that responded to Apple's Reply arguments and evidence. In this Sur-Reply, SpaceTime clarified its new construction for "the rendered first webpage." In particular, SpaceTime argued that "[t]he claims do not recite 'the first webpage' but 'the rendered first webpage'" and "[t]hus, the claims are not referring to the webpage generally, but *the rendered version from which the corresponding image was captured*." Appx4177. As to Ground 1, SpaceTime relied on this clarified

construction to argue that the Robertson-Gettman combination does not disclose this element because both Robertson and Gettman require re-rendering the webpage from newly received or stored HTML code.  Appx4179–4182.

The Board abused its discretion by concluding that Apple's Reply arguments and evidence were forfeited, while adopting SpaceTime's construction of "the rendered first webpage" as espoused in its Patent Owner Response and clarified in its Sur-Reply.  As discussed above, the Board first construed "'the rendered first webpage' as recited in claim 1, as 'not referring to the webpage generally, but ***the rendered version from which the corresponding image was captured*.'"  Appx23. Then, as to Ground 1, the Board held that Apple's Reply arguments were forfeited because "[t]he Petition did not argue that the browsers of Robertson and Gettman would, instead, present *previously* rendered and cached webpages in lieu of rendering those webpages."  Appx47 (emphasis added); *see also* Appx4469 (30:14–19).  However, the question of whether Ground 1 disclosed "the rendered first webpage" under the interpretation that the claim element requires a "*previously* rendered" webpage was not raised until SpaceTime's Patent Owner Response and with further clarification in its Sur-Reply.  This is contrary to this Court's directive that a petitioner, like Apple, be given the opportunity to respond to new claim constructions or other arguments raised for the first time in a Patent Owner Response.  *Axonics*, 75 F.4th at 1384; *Omni MedSci*, 2024 WL 3084509, at *5.

Indeed, the Board's error is further underscored by the fact that the construction the Board ultimately adopted was the clarified claim construction found in SpaceTime's Sur-Reply. Appx23. Despite allowing SpaceTime to advance these new arguments post-institution, the Board inexplicably, and contrary to this Court's precedent, concluded that Apple's responsive arguments were forfeited. Appx47. This Court therefore should remand to the Board to consider Apple's Reply arguments and evidence with respect to the construction of "the rendered first webpage."

**b.** Furthermore, Board's perfunctory assertion that Apple's expert's testimony was not credible cannot preclude vacatur. A Board's decision "must make the necessary findings and have an adequate 'evidentiary basis for its findings'" and "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *In re Nuvasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (vacating PTAB decision that failed to offer a reasoned basis for decision). Here, the Board discredited Dr. Fuchs' testimony based on an erroneous belief that an inconsistency existed between one sentence in Dr. Fuchs' declaration submitted with the Petition and one sentence in Dr. Fuchs' declaration submitted with Apple's Reply relating to the retrieval of a webpage. Appx45–46. From this flawed belief, the Board stated that "all of Dr. Fuchs' testimony on this point, in both declarations, is inconsistent, unreliable, not

41

credible, and entitled to little weight." Appx46. The Board's reasoning cannot stand.

No inconsistency exists between Dr. Fuchs' declarations. His Petition declaration explained that selecting a thumbnail in the web browser Internet Explorer caused it to "retrieve, render, and display the webpage represented by the thumbnail." Appx686–687 ¶ 65. Because SpaceTime had never previously proffered its narrow interpretation of "the rendered first webpage" in any proceeding, Dr. Fuchs' declaration applied the plain meaning of the claim language and did not provide additional detail on where Internet Explorer "retrieve[d]" the webpage from (*e.g.*, from memory/cache or from an origin server/Internet). After SpaceTime presented its belated construction that "the rendered first webpage" requires displaying an old version of the webpage, Dr. Fuchs' declaration submitted with Apple's Reply explained how a skilled artisan would have found it obvious to "retrieve" this webpage by presenting the copy stored in the browser's cache or from a copy from the origin server. Appx4113–4115 ¶ 79 ("In some instances, such as when a webpage consists of static content that is 'fresh' (as opposed to 'stale'), the browser presents the stored copy to the user without retrieving a new copy from the origin server.").

Rather than reading Dr. Fuchs' testimony as written, the Board erroneously believed Dr. Fuchs' declaration submitted with the Petition unequivocally limited

"retrieving" to an origin server and then erroneously believed he contradicted his earlier testimony by explaining retrieval could happen from more than just the origin server. Appx45–46. As shown, Dr. Fuchs' testimony in the Petition was agnostic as to where the retrieving occurred because it had never been a disputed issue before. Once disputed, Dr. Fuchs' supplemental declaration expanded on how the retrieving would happen, in a manner fully consistent with his original declaration and supported by state-of-the-art references. Because the Board did not have a basis to discredit Dr. Fuchs' testimony, its decision to afford Dr. Fuchs' testimony little weight cannot stand. *See NuVasive*, 842 F.3d at 1379 ("First, the PTAB must make the necessary findings and have an adequate evidentiary basis for its findings. Second, the PTAB must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (internal citations and quotations omitted)).

Thus, the Board abused its discretion by refusing to consider Apple's Reply arguments and evidence, including giving only a perfunctory review to Dr. Fuchs' supplemental declaration, and its decision should be vacated and remanded.

**B. As to Ground 2, the Board's Determination of No Obviousness Should Be Vacated and Remanded**

**1. The Board Applied the Wrong Legal Standard for Obviousness**

Even accepting the Board's construction of "the rendered first webpage," the Board's determination of no obviousness as to Ground 2 should be vacated and remanded because the Board applied an incorrect legal standard for obviousness by requiring *express* disclosure of the limitation in the asserted prior art. Specifically, in analyzing Apple's Ground 2 (the Sauve and Tsuda references), the Board focused on whether Sauve *expressly* disclosed "the rendered web first webpage" limitation. Appx74–75 ("We have analyzed the parties' citations to Sauve, and none clearly specifies . . . Sauve does not *expressly* state this." (emphasis added)). In doing so, the Board also failed to consider how a skilled artisan would have understood Sauve's disclosures. *See id.* More specifically, the Board failed to adequately analyze Dr. Fuchs' supplemental report, which unambiguously explained why a skilled artisan would have understood that Sauve's disclosed system could display a previously rendered version of the first webpage. *See id.* The Board's failure to meaningfully consider Dr. Fuchs' supplemental testimony, while narrowly focusing only on Sauve's express disclosures, was error.

In its petition, Apple detailed how Ground 2, the Sauve-Tsuda prior art combination, disclosed "the rendered first webpage" limitation. Appx211–242.

44

Apple further explained in its Reply how the combination disclosed this limitation even under SpaceTime's construction of the term as espoused in its Patent Owner Response. Appx3805–3811.

**The Sauve-Tsuda Combination.** The Sauve reference discloses a tabbed-browser software for convenient viewing of multiple webpages. Appx211. Specifically, as displayed in blue in the below left image (Sauve's Figure 4 (Appx1305)), Sauve describes how to arrange thumbnail images of webpages in a "quick pick user interface." Appx212. That "quick pick user interface" can have multiple tabs that each have webpage thumbnails. *Id.* Users can switch between those tabs and select a webpage thumbnail to open that webpage. *Id.* The Tsuda reference discloses "displaying windows in a virtual three-dimensional (3D) space," including, for example, webpages. Appx213 (quoting Appx1384 (1:5–12)). An example of Tsuda's display of windows in a 3D space is shown in red in the below right image (Tsuda's Figure 11B (Appx215 (annotated below))).



Fig. 4
**Sauve's Quick Pick
User Interface**

FIG. 11B

**Tsuda's
Virtual 3D Space**

Apple explained in its petition that "[t]he Sauve-Tsuda Combination applies Tsuda's teachings on a user interface featuring a virtual 3D space to Sauve's task of arranging graphical representations in a quick pick user-interface for a tabbed browser." Appx214. In other words, Sauve discloses displaying "thumbnails" of webpages in a way that makes it easy for a user to see and interact with them. *See* Appx1315 ¶ [0042]; Appx1305. In combination with Tsuda, Sauve would present these thumbnails in a 3D virtual space (*see, e.g.*, Appx223, Appx226). Apple depicted that combination in the above annotations of the references' figures, which describe how Sauve's 2D thumbnail-based user interface (blue) would be applied to Tsuda's 3D interface (red).

46

**"The Rendered First Webpage."**  In its petition, Apple explained how the Sauve-Tsuda combination renders obvious "the rendered first webpage" limitation:

> Sauve's tabbed browser provides conventional point-and-click web surfing/browsing functionality.  [Appx784-785 (Fuchs Declaration)] ¶ 194; [Appx1312 (Sauve)] ¶¶ 0002–0005, [Appx1313-1314] ¶¶ 0025-0027, [Appx1315] ¶¶ 0042-0044..  And this conventional functionality includes:  *receiving* a mouse click *interaction by the end user on a link provided in the rendered (first) webpage, the link corresponding to* a new webpage (*additional information*), per Element [1.d.iii]; *rendering the* new webpage (*additional information*), per Element [1.d.iv]; and *displaying* the rendered webpage (*additional information*) *in said window within the 2D space*, per Element [1.d.v].

Appx231–232 (emphasis in original).  In other words, Apple explained that a skilled artisan would have understood that when a user selects a link in the tabbed browser of the Sauve-Tsuda combination, the program would display the webpage content of a tab corresponding to the selected link.  More specifically, when a user clicks on a link in a webpage thumbnail in the Sauve-Tsuda interface (*i.e.*, *the user's interaction with the rendered first webpage*), the Sauve-Tsuda interface would render the webpage associated with the selected webpage (*i.e.*, *render the additional information*) and display the rendered webpage on the display screen (*i.e.*, *displaying the rendered additional information on the display screen in said window within the 2D space on the display screen*).

Then, in its Reply, Apple addressed SpaceTime's new claim construction argument concerning "the rendered first webpage" (*i.e.*, that it requires the *previously* rendered version of the webpage that resulted from the earlier-recited

"rendering" step) and corresponding assertion that Sauve's tabbed browser does not *expressly* teach using the "previously" rendered version of the webpage selected by the user via the quick-pick user interface. Appx3807–3808. In particular, Apple explained that a skilled artisan would have understood that Sauve does not suggest reloading a live webpage, and doing so would actually be counter to the purposes of Sauve. *Id.* And that "[r]e-loading a page each time a user selects a new tab is nonsensical and would defeat the purpose of using a tabbed browser in the first place—i.e., mak[ing] it easier and more convenient to view multiple web pages." Appx3808 (quoting Appx4125–4127 ¶¶ 100–104). In addition, Apple explained, "[t]he POSITA would have understood that the content displayed upon selection of an object thumbnail is the same version of the webpage that was originally loaded and used to create the thumbnail." *Id.* (citing Appx4125–4127 ¶ 103).

SpaceTime's sole counterargument was limited to whether Sauve *expressly* taught "the rendered first webpage." Appx3420–3424. As discussed above, this was also the basis for the Board's finding on patentability. Appx74–75.

Obviousness, however, does not require an "express" disclosure of a claim limitation in a prior art reference or combination of references. *See, e.g., Beckson Marine*, 292 F.3d at 727 ("[O]bviousness does not require the prior art to reach expressly each limitation exactly."). Requiring such an express disclosure "misapprehends the obviousness inquiry, which is not limited to the express

disclosures of the prior art but instead involves what 'a person of ordinary creativity, not an automaton,' would understand from the prior art." *GUI*, 2024 WL 1564694, at \*3 (quoting *KSR*, 550 U.S. at 421); *see also IXI IP, LLC v. Samsung Elecs. Co.*, 903 F.3d 1257, 1265 (Fed. Cir. 2018) (holding that the Board's reliance on implicit disclosure was reasonable and supported by the record); *see also Haag-Streit AG v. Eidolon Optical, LLC*, 840 F. App'x 561, 566 (Fed. Cir. 2021). Thus, a skilled artisan's knowledge must be considered when analyzing any possible differences between the prior art and the claimed invention. *See, e.g.*, *Koninklijke Philips*, 948 F.3d at 1337; *see also C.R. Bard, Inc. v. Medline Indus., Inc.*, No. 2020-1900, 2021 WL 3574043, at \*4 (Fed. Cir. Aug. 13, 2021).

Here, for example, Appellants provided several reasons why a skilled artisan would not have read Sauve to require reloading live webpages. *See, e.g.*, Appx3807-3808 (quoting Appx4125–4127 ¶¶ 100–104). Despite this analysis, which Appellants raised in response to SpaceTime's post-institution claim construction arguments, the Board incorrectly suggested Appellants were "silent" on this issue. *See* Appx74–75; Appx3807–3808 (quoting Appx4125–4127 ¶¶ 100–104). The Board erred by summarily ignoring Appellants' testimony directly addressing the absence of reloading in Sauve. *See, e.g.*, *Univ. of Strathclyde v. Clear-By Lighting LLC*, 17 F.4th 155, 164–65 (Fed. Cir. 2021) (reversing Board's obviousness

determination when its "stated reason for discrediting [an expert's] testimony is unsupported by the record"); *Axonics*, 75 F.4th at 1384.

Accordingly, because the Board required express disclosure of "the rendered first webpage" in the Ground 2 prior art references and also failed to consider how a skilled artisan would have understood those references, the Board's decision on obviousness should be vacated and remanded for the Board to assess the evidence under the correct legal standard for obviousness as to Ground 2.

## CONCLUSION

The Board's erroneous construction of "the rendered first webpage," along with its judgment of no unpatentability that was grounded in the construction, should be reversed. Even if the construction is upheld, the Board's judgment should be vacated and remanded for two separate reasons. As to Ground 1, the Board violated the APA by refusing to consider as forfeited Apple's Reply arguments and evidence responding to SpaceTime's claim construction arguments concerning "the rendered first webpage" that SpaceTime raised for the first time in its Patent Owner Response. As to Ground 2, the Board applied the wrong legal standard for obviousness by requiring express disclosure in the prior art.

Dated: March 17, 2025

Erika H. Arner, *Principal Attorney*
FINNEGAN, HENDERSON, FARABOW
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC  20001
(571) 203-2754

Daniel C. Tucker
Joseph M. Schaffner
FINNEGAN, HENDERSON, FARABOW
GARRETT & DUNNER, LLP
1875 Explorer St, 8th Floor
Reston, VA  20190
(571) 203-2793

Cory C. Bell
FINNEGAN, HENDERSON, FARABOW
GARRETT & DUNNER, LLP
2 Seaport Lane, 6th Floor
Boston, MA  02210
(617) 646-1641

*Counsel for Appellant Google LLC*

Respectfully submitted,

*/s/ Brian A. Rosenthal*

Brian A. Rosenthal, *Principal Attorney*
Allen Kathir
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
(212) 351-2339
brosenthal@gibsondunn.com

Jaysen S. Chung
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA  94111
(415) 393-8271

Albert Suarez IV
Julia G. Tabat
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Ave, Suite 2100
Dallas, TX  75201
(214) 698-3465

*Counsel for Appellant Apple Inc.*

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 11,580 words, excluding the parts of the brief exempted by Federal Circuit Rule 32(b)(2) and Rule 32(f) of the Federal Rules of Appellate Procedure.

2.     This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a monospaced typeface using Microsoft Word 2019 in 14-point Times New Roman font.

Dated:  March 17, 2025

*/s/ Brian A. Rosenthal*

Brian A. Rosenthal
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
(212) 351-2339

# ADDENDUM

## Table of Contents

Page

Final Written Decision (Paper 51 June 13, 2024)................................................Appx1

U.S. Patent No. 8,881,048................................................................Appx89

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC. and GOOGLE LLC,
Petitioner,

v.

SPACETIME3D, INC.,
Patent Owner.

———————

IPR2023-00242
Patent 8,881,048 B2

———————

Before DAVID C. McKONE, SHEILA F. McSHANE, and
FREDERICK C. LANEY, *Administrative Patent Judges*.

McKONE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
Dismissing Patent Owner's Motion to Exclude
*35 U.S.C. § 318(a)*

**Appx1**

## I. INTRODUCTION

### A. Background

Apple Inc. filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1–18 of U.S. Patent No. 8,881,048 B2 (Ex. 1001, "the '048 patent"). SpaceTime3D, Inc. ("Patent Owner") filed a Preliminary Response (Paper 6, "Prelim. Resp."). Petitioner also filed a Preliminary Reply (Paper 7) and Patent Owner filed a Preliminary Sur-reply (Paper 8).

The Board instituted an *inter partes* review of the challenged claims pursuant to 35 U.S.C. § 314. Paper 11 ("Inst. Dec."). We joined Google LLC as a party to the proceeding (collectively, with Apple Inc., "Petitioner"). Paper 14.

After institution, Patent Owner filed a Patent Owner Response (Paper 16, "PO Resp."). Petitioner filed a Reply (Paper 26, "Reply") and Patent Owner filed a Sur-reply (Paper 35, "Sur-reply"). The parties then presented oral arguments via a (video) Hearing (March 18, 2024), and the Board entered a Hearing transcript into the record (Paper 44).

Patent Owner filed a Motion to Exclude Evidence (Paper 34), Petitioner responded to that motion (Paper 36) and Patent Owner filed a reply (Paper 38).

For the reasons set forth in this Final Written Decision pursuant to 35 U.S.C. § 318(a), we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 14–18 are unpatentable, but has not demonstrated that claims 1–13 are unpatentable. We dismiss Patent Owner's Motion to Exclude as moot.

B. *Related Proceedings*

Petitioner indicates, and Patent Owner agrees, that the '048 patent is being asserted in *SpaceTime3D, Inc. v. LG Electronics Inc.*, No. 2:22-cv-00049 (E.D. Tex. 2022) and *SpaceTime3D, Inc. v. Apple Inc.*, No. 6:22-cv-00149 (W.D. Tex. 2022). Pet. 92; Paper 3.

Petitioner and Patent Owner also indicate that the '048 patent was involved in *SpaceTime3D, Inc. v. Samsung Electronics Co.*, No. 2:19-cv-00372 (E.D. Tex.) ("Samsung case"), which has terminated, and IPR2020-01417, in which the petition was dismissed prior to institution. Pet. 92; Paper 3.

The '048 patent is also subject to *ex parte* reexamination in 90/019,353. We stayed the reexamination pending the outcome of this proceeding. Paper 50.

C. *The '048 patent (Ex. 1001)*

The '048 patent relates to "a three-dimensional ('3D') interactive computing interface and sorting interface comprising information from real-time and static sources, including . . . meta search results from the Web." Ex. 1001, code (54), 1:30–33.

The '048 patent addresses the problem of finite space on a computer's desktop interface whereby "elements of the [Graphical User Interface ("GUI")] (the windows) are typically drawn on top of each other such that the GUI components overlap one another." *Id.* at 2:8–10. The '048 patent notes that "[w]e live in a 3D . . . world" and the "notion of expressing depth or time in a visual computer metaphor is important for the creation of a visual history of the end user's computing sessions." *Id.* at 2:14–20.

3

Accordingly, the '048 patent observes the potential to create "a virtual space that does not overlap or substitute what exists on the finite desktop," and proposes "an improved graphical user interface that allows the user to efficiently navigate through a virtual space wherein groups of windows can be easily organized, stored, and retrieved." *Id.* at 2:20–24, 2:40–43.

"The invention provides a Graphical User Interface (GUI) that uses the two-dimensional display of an end user's computer to display information (e.g., webpages and other information mapped onto 3D objects) in a simulated real-time 3-D immersive Cartesian space." Ex. 1001, 7:59–63. "The 3D GUI program creates the appearance of a 3-D space within a 2-D window on the desktop of a computer . . . ." *Id.* at 7:66–67. This is depicted in Figure 10, reproduced below.



FIG. 10

Figure 10 of the '048 patent is a drawing of simulated 3D virtual space 300 displayed within a 2D window. Ex. 1001, 6:30–31, 17:64. "The program

4

creates what seems to be an infinite simulated 3-D Cartesian space within the two-dimensional display . . . [and] creates interactivity of the simulated real-time 3-D immersive Cartesian space." *Id.* at 8:6–20.

Figure 11 of the '048 patent is reproduced below:



FIG. 11

Figure 11 depicts "an embodiment of a 3D GUI application window with an opened database module." *Id.* at 6:32–33. Figure 11 shows virtual space 300 along with interface 440 called a compass or database module. *Id.* at 9:66–10:4. Compass or database module 440 is "located to the left of the display of the virtual space 300." *Id.* at 10:2–4. Compass 440 includes names of viewpoints in virtual space 300 where the "names constitute a map of the 3D space as well as a method to navigate the map." *Id.* at 10:7–11. In the example shown in Figure 11, when a "tab called Web Browsers 453" is selected, compass 440 lists "the names of four viewpoints of the webpages

5

(shown in the main window or virtual space) . . . whose viewpoint names as they relate to the compass (and are listed as such) are 'http://www.yahoo. com—Yahoo!' 442, 'http://www.google.com—Google' 443, 'http://www. ebay.com—ebay' 444 and 'http://www.msn.com—MSN' 445." *Id.* at 10:34–48. At the bottom of the virtual space in Figure 11 "there is provided a linear map, called a timeline 340, having a plurality of icons (502, 504, 506, 508)," which "represent viewpoints indexed in the compass 440 and correspond to the windows 510, 512, 514, 51[6], respectively." *Id.* at 10:11–16. Windows 510, 512, 514, and 516 are displayed three-dimensionally above the timeline icons. "[E]ach 3D icon (502, 504, 506, 508) is a hyperlink or graphic that jumps to a new location or viewpoint (when clicked)." *Id.* at 11:47–49.

Figure 13B of the '048 patent is reproduced below:



FIG. 13B

Figure 13B depicts a 3D-GUI application window with an opened database module. *Id.* at 6:37–38. Figure 13B shows an example of clicking a name in compass 440 to present a favorable viewpoint of a webpage in the virtual space. *See id.* at 21:5–19. As shown in Figure 13B, in which search tab 454 is selected, clicking on one of the "indexed names (viewpoints)" in explorer pane 441 "brings a favorable viewpoint/perspective of the output for this particular webpage in the 3D virtual space to the end user's view." *Id.* at 21:5–12. In this way,

> each name indexed in the explorer pane of the window (compass or data base module 440) . . . serves both as an index of the search results . . . as well as a hyperlink or trigger to a favorable viewpoint within the 3D virtual space of each webpage within the search results.

*Id.* at 21:12–19.

The '048 patent notes, however, that an end user may "occupy[] an unfavorable viewpoint in the virtual space where objects are drawn in skew," therefore making it "difficult to interact with a file." *Id.* at 21:20–24. In this case, a "heads-up display" feature allows for clicking an icon to "trigger[] a change to the viewpoint of the end user within the virtual space . . . thereby making it easier to interact with." *Id.* at 21:29, 21:39–45. This may be "accomplished by revealing the 2D version of the webpage that was initially hidden or drawn off screen and positioning it in a layer that is in front of the 3D virtual space such that the end user can interact with this layer in 2D." *Id.* at 21:45–49. Further, "an end user can toggle or switch between 2D and 3D for any selectively captured computing output and information . . . that was drawn within a 3D virtual space." *Id.* at 21:54–58.

Claims 1 and 14 are illustrative and are reproduced below, with bracketing similar to Petitioner's annotations (Pet. i–ii):

7

**Appx7**

1. [1pre] A method for providing a three-dimensional (3D) graphical user interface, comprising:

[1a] receiving at least first and second inputs from an end user;

[1b] receiving first and second webpages from at least one server in response to said first and second inputs, wherein the first and second inputs are website addresses corresponding to said first and second webpages, respectively;

[1c] displaying at least a portion of the first webpage on a first object within a 3D space, and at least a portion of the second webpage on a second object within the 3D space, comprising;

[1ci] rendering the first and second webpages;

[1cii] capturing first and second images of the at least a portion of the first webpage and the at least a portion of the second webpage, respectively; and

[1ciii] texturing the first image on the first object and the second image on the second object, the first object being displayed in a foreground of the 3D space and the second object being displayed in a background of the 3D space; and

[1d] displaying additional information, comprising:

[1di] receiving an interaction by the end user on the first image;

[1dii] replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes the rendered first webpage;

[1diii] receiving an interaction by the end user on a link provided in the rendered first webpage,

8

the link corresponding to the additional information;

[1div] rendering the additional information; and

[1dv] displaying the rendered additional information in said window within the 2D space.

14. [14pre] A method for providing a three-dimensional (3D) graphical user interface, comprising:

[14a] receiving at least first and second website addresses from an end user;

[14b] using said first and second website addresses to retrieve first and second webpages from at least one source in response to said first and second inputs;

[14c] displaying at least a portion of the first webpage within a 3D space, and at least a portion of the second webpage within the 3D space, comprising;

[14ci] generating first and second images of the at least a portion of the first webpage and the at least a portion of the second webpage, respectively; and

[14cii] displaying the first image and the second image in the 3D space, the first image being displayed in a foreground of the 3D space and the second image being displayed in a background of the 3D space; and

[14d] displaying additional information to said end user, comprising:

[14di] receiving an interaction from the end user with the first image;

[14dii] replacing the first and second images within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes the first webpage;

9

[14diii] receiving an interaction by the end user on a link provided in the first webpage, the link corresponding to the additional information; and

[14div] displaying the additional information to the user.

### D. Asserted References and Testimonial Evidence

Petitioner relies on the following references:

| Name | Reference | Date | Exhibit No. |
|---|---|---|---|
| Gettman | US 2005/0086612 A1 | Apr. 21, 2005 | 1006 |
| Gralla | PRESTON GRALLA, HOW THE INTERNET WORKS (6th ed.) | 2002 | 1005 |
| Robertson | US 6,414,677 B1 | July 2, 2002 | 1004 |
| Sauve | US 2006/0230356 A1 | Pub. Oct. 12, 2006 (filed Apr. 7, 2005) | 1007 |
| Tsuda | US 6,577,330 B1 | June 10, 2003 | 1008 |

Petitioner also relies on the Declaration of Dr. Henry Fuchs (Ex. 1003) and the Supplemental Declaration of Dr. Henry Fuchs (Ex. 1060).

Patent Owner relies on the Declaration of Dr. Eddie Bakhash (Ex. 2001) and the Declaration of Scott Shaefer (Ex. 2014).

10

### E. Instituted Grounds

We instituted a trial under the following grounds:

| Ground | Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|--------|-------------------|-------------|--------------------|
| I | 1–18 | § 103(a)[1] | Robertson, Gralla, Gettman |
| II | 1–18 | § 103(a) | Sauve, Tsuda |

## II. ANALYSIS

### A. Claim Construction

We construe claims "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2019); *see also Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

#### 1. "3D space" and "two-dimensional (2D) space"

As we stated in the Institution Decision, at page 20, the parties agree that the claim terms "3D space" and "two-dimensional (2D) space" recited

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103. Because the challenged claims of the '048 patent have an effective filing date before the effective date of the applicable AIA amendments, we refer to the pre-AIA version of 35 U.S.C. § 103 throughout this Decision.

11

in claims 1, 8, and 14 should be construed as "a virtual space defined by a three-dimensional coordinate system" and "a finite graphical area defined by a two-dimensional coordinate system," respectively. Pet. 13–14; PO Resp. 19–20 (citing Ex. 2010, 16–17). Here, the parties' agreement stems from the constructions given by the District Court in the Samsung case. Ex. 2010, 19.

Despite this agreement, Patent Owner contends that "these constructions should be viewed in light of the [Samsung] Court's attendant reasoning." PO Resp. 20. Patent Owner argues that "a 2D browser can exist in 3D space" and also that, "[w]hile a 2D browser may constitute 'a window,' it does not define the space in which the window exists." *Id.* Patent Owner appears to glean this distinction from the District Court's observation that "objects" are recited separately from "spaces" in the challenged claims. *Id.* (citing Ex. 2010, 16–17). Patent Owner does not explain persuasively why this distinction would lead a skilled artisan to conclude that a 2D browser does not define the space in which a window exists. To the extent Patent Owner is arguing that a 2D space is a virtual space into which a window (such as a browser window) may be placed, the District Court made clear that a 2D space is not a virtual space:

> Defendants also argue that the "3D space" and "2D space" are both virtual spaces. This argument is not consistent with use of the term "virtual" in the intrinsic evidence. The specification describes the 3D space as a "seemingly unlimited space" that creates the "illusion of infinite space in three dimensions." In contrast, the specification describes the 2D space as the "finite working graphical area" of the desktop, and not as a virtual space.

Ex. 2010, 17 (citing Ex. 1001, 2:4–10, 4:62–63, 21:59–60). A browser defines a finite working 2D graphical area of the desktop and includes a window that displays a 2D webpage. Ex. 1003 ¶ 125; Ex. 1005, 134–135.

12

Patent Owner appears to argue that a browser window is not a window within a 2D space. PO Resp. 3 ("[T]he '048 Patent clearly provide that the terms 2D and 3D define the space—not the objects presented therein. This is also consistent with the cited prior art itself, which provides that the conventional 2D browser is positioned *in the foreground of the 3D space*."), 50 ("[W]hile a 2D browser may constitute 'a window,' it does not constitute 'a window within a 2D space.' In other words, the nature of the object (2D or 3D) does not define space."), 51 ("[T]he mere existence of a 2D browser does not indicate the space with which it exists."). Patent Owner does not clearly articulate the distinction it attempts to draw. However, as explained above, a browser defines a finite working 2D graphical area, and that area includes a window in which 2D webpages are displayed, which is all the Samsung court's construction requires. Patent Owner does not explain persuasively, or support with evidence, that a browser with a 2D window, displaying a 2D webpage, does not define "a finite graphical area defined by a two-dimensional coordinate system," as the District Court has construed the term. If it is Patent Owner's position that a browser or a browser window is an object and not a 2D space (a position that Patent Owner has not made clear), Patent Owner has not supported that argument with persuasive evidence.

Petitioner responds that the embodiment described in the '048 patent includes a 2D browser window within a virtual 3D space. Reply 3 (citing Ex. 1001, 21:45–47, 21:53–58). In this example,

> the 3D GUI system utilizes the Bind to the HUD feature whereby clicking an icon or bottom (analogous to the minimize in windows operating system environment) triggers a change to the viewpoint of the end user within the virtual space so that the webpage is directly in an end user's visual field, thereby

13

> making it easier to interact with. *In one embodiment, this is accomplished by revealing the 2D version of the webpage that was initially hidden or drawn off screen and positioning it in a layer that is in front of the 3D virtual space such that the end user can interact with this layer in 2D.* Furthermore, the end user has the freedom to unbind to the hud or hide the 2D webpage again that was initially hidden or drawn off screen by clicking the appropriate button (again, analogous to the minimize button in the windows operating system environment). As such, an end user can toggle or switch between 2D and 3D for any selectively captured computing output and information (webpages, applications, documents, desktops or anything that can be visualized on a computer) that was drawn within a 3D virtual space at will by using this technique.

Ex. 1001, 21:39–58; *see also* Ex. 2010, 13 (citing Ex. 1001, 21:54–58). We agree with Petitioner that this example describes a 2D space (here, a browser window in front of the 3D virtual space that allows the user to interact with a 2D version of a webpage, which corresponds to "a finite graphical area defined by a two-dimensional coordinate system") displayed within a 3D space (here, the 3D virtual space, which corresponds to "a virtual space defined by a three-dimensional coordinate system"). To the extent Patent Owner asks us to construe "2D space" to exclude a 2D browser window presented in front of a 3D virtual space, that argument is unpersuasive. *See Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1327 (Fed. Cir. 2023) ("The Federal Circuit "recognize[s] that '[a] claim construction exclud[ing] a preferred embodiment is rarely, if ever correct.'" (quoting *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022) (second and third alterations in original)).

The District Court's constructions of "3D space" and "two-dimensional (2D) space" are supported by the language of the claims and the

14

**Appx14**

description in the specification. Accordingly, we accept the parties' agreement and adopt the District Court's constructions of these terms. The District Court's construction of "two-dimensional (2D) space" does not exclude a conventional web browser displaying a 2D webpage in its window, and we see no sound basis to import such a limitation into the term. We reject Patent Owner's attempt to further construe "2D space" or exclude embodiments from the District Court's construction of that term.

We note that, prior to institution, Patent Owner argued that "replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space" requires "switching from a 3D environment, where only images are presented, to a 2D environment, where only one active application is presented for interaction." Prelim. Resp. 42. We understood Patent Owner's argument to be that claim limitation 1dii requires replacing the 3D space with a 2D space in its entirety. Inst. Dec. 42. We rejected that argument and explained that, according to the plain language of this limitation, "[o]nly the *objects* in the 3D space are required to be replaced and only by a *window* within a 2D space." *Id.* Thus,

> The claim does not appear to require replacement of the entire 3D environment with a 2D space, and Patent Owner does not explain why such a replacement is required. As long as first/second images within the 3D space are replaced by a window within a 2D space (e.g., a webpage), the limitation would appear to be met.

*Id.* We do not understand Patent Owner to be maintaining its argument that claim 1 requires entirely replacing the 3D space with a 2D space. Sur-reply 20 ("PO does not argue that the claims require 'replacing' a 3D space with a 2D space (Reply at 2) but ***replacing images (textured on objects)*** <u>***within 3D***</u>

15

*space with a window (including the rendered first webpage) within 2D space*.").  In any case, the record does not support such an argument.

### 2. Alleged chronological order

Claim 1 recites "receiving at least first and second inputs from an end user," "receiving first and second webpages from at least one server in response to said first and second inputs," "rendering the first and second webpages," "capturing first and second images," and "texturing the first image on the first object and the second image on the second object, the first object being displayed in a foreground of the 3D space and the second object being displayed in a background of the 3D space."  Independent claims 8 and 14 include similar recitations.

Patent Owner argues that "in the claimed GUI, images are not just placed in 3D space but arranged in a particular, chronological order.  The claims specify that this is done by arranging the images *in the order in which the webpages were requested by the user*."  PO Resp. 3; *see also id.* at 40 ("This is done by arranging the images *in the order in which the webpages were requested by the user*.").  According to Patent Owner,

> This can be seen in Claim 1 where, in response to receiving *a first input* (or first website address) from the user, *a first webpage* is received and rendered, from which *a first image* is captured and textured onto a *first object*, which is presented *in a foreground of the 3D space*.  In response to *a second input* (or second website address) from the user, *a second webpage* is received and rendered, from which *a second image* is captured and textured onto *a second object*, which is displayed *in a background of the 3D space*.

*Id.* at 40 (internal citations omitted).  In the Sur-reply, Patent Owner argues that "[t]he Challenged Claims recite a specific order in which objects are

<center>16</center>

presented in 3D space." Sur-reply 2–3. For example, "[a]ll of the claims . . . recite the terms 'first' and 'second' and antecedent bases." *Id.* at 5. According to Patent Owner, a person of ordinary skill in the art "would have understood that this claim language recites a specific arrangement where the first requested webpage (or image thereof) is displayed in the foreground and the second requested webpage (or image thereof) is displayed in the background." *Id.*

Petitioner points out that "the numerical terms 'first' and 'second' used throughout the claims 'should not in and of itself impose a serial or temporal limitation.'" Reply 9 (quoting *3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003)). We agree with Petitioner and find that the plain language of claim 1 does not suggest that "first" and "second" establish a chronological order. "First" and "second" are used throughout claim 1 as identifiers to distinguish one from another, and the claim itself does not specify the points in time at which inputs are received relative to others or when images are rendered, captured, and textured relative to others. And aside from stating that the first object is displayed in the foreground while the second object is displayed in the background, the claim does not limit the form of visual presentation. The plain language of the claim does not specify whether the "first" object displayed in the foreground was rendered, captured, and/or textured before other objects displayed in the background.

According to the Federal Circuit,

As a general rule, "[u]nless the steps of a method [claim] actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001) (citation omitted). However, a claim "requires an ordering of steps when the claim

17

> language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires" an order of steps. *TALtech Ltd. v. Esquel Apparel, Inc.*, 279 Fed. Appx. 974, 978 (Fed. Cir. 2008)

*Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1398–99 (Fed. Cir. 2014). In one example, "[a]s a matter of logic, a mailbox must be established before the contents of said mailbox can be transmitted." *Id.* at 1400. In this case, the "rendering" step of claim 1 must occur after the "receiving" inputs and "receiving" webpages, for example, as there must be something to render. However, nothing in the language of the claims suggests that the first webpage must be rendered before the second webpage, as the rendering of the second webpage does not rely on the first webpage having been already rendered.

Patent Owner argues that claim 6 confirms the specific chronological order it wishes to impose on the claims, because the third webpage is displayed on a third object in a further background of the 3D space, behind the second object. Sur-reply 5–6. Claim 6 recites no more than the visual position of the third object relative to the first and second objects. It says nothing about when the third webpage was received, rendered, textured, etc., relative to the first and second webpages. Thus, claim 6 does not support importing Patent Owner's proposed chronological order into the claims.

Patent Owner points to examples in the '048 patent where HTML pages entered by a user are represented by a 3D stack, which Patent Owner argues represents a visual chronological history of the user's computing session. PO Resp. 7–10 (citing Ex. 1001, 2:14–20, 2:62–63, 5:6–13, 17:45–54, 20:15–32, 22:15–16, 25:55–59, 29:23–38, Fig. 11); Sur-reply 3–4 (citing Ex. 1001, 5:6–13, 29:23–38, Fig. 11). According to Patent Owner, "[t]he

18

claimed order is not only consistent with the specification but required to create a '3D GUI [that] can function as a visual chronological history of the user's computing session.'" Sur-reply 6 (citing Ex. 1001, 5:6–21, 29:23–38, Figs 11, 4B (items 202, 206); Ex. 2014 ¶¶ 37–40). For example, the '048 patent explains:

> The system as a default draws each new webpage in what we call a "3D stack" (i.e., a stack visualized in 3D, sometimes referred to as a 3D stack) as shown where each new webpage occupies an x,y,z coordinate similar to the position of the existing webpage; except it is drawn further into the distance along the z axis (where it appears smaller from the given perspective) and is translated on the x or y or both x, y axis to allow the end user to see multiple webpages from any given perspective.

Ex. 1001, 17:45–54. However, the '048 patent describes this feature in terms of embodiments and examples, and Patent Owner does not point to any indication that the claims should be limited to these examples. *See Best Med. Int'l, Inc. v. Elekta Inc.*, 46 F.4th 1346, 1355 (Fed. Cir. 2022) ("While [the patent owner] cites to a passage from the written description describing a specific embodiment that supports its proposed construction, we do not 'limit[] claims to a preferred embodiment.'" (quoting *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010))).

In sum, we do not find sufficient support within the intrinsic record to justify imposing an additional chronological or temporal limitation into the claims based on the terms "first" and "second" in claim 1 (and similar instances in claims 8 and 14); rather, those terms are used as identifiers to distinguish between similar things (e.g., webpages).

### 3. *"the rendered first webpage"*

Claim limitation 1dii recites "replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes *the rendered first webpage*." Petitioner does not propose a construction for the term "the rendered first webpage" in the Petition. Pet. 13–14. Nevertheless, Patent Owner contends in the Patent Owner Response that "'*the rendered first webpage*' is the webpage that was requested by the user via the 'first input' from which the 'first image' was captured." PO Resp. 13. As Petitioner summarizes, "[a]ccording to Patent Owner, 'the rendered first webpage' presented in 2D space 'is the version that was previously received and rendered (e.g., stored in memory) from which the first image was captured. It is not a 'live' webpage from the Internet.'" Reply 6. Despite not proposing a construction in the Petition, Petitioner, in the Reply, asks us to construe "the rendered first webpage" to include either the previously received and rendered first webpage or a new (so called "live") version of the first webpage rendered in response to receiving the user interaction of claim limitation 1dii. Reply 6–7.

The plain and ordinary meaning of claim 1 supports Patent Owner's argument. "To begin with, the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314 ("To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel."). Here, claim 1 refers to replacing the first and second objects with "the rendered first webpage," which implies that the objects are not replaced with just any version of the first webpage. "Rendered" is in the

20

**Appx20**

past tense, suggesting a webpage that previously has been rendered. This is a clear reference to limitation 1ci, "rendering the first and second webpages."

Dr. Fuchs' testimony is instructive. According to Dr. Fuchs, a skilled artisan "would have known that webpage rendering was a ubiquitous process for converting raw HTML code received from a web server into visible content." Ex. 1003 ¶ 104. According to Dr. Fuchs, "[w]ebpage rendering is a core functionality of virtually all web browsers, and it would have been obvious to a [person of ordinary skill in the art] that rendering is a prerequisite step to obtaining 'screen snapshots of actual web pages,' as explained in Robertson's companion Data Mountain paper." *Id.* ¶ 105 (citing Ex. 1030, 5). Dr. Fuchs testifies that a skilled artisan "would have understood that Robertson's 3D-GUI *captures images* of the rendered (**first/second**) **webpages** to obtain the webpage images on the object thumbnails." *Id.* ¶ 107. Similarly, Dr. Fuchs testifies that "Gettman's technique involves 'cach[ing]' 'bitmap screenshots' (*captured first/second images*) of rendered (*first/second*) *webpages* in local memory." *Id.* ¶ 108.

Here, as Dr. Fuchs reads claim limitations 1ci and 1cii, in step 1ci, a webpage is converted from raw HTML code into visible content, i.e., it is rendered. *Id.* ¶¶ 104–105. A portion of that rendered webpage, a particular version of that page previously processed and now in the form of visible content, is then captured in step 1cii to obtain an image (a thumbnail) to texture onto the first object. *Id.* ¶¶ 107–108. Petitioner argues that "the rendered first webpage" is simply a reference to "receiving first and second webpages," "displaying at least a portion of the first webpage," and "rendering the first and second webpages," and that "[n]one of these recitations require different 'versions'; just 'the first webpage.'" Reply 6–7.

21

However, according to Dr. Fuchs' testimony, the "capturing" and "texturing" steps of limitations 1cii and 1ciii do require the prerequisite step of rendering a particular version of the first webpage; thus, they require the version of the first webpage rendered in the "rendering" step of limitation 1ci. Thus, while we agree with Petitioner that claim 1 does not recite "the rendered *old version of* the first webpage," the "rendered first webpage" is the "old version" of the first webpage rendered, captured, and textured in other steps of claim 1, and not the new "live" version. Moreover, if "the rendered first webpage" were simply a reference to the first webpage generally, "rendered" would be superfluous, as "the first webpage" would identify that webpage generally.

The specification of the '048 patent is consistent with the ordinary meaning of claim 1. The specification describes an example in which

> the 3D GUI system utilizes the Bind to the HUD feature whereby clicking an icon or bottom (analogous to the minimize in windows operating system environment) triggers a change to the viewpoint of the end user within the virtual space so that the webpage is directly in an end user's visual field, thereby making it easier to interact with. In one embodiment, *this is accomplished by revealing the 2D version of the webpage that was initially hidden or drawn off screen and positioning it in a layer that is in front of the 3D virtual space* such that the end user can interact with this layer in 2D.

Ex. 1001, 21:39–49 (emphasis added). Here, objects within the 3D space are replaced with "the 2D version of the webpage that was initially hidden or drawn off screen." This is the "old" version, and not the "current" or "live" version of the webpage, to use Petitioner's designations. PO Resp. 13 (citing Ex. 1001, 21:45–47). Petitioner argues that "the notion of different webpage 'versions'" is "absent from the specification." Reply 7. However, Petitioner does not address Patent Owner's reference to the specification,

22

which does introduce the notion of different webpage versions. Ex. 1001, 21:39–49. Petitioner does not point to examples in the specification that support its position.

Upon consideration of the plain language of claim 1 and the description in the specification, we agree with Patent Owner that "the rendered first webpage," as recited in claim 1, is "not referring to the webpage generally, but *the rendered version from which the corresponding image was captured*." Sur-reply 11.

### 4. Remaining claim terms

Based on the record before us, we do not find it necessary to provide express claim constructions for any other terms. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'") (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

### B. Obviousness over Robertson, Gralla, and Gettman

Petitioner argues that claims 1–18 would have been obvious over Robertson, Gralla, and Gettman. Pet. 3, 14–54.

A claim is unpatentable under pre-AIA 35 U.S.C. § 103(a) "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." We resolve the question of obviousness on the basis of underlying factual determinations, including (1) the scope

23

and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### 1. Level of Ordinary Skill in the Art

Petitioner contends that a skilled artisan would have had "a bachelor's degree in computer science or a comparable field and at least two years of professional experience working with 2D and 3D graphical user interfaces," and that "[a]dditional years of experience could substitute for an advanced-level degree (and vice versa)." Pet. 13 (citing Ex. 1003 ¶¶ 28–29) (citations omitted). Patent Owner "generally agrees" with this definition. PO Resp. 19.

Petitioner's proposed definition is consistent with that reflected by the prior art of record and we adopt it for purposes of this Decision. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978).

### 2. Scope and Content of the Prior Art

#### a. Overview of Gettman (Ex. 1006)

Gettman relates to "a method of organizing and displaying a large volume of material content in a manner that can be easily browsed and accurately navigated by a viewer." Ex. 1006 ¶ 44.

Figure 1 of Gettman is reproduced below:

24

Fig.1.



Figure 1 is a diagram of a screen. *Id.* ¶ 9. Figure 1 shows virtual street 2 with buildings 3 having virtual display windows 4.

Figure 1 shows "an image of a virtual street 2 seen in three-dimensional perspective from the middle of the street," where "[b]uildings 3 are located on each side of the street 2, and each has one or more virtual display windows 4 facing the street 2." *Id.* ¶ 76. Each window 4 may show content from "an Internet HTML page," and "[t]hese may be the home pages of commercial concerns or pages specifically generated for display in this format." *Id.* "As a viewer 'moves' along the street, distant windows come into view and close-by ones pass out of sight 'behind' the viewer," with "the program carefully select[ing] the set of HTML pages to cache and store in

25

memory to ensure a smooth and fast appearance of rendered display windows." *Id.* ¶ 84. However, in one example, a "page is not rendered dynamically until the viewer turns toward it (and 'clicks' on it or remains in that position for a set period of time), at which stage the dynamically cached page may be displayed in a two-dimensional, conventional-style browser display box." *Id.* ¶ 83.

### b. Overview of Gralla (Ex. 1005)

Gralla is a book titled "How the Internet Works," and is aimed at professionals and novices alike. Ex. 1005, 12. In a section titled "How the World Wide Web Works," Gralla explains the basics of how a Web browser sends a URL request in order to retrieve a page, document, or object from a Web server. *Id.* at 134.

### c. Overview of Robertson (Ex. 1004)

Robertson relates to "[a] graphical user interface in which object thumbnails are rendered on a simulated three-dimensional surface which (i) exploits spatial memory and (ii) allows more objects to be rendered on a given screen." Ex. 1004, code (57).

Figure 8A of Robertson is reproduced below:



FIGURE 8A

Figure 8A depicts a display of webpage thumbnails using a user interface. *Id.* at 8:4–5. Display 800 illustrates inclined plane 802 as having "low resolution images . . . or object thumbnails 806," where "object thumbnails 806 represent web (or hypertext markup language or 'HTML') pages. *Id.* at 12:58–65.

Figure 9 is reproduced below:

27



FIGURE 9

Figure 9 depicts a display showing a selected webpage using a user interface. *Id.* at 8:9–10.

Selected object thumbnail 902 in display 900 may be "displayed in a preferred viewing position, in this case, at the center foreground of the three-dimensional environment." *Id.* at 13:58–62. Here, "selected object thumbnail 902 is a high resolution bit map," which may be an instance of a browser application "rendering a web page, with the user interface of the present invention in the background." *Id.* at 13:62–14:4.

28

### 3. Claims 1–13

Petitioner contends that the combination of Robertson, Gralla, and Gettman would have rendered claim 1 obvious. *See* Pet. 25–44.

Petitioner contends that, if the preamble of claim 1 is limiting[2], Robertson teaches providing a 3D-GUI. Pet. 25 (citing, *inter alia*, Ex. 1004, 6:30–31 ("The present invention provides a user interface, and in particular a graphical user interface . . . a simulated three-dimensional environment on the user's video monitor.")). We agree, and find that Robertson teaches the preamble of claim 1.

As to claim limitation 1a, Petitioner contends that Gralla shows a web browser receiving inputs from an end user when, for example, a "user 'type[s] the URL for a location [they] want to visit'" in an address bar. *Id.* at 26–27 (citing Ex. 1005, 134; Ex. 1003 ¶ 93). Dr. Fuchs testifies that a person of ordinary skill in the art "would have understood and found it obvious that a user would visit multiple Internet locations (e.g., webpages and websites) during one or more browsing sessions and, accordingly, provide multiple (first/second) uniform resource locator (URL) inputs. Any person who has used the Internet can attest to this indisputable fact." Ex. 1003 ¶ 93; Pet. 26–27. We agree, and find that Gralla teaches receiving at least first and second inputs from an end user.

As for a 3D-GUI "receiving at least first and second inputs from an end user," Petitioner contends that a skilled artisan would have "integrate[d] Robertson's 3D-GUI into the web browser described by Gralla as an

---

[2] For purposes of this Decision, we need not determine whether the preamble is limiting, as Petitioner's evidence is sufficient to show that Robertson teaches the preamble if it is limiting.

upgrade to the conventional bookmark/favorites tools for revisiting webpages." Pet. 18 (citing Ex. 1003 ¶¶ 71–21). Dr. Fuchs testifies that "extensive development on 3D-GUIs and webpage revisitation tools took place long before the '048 patent, and those of skill in the art had already integrated these lines of development to create new and improved 3D-GUIs for web browsers." Ex. 1003 ¶ 71. According to Dr. Fuchs, "the integration of Robertson and Gralla tracks the broad development trends in the prior art." *Id.* Petitioner further argues that "Robertson makes clear that its 3D-GUI is an improvement over the 'Favorites' tool employed in Microsoft's Internet Explorer, a featured web browser in Gralla." Pet. 18–19 (citing Ex. 1004, 3:55–4:3; Ex. 1005, 133–34). According to Petitioner, Robertson notes downsides of the hierarchical lists used in this "Favorites" tool. *Id.* at 20 (referring to Ex. 1004, 3:55–4:3). To overcome this, Petitioner argues, Robertson "propos[es] its 3D-GUI as a needed improvement . . . expressly encourag[ing] the [person of ordinary skill in the art] to combine the teachings of Robertson and Gralla" and thereby arrive at a 3D-GUI "receiving at least first and second inputs from an end user," as recited in limitation 1a. *Id.* (citing Ex. 1004, 6:15–67, 9:14–50; Ex. 1003 ¶¶ 74–76). Petitioner contends that a skilled artisan would have had a reasonable expectation of success in combining the teachings of Robertson and Gralla because GUIs, web browsers, and simulated 3D environments were all well-known technologies that had been successfully demonstrated in the real world. Pet. 25 (citing Ex. 1003 ¶ 90).

We credit Dr. Fuchs' testimony and find that a skilled artisan would have had reasons, with rational underpinning, to combine the teachings of Robertson and Gralla, and would have had a reasonable expectation of success in doing so. Patent Owner argues generally that "in support of their

obviousness Grounds, Petitioners offered only vague and conclusory assertions concerning the alleged motivations to combine references and a person of ordinary skill in the art['s] . . . reasonable expectation of success in doing so." PO Resp. 4. However, Patent Owner does not present arguments specific to this ground and, instead, appears to limit this argument to the combination of Sauve and Tsuda (which we discuss below). *Id.* at 4–5. In any case, we do not find Petitioner's proposed reasons to combine Robertson and Gralla vague and conclusory.

As to limitation 1b, Petitioner contends that Gralla teaches a user typing "URLs (website addresses corresponding to webpages) into the address bar of a web browser." Pet. 27 (emphasis omitted) (citing Ex. 1005, 134, 163; Ex. 1003 ¶ 96). According to Petitioner, this satisfies the part of limitation 1b calling for "wherein the first and second inputs are website addresses corresponding to said first and second webpages." *Id.* For "receiving first and second webpages from at least one server in response to said first and second inputs," as recited in limitation 1b, Petitioner argues that the typical sending of a URL request to a server, whereupon the requested webpage is found and then sent to the browser, as taught by Gralla, satisfies the limitation. *Id.* at 27–28 (citing Ex. 1005 ¶¶ 134, 163; Ex. 1003 ¶¶ 96–97). We agree, and find that Gralla teaches claim limitation 1b.

As to claim limitation 1c, Petitioner contends that Robertson's Figure 8A illustrates "displaying [via display 800] at least a portion of the first webpage on a first object within a 3D space, and at least a portion of the second webpage on a second object within the 3D space." *Id.* at 29–30 (citing Ex. 1004, 12:54–63; Ex. 1003 ¶ 100). Petitioner argues that, in the combination of Gralla and Robertson, "the *first/second object* thumbnails of

31

Robertson represent the *first/second webpages* of Gralla (per Element [1.b]),” and that “Robertson evinces that the *object* thumbnails comprise visual representations—images (*displaying at least a portion*)—of the *webpages*.” *Id.* at 30 (citing Ex. 1004, 6:30–50, 9:10–35, 12:54–13:4, 18:1–5, 28:1–16, Figs. 2, 4, 8A–18; Ex. 1003 ¶¶ 101–102). We agree, and find that Gralla and Robertson teach claim limitation 1c.

As to claim limitation 1ci, “rendering the first and second webpages,” Petitioner contends that a skilled artisan “would have understood that Robertson's 3D-GUI *renders the (first/second) webpages* to obtain the webpage images on the object thumbnails,” and that a skilled artisan “would have known that webpage *rendering* was a ubiquitous process for converting code received from a web server into visible content.” Pet. 31 (citing Ex. 1004, 6:30–50, 9:10–35, 12:54–13:4, 18:1–5, 28:1–16, Figures 2, 4, 8A–18; Ex. 1003 ¶¶ 104–105). Dr. Fuchs testifies that “[w]ebpage *rendering* is a core functionality of virtually all web browsers, and it would have been obvious to a [person of ordinary skill in the art] that rendering is a prerequisite step to obtaining ‘screen snapshots of actual web pages,’ as explained in Robertson's companion Data Mountain paper.” Ex. 1003 ¶ 105 (quoting Ex. 1030).

Petitioner further argues that a skilled artisan would have applied “implementation details provided by Gettman for displaying webpages in a 3D-GUI” to Robertson's disclosure of object thumbnails displaying webpage images. Pet. 31. Petitioner contends that “Gettman's technique involves ‘cach[ing]’ ‘bitmap screenshots’ of *webpages* in local memory using a ‘HTML page-*rendering* engine’—a software application for *rendering (the first/second) webpages*.” *Id.* at 31–32 (citing Ex. 1006 ¶¶ 82, 108–121, Fig. 2; Ex. 1003 ¶ 106).

Relying on Dr. Fuchs' testimony, Petitioner contends that a skilled artisan would have substituted Gettman's browser-window technique for Robertson's to obtain the predictable benefit of improved usability. *Id.* at 24 (citing Ex. 1003 ¶¶ 87–88). Petitioner further argues that this combination would have been the predictable substitution of one element known in the field for another. *Id.* (citing Ex. 1003 ¶ 89). Petitioner contends that a skilled artisan would have had a reasonable expectation of success in combining the teachings of Robertson, Gralla, and Gettman because GUIs, web browsers, and simulated 3D environments were all well-known technologies that had been successfully demonstrated in the real world. *Id.* at 25 (citing Ex. 1003 ¶ 90).

We credit Dr. Fuchs' testimony and find that a skilled artisan would have had reasons, with rational underpinning, to combine the teachings of Robertson and Gralla with those of Gettman, and would have had a reasonable expectation of success in doing so. As noted above, Patent Owner does not present arguments specific to the reasons to combine Robertson, Gralla, and Gettman. PO Resp. 4–5.

As to claim limitation 1cii, Petitioner argues that a skilled artisan "would have understood that Robertson's 3D-GUI *captures images* of the rendered (*first/second*) *webpages* to obtain the webpage images on the object thumbnails." Pet. 32 (citing Ex. 1004, 6:30–50, 9:10–35, 12:54–13:4, 18:1–5, 28:1–16, Figs. 2, 4, 8A–18; Ex. 1003 ¶ 107). Petitioner further argues that "Gettman's technique involves 'cach[ing]' 'bitmap screenshots' (*captured first/second images*) of rendered (*first/second*) *webpages* in local memory." *Id.* at 33 (citing Ex. 1006 ¶¶ 82, 108–121; Ex. 1003 ¶ 108). We agree, and find that Robertson and Gettman teach claim limitation 1cii.

33

Regarding claim limitation 1ciii, Petitioner argues that "Robertson's figures [8A and 15A] demonstrate how the webpage *images* are drawn/mapped based on the size and shape of the *object* thumbnail—e.g., larger in the foreground, smaller in the background, and optionally with a parallax effect." Pet. 33–35 (citing Ex. 1004, 6:30–50, 9:10–35, 12:54–13:4, 14:61–63, 17:49–67, 18:1–13, 28:1–16, Figs. 2, 4, 8A–18; Ex. 1003 ¶¶ 110–113). Petitioner concedes that "Robertson does not use the exact term ['texturing']," but argues that Gettman "confirms that a [person of ordinary skill in the art] would have understood Robertson's technique to use *texturing*." *Id.* at 35–36 (citing Ex. 1006 ¶¶ 112–121, 163, Fig. 6C; Ex. 1003 ¶ 114). We agree, and find that Robertson and Gettman teach claim limitation 1ciii.

As to claim limitation 1di, Petitioner argues that, with Robertson's 3D-GUI, an object is selected when an end user inputs, and the 3D-GUI receives, a predetermined interaction, such as a mouse click, on the first image of the object thumbnail. *Id.* at 39 (citing Ex. 1004, 13:55–14:21, 15:45–68, 16:3–17, Fig. 22; Ex. 1003 ¶ 122). We agree, and find that Robertson teaches claim limitation 1di.

Claim limitation 1dii recites "replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes the rendered first webpage." The parties dispute several aspects of the applicability of the teachings of Robertson and Gettman to this limitation.

Petitioner contends that Robertson teaches this limitation because, when the user selects an object thumbnail, "Robertson's 3D-GUI presents a '"live" object' that is 'in its associated application,' such as 'the Internet Explorer™ Internet browser . . . [for] rendering a [first] web page.'"

34

Pet. 39–40 (emphasis omitted) (quoting Ex. 1004, 13:55–14:14; citing Figure 9). According to Petitioner, in doing so, "the *(first/second) objects in the 3D space* of Robertson's GUI are *replaced*—both from the user's perspective of what content is viewable and the computer's standpoint in terms of what content is being displayed—by a full-screen *window in the two-dimensional space* of a conventional Internet Explorer web browser." *Id*. at 40 (citing Ex. 1003 ¶¶ 123–125).

Petitioner also relies on Gettman which, according to Petitioner, "describes an embodiment where 'the result of the interaction [with a 3D display window in the virtual city] may cause the target [w]eb site to open in a conventional two-dimensional web browser.'" Pet. 40–41 (quoting Ex. 1006 ¶ 164; citing *id*. ¶¶ 200–201). Petitioner quotes Gettman as explaining that in this embodiment, "'the user *switches* to an alternate two-dimensional view of the web page.'" *Id*. (Petitioner's emphasis). Petitioner provides annotated versions of Gettman Figures 12 and 13, reproduced below, to illustrate that, when a user interacts with buttons, a 2D space (i.e., a 2D web browser (Fig. 13)) "switches" to a 3D space (i.e., a virtual 3D space (Fig. 12)). *Id*. at 41 (citing Ex. 1004 ¶ 200, Figs. 12, 13).

35



The figures above are Petitioner's annotated versions of Gettman's Figures 12 (bottom) and 13 (top) showing buttons 1204 and 1222, that, when interacted with, cause a 2D space (outlined in red) to switch to a 3D space (outlined in blue). According to Petitioner, a skilled artisan "would have been motivated to employ Gettman's above-discussed teaching of toggling between 'a virtual 3D space' and 'a two dimensional browser' in response to an end user interacting with and selecting an object thumbnail." Pet. 42 (citing Ex. 1003 ¶ 127).

Patent Owner argues that "the present invention requires both 2D and 3D space, where images of webpages are presented in 3D space and

36

*replacing* the images with a single, active webpage *in 2D space*, where the webpage is selected based on the user interacting with one of the images in 3D space." PO Resp. 38. According to Patent Owner, this "***requir[es] both a 3D environment, where only images are presented, and a 2D environment, where only individual, active applications are presented for interaction***." *Id.* at 39. Patent Owner argues that "[n]ot only does this require the user to go back-and-forth between 3D and 2D space, but it does so in way to (a) provide a visual chronological history of the user's computing events and (b) present the webpage ***where the user last left off***." *Id.* at 39–40.

As to a chronological order, Patent Owner argues that "images are not just arranged in 3D space but arranged in a particular order to provide 'a visual chronological history of the user's computing session.' This is done by arranging the images *in the order in which the webpages were requested by the user*." *Id.* at 40 (quoting Ex. 1001, 5:6–12). Patent Owner argues that "Robertson's objects are not a '3D stack' with a first image in the foreground, a second image in the background, etc., but arranged in 'clusters' where objects are arranged 'relatively close to one another.'" *Id.* at 57 (quoting Ex. 1004, 7:24–33; citing Ex. 2014 ¶ 170).

Petitioner contends that Patent Owner's arguments are moot because the claims do not require a 3D stack of objects arranged chronologically. Reply 19. We agree with Petitioner. As explained in the Claim Construction section above, the challenged claims do not require the chronological ordering proposed by Patent Owner. Accordingly, Patent Owner's argument is not persuasive.

As to "replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space," as recited in claim

37

limitation 1dii, Patent Owner argues that Robertson describes an example in which a user clicks on an object thumbnail presented in 3D space, and that object thumbnail is displayed in the foreground, still in 3D space. PO Resp. 42–43 (citing Ex. 1004, 13:55–14:10). However, Robertson describes another example in which, "rather than merely providing a high resolution object thumbnail, the actual object, in its associated application, may be presented." Ex. 1004, 13:65–67. Patent Owner acknowledges that "Robertson provides that in one embodiment, the selected webpage may be presented in an Internet Explorer™ Internet browser in 3D space." PO Resp. 43 (citing Ex. 1004, 13:64–14:10). Patent Owner argues that, even in this browser example, the browser "is still in 3D space," as "supported by the fact that Robertson provides that when the browser is enlarged, the other objects (or images) are 'in the background,'" and further supported by Robertson's Figure 13B, "which provides that the selected object could be presented in the background (as opposed to the foreground) so as to not to occlude the other objects." *Id.* at 43–44 (quoting Ex. 1004, 13:55–14:10; citing Ex. 1004, 22:39–43, Fig. 13B). According to Patent Owner, "[w]hile the 'live' object may appear as 2D in Figure 9, that is merely due to the user having a top-down viewpoint. If the user changes their viewpoint, the object appears more 3D." *Id.* at 44–45 (citing Ex. 1004, 17:9–14, 22:39–43, Figs. 9, 13B; Ex. 2014 ¶ 83). Patent Owner appears to contend that Robertson's browser window is a 2D object presented in a 3D space rather than a 2D space replacing objects within a 3D space. *Id.* at 45 ("However, whether the object is 2D or 3D is really a red herring as the challenged claims ***do not require a 2D object, but a 2D space***.") (citing Ex. 2014 ¶ 83).

Robertson describes a user clicking on a thumbnail image and, in response, "rather than merely providing a high resolution object thumbnail,

the actual object, in its associated application, may be presented," for example, "the Internet Explorer™ Internet browser . . . may be rendering a web page, with the user interface of the present invention in the background." Ex. 1004, 13:58–14:4. We find that an Internet Explorer browser rendering a webpage in its window is "a finite graphical area defined by a two-dimensional coordinate system." Thus, it is a 2D space, as we construe the term, as discussed above. It is not the "first object," as recited in claim limitation 1c–1ciii (Robertson's first object thumbnail, onto which an image of the first website is textured), as the object thumbnail is replaced with "the actual object, in its associated application," such as the website rendered in a browser window. Patent Owner's arguments to the contrary are not persuasive. Thus, we find that Robertson teaches "replacing the first . . . object[] within the 3D space with a window within a two-dimensional (2D) space," as recited in claim limitation 1dii.

Patent Owner further argues that "Gettman is similar to Robertson in that objects are only presented in 3D space." *Id.* at 47. Patent Owner acknowledges that, in one embodiment, Gettman's "'live' webpage is presented in a conventional 2D browser, but it is still presented *in the 3D space*." *Id.* (citing Ex. 1006 ¶¶ 83, 121, 128, 164). Gettman describes

> When a window first becomes visible in the viewer's screen, the corresponding cached HTML page is copied by the program from the internal memory and rendered in the window. The page is not rendered dynamically until the viewer turns toward it (and "clicks" on it or remains in that position for a set period of time), at which stage the dynamically cached page may be displayed in a two dimensional, conventional-style browser display box.

Ex. 1006 ¶ 83. In the example of Figure 6C, "the result of the interaction may cause the target Web site to open in a conventional two-dimensional

web browser which forms another 'view' within the virtual space browser[,] ie.[,] [t]he content within the virtual space itself does not change as a result of the interaction, but the user switches to an alternate two-dimensional view of the web page." *Id.* ¶ 164. These are examples of an image of a website being textured on an object (display window 4, shown in Gettman's Fig. 1; display windows 644, 646 of Fig. 6C), and replaced with a browser rendering the website corresponding to the image when the user selects (clicks on a display window or "turns toward") the object. We find that a "two dimensional, conventional-style browser display box" rendering a webpage is "a finite graphical area defined by a two-dimensional coordinate system." Thus, it is a 2D space, as we construe the term. As a result, we find that Gettman teaches "replacing the first . . . object[] within the 3D space with a window within a two-dimensional (2D) space," as recited in claim limitation 1dii.

As to "replacing the first and second objects," as recited in claim limitation 1dii, Patent Owner argues that Robertson's browser window only replaces the selected first object and not both the first and second objects. PO Resp. 46 (citing Ex. 1004, 22:4–5; Ex. 2014 ¶ 86). Patent Owner contends that Robertson teaches avoiding total preclusion of other objects besides the first object being replaced. *Id.* at 46–47 (citing Ex. 1004, 9:65–10:14, 17:39–40, 22:31–55, Figs. 13A–D; Ex. 2014 ¶ 88). Comparing Robertson's Figure 8 to Figure 9, however, clearly shows that multiple objects are entirely occluded when an object is selected and window 902 is invoked. Thus, we find that Robertson teaches replacing first and second objects.

Moreover, Petitioner also cites Gettman as teaching replacing both the first and second objects. Pet. 40–42; Reply 14–16. For example, in

40

Gettman's example of Figure 6C, virtual display windows 644, 646 display textures rendered from webpages. Ex. 1006 ¶ 164. When a user interacts with a virtual display window, "the result of the interaction may cause the target Web site to open in a conventional two-dimensional web browser which forms another 'view' within the virtual space browser[,] ie.[,] [t]he content within the virtual space itself does not change as a result of the interaction, but the user switches to an alternate two-dimensional view of the web page." *Id.* Gettman's Figure 13 illustrates a "web view" that results when a hyperlink is selected by a user, causing the browser to display a view of a webpage in the main pane of the screen display area. *Id.* ¶ 200.

Patent Owner argues that Figure 13 is not the 2D browser that is presented when the user clicks on a window in 3D space and, instead, is a browser launched when a user clicks on the "web button area" of Figure 12. PO Resp. 48. To the extent Patent Owner is arguing that Gettman does not teach replacing all of the objects in a 3D space with a browser window rendering a selected webpage (which Patent Owner has not clearly articulated), we are not persuaded. Figure 13 is representative of a browser window that Gettman's system invokes when a user clicks a hyperlink. Ex. 1006 ¶ 200. Clicking on a display window in Gettman's Figure 1 or 6C invokes a 2D browser window. *Id.* ¶¶ 83, 164. We find that Figure 13's example of a webpage rendered in a browser would also be applicable to the

examples of Figures 1 and 6C.[3]  Taken together, we agree with Petitioner, and find that Gettman teaches replacing the objects in a 3D space (Gettman's virtual display windows in a virtual 3D street) with a browser window rendering the webpage selected by the user.

Patent Owner argues that "***Robertson's use of a single 3D space actually <u>teaches away</u> from the claimed invention***, where the user goes back-and-forth between a plurality of images in 3D space and individual, active webpages in 2D spaces." PO Resp. 49.  "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).

Specifically, Patent Owner argues that "Robertson is concerned with object occlusion, and how total preclusion of other objects presented in 3D space should be avoided." PO Resp. 46–47 (citing Ex. 1004, 7:13–16, 9:65–10:14, 17:39–40, 22:31–55).  Patent Owner argues that Robertson teaches that its 3D-GUI is advantageous in that it can present more objects at one time on a single display screen while preventing object occlusion. *Id.* at 48 (citing Ex. 1004, 5:62–67, 6:20–23, 6:65–67, 7:13–16, 22:20, 22:32–34, Figs. 20A–B; Ex. 2014 ¶ 87).  Dr. Schaefer cites to further material in

---

[3] The Preliminary Response contended that, in Gettman's Figure 4 embodiment, "the 'live' webpage is presented in a conventional, 2D browser in 3D space."  Prelim. Resp. 46.  To the extent that Patent Owner contends that Gettman's Figure 4 illustrates selecting a virtual display window, but not entirely replacing the 3D space, we note that the 2D rendering of the webpage in the foreground of Figure 4 occludes more than one object and, thus, replaces at least first and second objects.

Robertson to show "that only the selected object is replaced" and "that Robertson discusses at length the issue of object occlusion, and how total preclusion of other objects presented in 3D space should be avoided." Ex. 1014 ¶ 87 (citing Ex. 1004, 5:47–49, 5:22–24, 7:13–17, 9:65–10:14, 17:39–40, 22:31–55, Figs. 13A–D, 23A–B). Thus, Patent Owner argues, a skilled artisan would not have modified Robertson to present a webpage in 2D space, "especially if doing so would result in the total occlusion of objects presented in 3D space." *Id.* at 49–50.

Although Robertson states that it is advantageous to display more objects in a 3D landscape without one object thumbnail totally occluding another, and describes examples where selected objects do not occlude other objects, none of Patent Owner's citations purports to discourage or lead in a direction divergent from a selected object replacing multiple objects. Moreover, as explained above, and contrary to Patent Owner's arguments, Robertson depicts an example of occluding entirely objects displayed in Figure 8 when window 902 is invoked, as shown in Figure 9. Here, "the 'mere disclosure of alternative designs does not teach away,'" and "just because better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes." *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012) (quoting *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004); citing *Gurley*, 27 F.3d at 553). Thus, Robertson does not teach away from a combination with Gettman in which, when a user selects an object in a 3D space, a browser window is invoked, occluding multiple objects, or even the entire 3D space (and the first and second objects therein).

As to replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space "wherein the window includes

43

the rendered first webpage" of limitation 1dii, Patent Owner argues that both Robertson and Gettman teach that, when a user selects an object with an image of a webpage, and a web browser is invoked, the web browser renders the webpage anew and does not display the version of the webpage that was rendered previously in the step of claim limitation 1ci. PO Resp. 52–56.

We agree with Patent Owner's characterization and find that it is correct. In Robertson, for example, "the Internet Explorer™ Internet browser . . . may be rendering a web page, with the user interface of the present invention in the background." Ex. 1004, 13:55–14:4. Dr. Fuchs admits that Robertson operates in this manner:

> when a user selects a thumbnail, "the Internet Explorer browser . . . render[s] [the corresponding] web page, with the [3D] user interface . . . in the background." In other words, selecting the thumbnail causes Internet Explorer to retrieve, render, and display the webpage represented by thumbnail.

Ex. 1003 ¶ 65 (quoting Ex. 1004, 13:67–14:14). In Gettman,

> When a window first becomes visible in the viewer's screen, the corresponding cached HTML page is copied by the program from the internal memory and rendered in the window. The page is not rendered dynamically until the viewer turns toward it (and "clicks" on it or remains in that position for a set period of time), at which stage the dynamically cached page may be displayed in a two dimensional, conventional-style browser display box.

Ex. 1006 ¶ 83. Petitioner does not appear to dispute that this describes rendering the "current" or "live" webpage in response to the user's selection. Reply 18–19.

Patent Owner contends that "wherein the window includes the rendered first webpage" "requires receiving a first input (or web address) from the user and, in response, receiv[ing] a first webpage, render[ing] the

44

first webpage, and captur[ing] a first image of the rendered first webpage, which is textured on a first object in 3D space." PO Resp. 53. As explained in the Claim Construction section above, we agree with Patent Owner that "the rendered first webpage," as recited in claim 1, is not referring to the webpage generally, but the rendered version from which the corresponding image was captured. Neither Robertson nor Gettman teaches "the window includes *the rendered first webpage*."

Petitioner's primary argument relies on us construing "wherein the window includes the rendered first page" to include the window presenting the "current" or "live" version of the webpage. Reply 6–8, 18. We reject that argument for the reasons given in the Claim Construction section, above.

Petitioner further argues that, if we adopt Patent Owner's construction (which we do), that construction "reads on basic browser caching, a staple of the 'conventional' web browsers in the Robertson-Gettman combination." *Id.* at 19. According to Petitioner, a skilled artisan "would have known [that] web browsers like Internet Explorer include a built-in browser cache that stores copies of previously retrieved webpages," and the web browsers would have presented the stored copy to the user instead of retrieving a new copy. *Id.* (citing Ex. 1060 ¶¶ 78–80). Dr. Fuchs, in turn, relies on two new exhibits, Exhibits 1055 and 1056. Ex. 1060 ¶ 79.

First, to the extent Petitioner argues that this browser caching feature is present in the combination of Robertson, Gralla, and Gettman, Dr. Fuchs' new testimony (Ex. 1060 ¶ 79), e.g., "[i]n some instances, such as when a webpage consists of static content that is 'fresh' (as opposed to 'stale'), the browser presents the stored copy to the user without retrieving a new copy from the origin server," is directly contradicted by the testimony he

45

submitted with the Petition (Ex. 1003 ¶ 65). Dr. Fuchs unequivocally testified that "selecting the thumbnail causes Internet Explorer to retrieve, render, and display the webpage represented by thumbnail." Ex. 1003 ¶ 65. Thus, all of Dr. Fuchs' testimony on this point, in both declarations, is inconsistent, unreliable, not credible, and entitled to little weight. Thus, Petitioner's new theory is unsupported by evidence and not persuasive.

Even if we were to find Dr. Fuchs' testimony credible, as Patent Owner observes (Sur-reply 11–12), Petitioner's argument was not presented in the Petition and relies on new evidence (Exhibits 1055, 1056, and 1060 (new testimony from Dr. Fuchs)) that was not included in the Petition. This is contrary to our rules. *See* 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the corresponding . . . patent owner response, or decision on institution."). Specifically, "Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g. to make out a prima facie case of unpatentability." Consolidated Trial Practice Guide ("TPG") at 73; *see also* 84 Fed. Reg. 64,280 (Nov. 21, 2019).

> "Respond," in the context of 37 C.F.R. § 42.23(b), does not mean proceed in a new direction with a new approach as compared to the positions taken in a prior filing. While replies and sur-replies can help crystalize issues for decision, a reply or sur-reply that raises a new issue or belatedly presents evidence may not be considered. The Board is not required to attempt to sort proper from improper portions of the reply or sur-reply.

> Examples of indications that a new issue has been raised in a reply include new evidence necessary to make out a *prima facie* case for the patentability or unpatentability of an original or proposed substitute claim, such as newly raised rationale to combine the prior art references that was not expressed in the petition.

46

TPG 74.  *See also Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F3d 1359, 1369 (Fed. Cir. 2016).

The Petition presented the theory that Robertson's and Gettman's descriptions of browser windows rendering webpages anew teach "wherein the window includes the rendered first webpage." Pet. 39–42. The Petition did not argue that the browsers of Robertson and Gettman would, instead, present previously rendered and cached webpages in lieu of rendering those webpages. *Id.* Petitioner's Reply argument is an attempt to present a new prima facie case of obviousness, i.e., that a skilled artisan would have known that web browsers such as those in Robertson and Gettman could present cached webpages and that it would have been obvious to do so when such pages are "fresh" and not "stale." Reply 19. Tellingly, Petitioner does not cite to evidence presented with the Petition to support this new argument; rather, Petitioner introduces new expert testimony and supporting exhibits that supply the missing teachings of web browser caching. *Id.* (citing Ex. 1060 ¶ 79 (citing Exs. 1055, 1056)). Petitioner's new argument and new testimony is improper, has been forfeited, and will not be considered.[4]

In sum, we find that neither Robertson nor Gettman teaches "replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes *the rendered first webpage*," as recited in claim limitation 1dii.

---

[4] Below, we address Patent Owner's motion to exclude this new evidence, specifically Exhibit 1060 ¶ 79 and Exhibits 1055 and 1056, referenced therein, and find that motion moot.

This issue is dispositive for claim 1 and independent claim 8, which similarly recites "replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space on the display screen in response to receiving the interaction, wherein the window includes *the rendered first webpage*." It also is dispositive for claims 2–7 and 9–13, which depend from claims 1 and 8, respectively. Nevertheless, we address the remaining limitations of claim 1, as it bears on the patentability of independent claim 14, as discussed in detail below.

As to claim limitation 1diii, Petitioner contends that Robertson "teach[es] the concept of launching a web browser (*e.g.*, Intern[et] Explorer or Mozilla) for the user to interact with in a conventional way—*i.e.*, in a 2D window instead of a virtual 3D space." Pet. 42 (citing Ex. 1003 ¶ 128). Petitioner relies on Gralla for an explanation of the "conventional way"; that is, "the conventional functionalities of such a web browser involve *receiving an interaction by the end user*—a 'click'—*on a link provided in the rendered (first) webpage, the link corresponding to the additional information*." *Id*. (citing Ex. 1005, 134). We agree with Petitioner that Robertson and Gralla teach receiving an interaction with a link, on a rendered webpage, to additional information. Thus, we find that Robertson and Gralla teach this aspect of claim limitation 1diii. However, as noted above for claim limitation 1dii, in Petitioner's combination, the rendered webpage in the window within the 2D space is of the current or live version of the webpage, rather than the "rendered first webpage." Thus, for the same reasons as given for claim limitation 1dii, the combination of Robertson, Gralla, and Gettman does not teach receiving an interaction on a link provided in "the rendered first webpage," as recited in claim limitation 1diii.

<div align="center">48</div>

As to claim limitations 1div and 1dv, Petitioner argues that Robertson "teach[es] the concept of launching a web browser (e.g., Intern[et] Explorer or Mozilla) for the user to interact with in a conventional way—i.e., in a 2D window instead of a virtual 3D space" and "Gralla explains that the conventional functionalities of such a web browser involve rendering and displaying the additional information." *Id.* at 43–44 (emphasis omitted) (citing Ex. 1005, 142–43; Ex. 1003 ¶¶ 104–105, 129). We agree with Petitioner, and find that Robertson and Gralla teach claim limitations 1div and 1dv.

### 4. Claims 14–18

Independent claim 14 is similar in many respects to claim 1, and Petitioner and Patent Owner cite back to their arguments and evidence as to claim 1 for claim 14. Pet. 52–53; PO Resp. 57.

We agree with Petitioner (Pet. 52–53) that the evidence and argument Petitioner presents for claim limitations 1a–1di and 1div–1dv are sufficient to show that Robertson, Gralla, and Gettman teach claim limitations 14a–14di, and 14div, for the reasons given above. Aside from arguing that the claims have a chronological order requirement, Patent Owner does not present separate arguments for these limitations. Like claim 1, claim 14 does not have Patent Owner's proposed chronological order requirement. For the same reasons as given for claim 1, Patent Owner's arguments on this point (PO Resp. 40–41, 56–58; Sur-reply 2–7) are not persuasive.

Claim limitation 1dii recites "replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes the

49

*rendered* first webpage." Claim limitation 1diii recites "receiving an interaction by the end user on a link provided in the *rendered* first webpage, the link corresponding to the additional Information." As explained above, Petitioner has not shown that Robertson, Gralla, and Gettman teach these limitations of claim 1, in particular, that the window includes the "rendered" first webpage.

Claim limitation 14dii is similar to claim limitation 1dii, but different in at least one meaningful respect. Claim limitation 14dii recites "replacing the first and second images within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes the first webpage." Here, claim limitation 14dii does not recite that the window includes a "rendered" first webpage; rather, it simply recites that the window includes the first webpage, which could be a version previously rendered or rendered in response to the receiving of limitation 14di. Similarly, claim limitation 14diii recites receiving an interaction on a link provided in "the first webpage," rather than in "the rendered first webpage," as in claim limitation 1diii. Thus, the deficiency in the Petition's evidence for claim limitations 1dii and 1diii is not present for claim limitations 14dii and 14diii.

We find that Robertson's example of displaying an Internet browser window rendering a webpage in response to a user selecting an object thumbnail (Ex. 1004, 13:55–14:14, Fig. 9; Ex. 1003 ¶¶ 123–125; Pet. 39–40) teaches "replacing the first and second images within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes the first webpage," as recited in limitation 14dii. Similarly, Gettman's example of interacting with a virtual display window, resulting in the target web site opening in a conventional

50

two-dimensional browser (Ex. 1006 ¶¶ 164, 200–201, Figs. 12–13; Ex. 1003 ¶¶ 126–127; Pet. 39–42) teaches this limitation. And as explained above for claim limitation 1diii, Robertson and Gralla teach that the user interacts with a link on a version of the first webpage, which is all claim limitation 14diii requires. Ex. 1003 ¶ 128; Ex. 1005, 134. Patent Owner's arguments as to the window including "the rendered first webpage" (PO Resp. 52–56; Sur-reply 9–16) are not applicable to claim 14, as claim 14 does not include this recitation or any other recitation corresponding to it.

As to Patent Owner's remaining arguments, Robertson and Gettman teach "replacing the first and second images within the 3D space with a window within a two-dimensional (2D) space," as recited in claim limitation 14dii for the same reasons that they teach "replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space," as recited in claim limitation 1dii. Patent Owner's arguments as to this limitation (PO Resp. 38–39, 42–52; Sur-reply 19–23) are not persuasive. Thus, for the reasons given for claim 1, and as further discussed here, Robertson, Gralla, and Gettman teach each limitation of claim 14, and a skilled artisan would have had reasons, with rational underpinning, to combine the teachings of Robertson, Gralla, and Gettman, with a reasonable expectation of success.

Claim 15 depends from claim 14 and adds "wherein the additional information is displayed in the window, thereby replacing the first webpage in the window." Petitioner contends that Robertson, Gralla, and Gettman teach the additional limitation of claim 15 for the same reasons as given for claim limitations 1dii and 1dv (which we analyze above). Pet. 53. We agree, and find that Robertson, Gralla, and Gettman teach the additional limitation of claim 15.

51

Claim 16 depends from claim 14 and adds

[16a] generating a third image of at least a portion of the additional information; and

[16b] replacing the window with at least the second and third images within the 3D space, wherein the third image replaces the first image in the foreground of the 3D space, and the second image remains in the background of the 3D space.

Petitioner contends that Robertson, Gralla, and Gettman teach the additional limitations of claim 16 for the same reasons as given for claim limitations 2a and 2c. Pet. 53.

As to limitations 2a and 2b, Petitioner contends that they essentially require repeating claim limitations 1cii and 1ciii. *Id.* at 44. Petitioner contends that Robertson's 3D-GUI processing steps are performed as a sequence of cycles, resulting in claim limitations 1cii and 1ciii being repeated. *Id.* at 44–45 (citing Ex. 1004, 14:25–24; Ex. 1003 ¶ 131). As to limitation 2c, Petitioner argues that this limitation requires the 3D-GUI to revert the replacing step of claim limitation 1dii to re-enter 3D space, and that this is taught by Robertson and Gettman, e.g., Robertson's teaching of re-entering 3D space when an object is de-selected. *Id.* at 45 (citing Ex. 1004, 16:15–17, 22:67–23:4, Fig. 22; Ex. 1006 ¶¶ 200–201; Ex. 1003 ¶¶ 135–136).

We agree that claim limitation 16a corresponds to claim limitation 2a and claim limitation 16b corresponds to claim limitation 2c. We find that Robertson, Gralla, and Gettman teach the additional limitations of claim 16 based on the evidence Petitioner presents for claim 2.

Claim 17 depends from claim 16 and adds "[17a] receiving a toggle interaction by the end user; and [17b] replacing the window with at least the second and third images within the 3D space in response to the toggle

52

interaction." Petitioner contends that Robertson, Gralla, and Gettman teach the additional limitations of claim 17 for the same reasons as given for claim limitations 2c, 3a, and 3b. Pet. 53. As to claim 3, Petitioner contends that Robertson and Gettman both teach reverting the replacing step of claim limitation 1dii in response to a mouse click or button selection (a toggling interaction). *Id.* at 46 (citing Ex. 1004, 16:15–17, 22:67–23:4, Fig. 22; Ex. 1006 ¶¶ 200–201, Figs. 12–13; Ex. 1003 ¶¶ 137–138). We agree that claim limitation 17a corresponds to claim limitation 3a and claim limitation 17b corresponds to claim limitation 3b. We find that Robertson, Gralla, and Gettman teach the additional limitations of claim 17 based on the evidence Petitioner presents for claim 3.

Claim 18 depends from claim 17 and adds "[18a] receiving a navigation interaction by the end user; and [18b] moving said second image from the background of the 3D space to the foreground of the 3D space in response to the navigation interaction." Petitioner contends that Robertson, Gralla, and Gettman teach the additional limitations of claim 18 for the same reasons as given for claim limitations 4a and 4b. Pet. 54. As to claim 4, Petitioner contends that Robertson's object thumbnails are moved about the landscape, which a skilled artisan would have understood would include moving them from background to foreground, and vice versa. *Id.* at 46 (citing Ex. 1004, 6:32–40, 9:36–63; Ex. 1003 ¶ 139).

We agree that claim limitation 18a corresponds to claim limitation 4a and claim limitation 18b corresponds to claim limitation 4b. We find that Robertson, Gralla, and Gettman teach the additional limitations of claim 18 based on the evidence Petitioner presents for claim 4.

Patent Owner does not present separate arguments for claims 14–18. In sum, we find that Robertson, Gralla, and Gettman teach each limitation of

claims 14–18, and a skilled artisan would have had reasons, with rational underpinning, to combine the teachings of Robertson, Gralla, and Gettman, with a reasonable expectation of success.

### 5. Objective Indicia of Nonobviousness

Patent Owner presents arguments and evidence related to objective indicia of non-obviousness. PO Resp. 68–70. In support, Patent Owner relies on the Bakhash Declaration. *Id.* (citing Ex. 2001 ¶¶ 13–23).

Notwithstanding what the teachings of the prior art would have suggested to one skilled in the art, objective evidence of nonobviousness (so called "secondary considerations") may lead to a conclusion that the challenged claims would not have been obvious. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984). "[E]vidence of secondary considerations may often be the most probative and cogent evidence in the record." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983). "[T]o be accorded substantial weight in the obviousness analysis, the evidence of secondary considerations must have a 'nexus' to the claims, *i.e.*, there must be 'a legally and factually sufficient connection' between the evidence and the patented invention." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). "The patentee bears the burden of showing that a nexus exists." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999). Patent Owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–

54

74 (Fed. Cir. 2019) (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)).

> According to the Federal Circuit,

> Commercial success is relevant because the law presumes an idea would successfully have been brought to market sooner, in response to market forces, had the idea been obvious to persons skilled in the art. Thus, the law deems evidence of (1) commercial success, and (2) some causal relation or "nexus" between an invention and commercial success of a product embodying that invention, probative of whether an invention was non-obvious.

*Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376 (Fed. Cir. 2005). "To establish a proper nexus between a claimed invention and the commercial success of a product, a patent owner must offer 'proof that the sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter.'" *SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1319 (Fed. Cir. 2015) (quoting *Huang*, 100 F.3d at 140).

"Evidence that the industry praised a claimed invention or a product that embodies the patent claims weighs against an assertion that the same claimed invention would have been obvious." *Apple Inc. v. Samsung Electronics Co., LTD*, 839 F.3d 1034, 1053 (Fed. Cir. 2016).

Patent Owner initially states that "Petitioner Fails To Address The Required 'Objective Indicia' Of Non-Obviousness." PO Resp. 68; *see also id.* at 70 ("Petitioner fails to adequately address these secondary considerations of non-obviousness and instead relies on improper hindsight"). However, Petitioner did address in the Petition Patent Owner's

evidence of industry praise, for instance, arguing that it contained statements that undermined Patent Owner's position.[5]  *See* Pet. 85–87.

Patent Owner discusses, primarily, objective indicia in the form of industry praise reported in "technical journals and newspapers."  PO Resp. 69 (citing Ex. 2001 ¶¶ 13–16).  Although the Patent Owner Response does not allege a nexus between the industry praise and the claimed invention, Mr. Bakhash testifies that *TechNewsWorld* stated that, "'[w]ith SpaceTime, I have an unlimited 3-D space . . . [that] lets me alternate between 3-D and 2-D perspectives . . . .'"  Ex. 2001 ¶ 16.  However, *TechNewsWorld* (Exhibit E to Exhibit 2001) does not clearly identify the claimed invention or any of its features.  *See* Ex. 2001 ¶ 16, pp. 88–91 (Exhibit E).  It simply describes "[a]n innovative three-dimensional search program" and a "browser."  *Id.* at pp. 88–91 (Exhibit E).  Thus, Patent Owner's evidence does not show a nexus between the claimed invention and the industry praise, and Patent Owner's evidence of industry praise is entitled to little weight.

Similarly, Mr. Bakhash testifies that Samsung sent emails to SpaceTime3D expressing interest in its technology and inviting SpaceTime3D to present its technology at Samsung's headquarters.  Ex. 2001 ¶¶ 17–23; PO Resp. 69.  However, Patent Owner does not allege a nexus between these emails and the claimed invention and it is unclear from reading the emails (Exhibits F–J to Exhibit 2001) that they are referring to the claimed invention.  All they mention is SpaceTime's "technology and solutions."  *See* Ex. 2001 ¶¶ 17–23, pp. 92–104 (Exhibits F–J).  Thus, Patent

---

[5] Patent Owner had alleged similar evidence of industry praise in an earlier *inter partes* review, which Petitioner addressed in the Petition.  Pet. 85.

Owner's evidence does not show a nexus between the claimed invention and the Samsung emails.

Finally, Patent Owner contends that Samsung and LG licensed the '048 patent, and argues that "[g]iven the nature of these licenses, they are strong indicators of commercial success." PO Resp. 69–70 (citing Ex. 2016 (Declaration of Patent Owner's attorney, Todd Fitzsimmons (filed under seal)). Petitioner argues that merely alleging the existence of licenses does not prove nexus, and that Patent Owner's cursory reference to the nature of the licenses lacks sufficient explanation and analysis. Reply 27 (citing *In re Antor Media Corp.*, 689 F.3d 1282, 1293–94 (Fed. Cir. 2012)). We observe that "[Federal Circuit] cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'" *Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1038 (Fed. Cir. 2017), as amended on reh'g in part (Mar. 15, 2018) (quoting *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004)). The Patent Owner Response does not allege, with particularity, what about these licenses are strong indicators of commercial success, or allege any nexus between the licenses and the claimed invention. PO Resp. 69–70.

In response to Petitioner's argument that alleging the existence of licenses does not show the requisite nexus, Patent Owner argues:

> The licenses themselves have been submitted as evidence along with a declaration that provides details of the licenses, including that (i) the licenses are limited to the '048 patent and patents that are related thereto (e.g., patents that are at issue in IPR2023-00343 and 344), (ii) licensees (Samsung and LG) are two of the three largest smartphone manufactures in the United States, and (iii) and the amounts paid for the licenses.

57

Sur-reply 27 (citing *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1353 (Fed. Cir. 2012)). If it is Patent Owner's position that the Declaration of its attorney, Mr. Fitzsimmons, includes the arguments missing from the Patent Owner Response that would show a nexus between the alleged commercial success and the claimed invention, it is improper, under our rules, to incorporate such arguments by reference from the Declaration into the Patent Owner Response. *See* 37 C.F.R. § 42.6(a)(3) ("Arguments must not be incorporated by reference from one document into another document."). Thus, those arguments are forfeited and will be disregarded.

In any case, even if we were to consider the Fitzsimmons Declaration, we see no persuasive argument in the Fitzsimmons Declaration or persuasive evidence in the attached licenses, to support Patent Owner's allegation of commercial success and corresponding nexus. As Patent Owner has not shown a nexus between the alleged commercial success and the claimed invention, we find that Patent Owner's evidence of commercial success is entitled to little weight. *See Bosch*, 878 F.3d at 1038 ("Given the lack of evidence that these licenses were entered into out of respect for the [challenged] patent, it was reasonable for the Board to assign less credit to the licensing evidence."). The *Transocean* case does not help Patent Owner. Even if "the royalties paid under the licenses exceed any litigation costs, and thus are an accurate reflection of the value of the claimed invention" in this case, which Patent Owner has not alleged specifically, "[t]he jury [in *Transocean*] found that Transocean established that its licenses to customers and competitors were due to the merits of the claimed invention and thus support nonobviousness." 699 F.3d at 1353. Here, Patent Owner does not

58

allege in its briefs, and Patent Owner's evidence does not show, that its licenses were due to the merits of the claimed invention.

In sum, we have considered Patent Owner's evidence of industry praise and commercial success, but, on the complete record, we find it unpersuasive and entitled to little weight.

### 6. Conclusion of Obviousness

In sum, as detailed above, Petitioner's proposed combination of Robertson, Gralla, and Gettman teaches each limitation of claims 14–18, but not claims 1–13. A skilled artisan would have had reasons, with rational underpinning, to combine the teachings of Robertson, Gralla, and Gettman, with a reasonable expectation of success. Patent Owner's objective indicia of nonobviousness are unpersuasive and entitled to little weight. Upon consideration of all the evidence, we conclude that Petitioner has proved by a preponderance of the evidence that claims 14–18 would have been obvious over Robertson, Gralla, and Gettman, but has not proved, by a preponderance of the evidence, that claims 1–13 would have been obvious over Robertson, Gralla, and Gettman.

### C. Obviousness over Sauve and Tsuda

Petitioner contends that claims 1–18 would have been obvious over Sauve and Tsuda. Pet. 54–85.

59

### 1. *Scope and Content of the Prior Art*

### a. *Overview of Sauve (Ex. 1007)*

Sauve relates to browsing software that "provide[s] a quick pick user-interface that visually displays the several tabs" open in a tabbed browser window. Ex. 1007 ¶ 6.

Figure 4, reproduced below, depicts "a display illustrating one embodiment for the quick pick user-interface and illustrating a user's selection within the interface." Ex. 1007 ¶ 11.



*Fig. 4*

Figure 4 of Sauve is a block diagram of quick pick user-interface 400 with quick pick window 460 displaying thumbnails 401–414. Quick pick window 460 of quick pick user-interface 400 displays "a rich set [of]

60

information, such as a graphical representation (e.g., thumbnails 402–411) for each of the open tabs in the tab row 320, [and] a graphical representation (e.g., thumbnails 401, 412–414) of the open tabs that are not currently visible in the tab row because they are in the overflow." *Id.* ¶ 42. Each thumbnail is scaled "so that the content of each tab can be viewed in the quick pick window 460." *Id.*

### b. *Overview of Tsuda (Ex. 1008)*

Tsuda relates to a "multiple window display device" that "display[s] windows inclined in the depth direction of the screen (hereafter also described as the ability to display windows in perspective) as if placed in a virtual 3D space." Ex. 1008, 10:57–61.

Figure 11B of Tsuda, reproduced below, depicts an exemplary alignment method of windows. Ex. 1008, 8:3–4.

61

## FIG. 11B



Figure 11B shows an example of windows aligned in 3D. In Figure 11B, five windows have been aligned in a stacked arrangement by using a 3D position calculating unit. *Id.* at 17:53–65.

### 2. Claims 1–13

In Petitioner's proposed combination, a skilled artisan would have applied Tsuda's teachings of a user interface with a virtual 3D space to Sauve's quick pick user-interface for a tabbed browser, as shown in Petitioner's annotated combination of Sauve's Figure 4 and Tsuda's Figure 11B, reproduced below:

62



The figure above shows Sauve's Figure 4 (a block diagram of a quick pick user interface and browser tabs) and Tsuda's Figure 11B (a picture of stacked windows) combined into a single image (illustrating stacked windows corresponding to browser tabs). Pet. 57–58 (citing Ex. 1003 ¶¶ 155–163).

Petitioner argues that Tsuda states that its invention may also be effective for desktop computers, "if a user is browsing various homepages on the Internet." *Id.* at 58 (quoting Ex. 1008, 14:24–26). Petitioner contends that a skilled artisan would have seen the 2D thumbnails of the quick pick interface of Sauve's tabbed web browser as a natural place to take Tsuda's suggestion to apply its solution, and would have appreciated that efficiently depicting 3D windows in perspective view would have been beneficial in that context. *Id.* at 58–59 (citing Ex. 1008, 14:16–24; Ex. 1003 ¶¶ 156–158). Relying on the testimony of Dr. Fuchs, Petitioner further argues that the known benefits of 3D-GUIs, such as Tsuda's, would have

63

predictably improved Sauve's quick pick interface, and would have promoted space efficiency and conveyed order more clearly. *Id.* at 59–60 (citing Ex. 1003 ¶ 159). Petitioner further argues that the combination would have exploited spatial memory and more efficient use of screen space and, thus, would have been a differentiator among competing web browsers. *Id.* at 60–61 (citing Ex. 1003 ¶¶ 160–162). Petitioner argues that a skilled artisan would have had a reasonable expectation of success in making the combination because GUIs, web browsers, and simulated 3D environments were all well-known technologies that had been demonstrated successfully in the real world. *Id.* at 61 (citing Ex. 1003 ¶ 163). Dr. Fuchs' testimony has rational underpinning, is logical and well-reasoned, and, accordingly, we give it substantial weight.

Patent Owner argues that Tsuda teaches away from presenting objects in a background of 3D space. PO Resp. 59. Patent Owner argues that Tsuda describes a GUI that functions exclusively in 3D, and that switching to 2D would have been counterintuitive to the teachings of Tsuda. *Id.* at 66–67 (citing Ex. 1008, 1:26–28, 14:16–27; Ex. 2014 ¶ 225). Relying on Dr. Schaefer's testimony, Patent Owner argues that "both references provide vastly different solutions to the same problem, *i.e.*, how to interact with windows that are otherwise hidden in 2D space, that have much different hardware and software requirements." *Id.* at 67 (citing Ex. 2014 ¶¶ 93, 227). Thus, Patent Owner argues, a skilled artisan would not have combined Sauve and Tsuda, but would have chosen one solution or the other. *Id.* Patent Owner argues that "the whole purpose of Sauve is to make each webpage more distinguishable, as the stacking nature of a tab browser provides limited information for each tab," and that Petitioner's combination

64

with Tsuda would not have achieved the objectives of Sauve. Sur-reply 24 (citing Ex. 2014 ¶ 112), 26.

Patent Owner's arguments are not persuasive. As noted above, a reference teaches away "when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Gurley*, 27 F.3d at 553. We have considered the portions of Sauve and Tsuda cited by Patent Owner and Dr. Schaefer, and find nothing that would discourage or lead in a direction divergent from the path taken by the inventor. Other than repeating Patent Owner's argument that Sauve and Tsuda provide drastically different solutions for moving from one active window to another, Dr. Schaefer does not explain why he concludes that the solutions teach away from one another or point to evidence to support that conclusion. Ex. 2014 ¶¶ 225–227.

Dr. Schaefer's testimony at paragraph 112 of his Declaration cites to paragraph 3 of Sauve, which states: "after opening several web pages, each in its own window, the taskbar may become quite cluttered. This makes it difficult to re-locate a particular web page. Tabbed browsers have been introduced to help manage the viewing of multiple web pages." Ex. 1007 ¶ 3. Nothing in this statement purports to discourage or lead in direction different from a combination with Tsuda. Instead, Sauve calls out for a solution that would organize several open webpages, a problem that Tsuda attempts to solve. Ex. 1007 ¶ 3; Ex. 1008, 14:16–27; Ex. 1003 ¶¶ 159, 162. As Petitioner points out, two references teaching different solutions to the same problem does not teach away from combining those references. Reply 23–24 (citing *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023) ("[I]f there's a known technique to address a known

65

problem using prior art elements according to their established functions, then there is a motivation to combine.")).

Patent Owner further argues that, if a skilled artisan were to combine Sauve and Tsuda, "the motivation would be to present *the hidden webpages (tabs)* in 3D space—*not the thumbnails* as Petitioner contends," because, in Sauve, "it is the webpages (or tabs) for which 'there is inefficient space.'" PO Resp. 67–68 (citing Ex. 2001 ¶ 52; quoting Ex. 1007 ¶ 38; citing Ex. 2014 ¶ 228). Patent Owner offers nothing more than conclusory testimony to support this alternative combination. *Id.* However, even if a skilled artisan also would have considered Patent Owner's alternative proposal, as we explained above, "the 'mere disclosure of alternative designs does not teach away.'" *Mouttet*, 686 F.3d at 1334 (quoting *Fulton*, 391 F.3d at 1201).

In sum, Petitioner has presented persuasive evidence that a skilled artisan would have combined the teachings of Sauve and Tsuda. We have considered Patent Owner's teaching away arguments and find them weak and unpersuasive. Accordingly, we find that a skilled artisan would have had reasons, with rational underpinning, to combine the teachings of Sauve and Tsuda, with a reasonable expectation of success.

As to the preamble[6] of claim 1, Petitioner contends that Sauve describes a "tab UI" that provides a quick pick user interface, where each browser tab is displayed as a graphical representation. Pet. 61 (citing Ex. 1007 ¶¶ 35, 42, Figs. 2, 4). Petitioner argues that the combination of

---

[6] For purposes of this Decision, we need not determine whether the preamble is limiting, as Petitioner's evidence is sufficient to show that Sauve teaches the preamble, if it is limiting.

Sauve with Tsuda would represent Sauve's 2D-GUI as a 3D-GUI. *Id.* at 61–62 (citing Ex. 1008, 1:5–12, 14:16–27, Figs. 1, 5, 11B, 12A–C; Ex. 1003 ¶ 164). We agree, and find that Sauve and Tsuda teach the preamble of claim 1.

Petitioner cites to Sauve's description of a web browser receiving an address as input to an address bar of a browser and receiving a webpage in return as teaching claim limitations 1a and 1b. *Id.* at 62–63 (citing Ex. 1007 ¶¶ 2, 4, 5, 40, Fig. 3; Ex. 1003 ¶¶ 165, 167). We agree and find that Sauve teaches receiving first and second inputs from an end user and receiving first and second webpages in response. Thus, Sauve teaches claim limitations 1a and 1b.

As to claim limitation 1c, Petitioner contends that Sauve's quick pick interface visually displays thumbnail images describing each tab, and that in combination with Tsuda, the visually displayed information would have been placed in a virtual 3D space. *Id.* at 64–65 (citing Ex. 1007 ¶¶ 18, 42; Ex. 1008, 10:52–62, 11:27–31, 11:59–12:4, 12:8–67, 13:15–43, Figs 2B, 3C, 4, 5; Ex. 1003 ¶¶ 169–170). Patent Owner argues that if a skilled artisan were to combine Sauve and Tsuda, "the motivation would be to present *the hidden webpages (tabs)* in 3D space—*not the thumbnails* as Petitioner contends." PO Resp. 67 (citing Ex. 2001 ¶ 52). For the reasons given above, we are not persuaded that Patent Owner's alternative proposed combination undermines that proposed by Petitioner. In Petitioner's combination, at least a portion of first and second webpages, thumbnails, are displayed on first and second objects, as shown in Petitioner's annotated combination of Sauve's Figure 4 and Tsuda's Figure 11B, reproduced below:



Petitioner's annotated figure, above, shows a 3D space (in green), including a texture-mapped image on a first object (in red) and a texture-mapped image on a second object (in blue). Pet. 66. We find that the combination of Sauve and Tsuda teaches claim limitation 1c.

As to claim limitation 1ci, Petitioner argues that Sauve's browser renders HTML for each webpage of its tabs. *Id.* at 66–67 (citing Ex. 1007 ¶¶ 2, 4, 26–27, 41; Ex. 1003 ¶¶ 173–174). Petitioner argues that Sauve suggests capturing images of the webpages to create thumbnails and that Tsuda describes displaying objects as bitmap images, with either example satisfying claim limitation 1cii. *Id.* at 67 (citing Ex. 1007 ¶¶ 41–42; Ex. 1008, 11:4–12, 13:10–46, Figs. 1, 4–6, 9, 11–12C; Ex. 1003 ¶¶ 175–176). We agree with Petitioner, and find that Sauve and Tsuda teach claim limitations 1ci and 1cii.

As to claim limitation 1ciii, Petitioner contends that Tsuda describes texturing first and second images from 2D content, such as the webpages described in Sauve, onto first and second windows in 3D space. Pet. 68 (citing Ex. 1008, 13:15–43, Fig. 4 (steps S5122–S5124); Ex. 1003 ¶¶ 177–

68

179). We agree, and find that Tsuda teaches "texturing the first image on the first object and the second image on the second object," as recited in claim limitation 1ciii.

As to "the first object being displayed in a foreground of the 3D space and the second object being displayed in a background of the 3D space," as recited in limitation 1ciii, Petitioner argues that "Tsuda's windows (*objects*) are stacked horizontally from right to left, such that the rightmost window in the stack occupies a plane that is forward in the stack (*first object* in a *foreground*) relative to the plane of a window further to left (*second object* in a *background*)." *Id.* at 69 (citing Ex. 1008, 8:3–14, 17:25–32, 18:8–18; Ex. 1003 ¶¶ 180–181 (depicting Petitioner's annotated version of Tsuda Fig. 11 in the context of Sauve's quick pick user-interface)). Petitioner presents the annotated figure, reproduced below, as an example of how the features of Tsuda and Sauve would have been combined:

**Appx69**

Petitioner's annotated figure, above, shows a 3D space (in green), including a first foreground object (in red) and a second background object (in blue). *Id.* Dr. Fuchs testifies that "[i]n Figures 11B–12C, Tsuda's windows (objects) are stacked horizontally from right to left, such that the rightmost window in the stack occupies a plane that is forward in the stack (*first object* in a *foreground*) relative to the plane of a window further to left (*second object* in a *background*)." Ex. 1003 ¶ 180.

> Patent Owner disagrees, contending that

> Petitioner's argument . . . contradicts Tsuda, which provides that at least a portion of each object is presented in the foreground, "inclined in a depth direction, so that . . . even if a plurality of windows are being displayed, the user can grasp the type and display content of each window at a glance."

PO Resp. 65–66 (quoting Ex. 1008, 2:13–26).

We agree with Petitioner and find that the first object (in red in Petitioner's annotated figure above) appears in the foreground relative to the second object in the stack (in blue in Petitioner's annotated figure), with the second object remaining in the background relative to the first object. Accordingly, we find that Sauve and Tsuda teach claim limitation 1ciii.

For claim limitation 1di, Petitioner contends that Sauve teaches that an end user can switch from the quick pick user-interface (shown in Sauve's Figure 4) and a tabbed window showing the webpage content for an in-focus tab (shown in Sauve's Figure 5) by "select[ing] any one of the thumbnails to view its corresponding content." Pet. 72 (quoting Ex. 1007 ¶¶ 43–44; citing Ex. 1007 ¶¶ 18, 43, Figs. 4–5; Ex. 1003 ¶ 190). We agree with Petitioner and find that Sauve teaches claim limitation 1di.

As to claim limitation 1dii, Petitioner argues that "the web browser of the Combination *replaces* the *3D space* of the quick pick user-interface,

which includes the (*first/second*) virtual 3D windows (*objects*), with a *window within a 2D space* including the (*first*) *webpage* of the selected tab," arriving at the arrangement shown in the annotated figure reproduced below. Pet. 73–74 (citing Ex. 1007 ¶¶ 18, 42–44; Ex. 1003 ¶¶ 192–193).



Petitioner's annotated figure, above, shows the annotated figure from page 66 of the Petition on the left, followed by an arrow, and a figure on the right showing the 3D space of the left figure replaced by a window within a 2D space including the first webpage. *Id.* at 74.

In response, Patent Owner argues that "Tsuda provides *no order* in which the objects should be presented in 3D space, let alone the claimed *chronological order*." PO Resp. 59 (citing Ex. 2014 ¶ 178). Patent Owner continues, "Sauve does not disclose which object should be presented in the foreground of 3D space and which object should be presented in the background of 3D space, and therefore cannot make up for this deficiency in Tsuda." *Id.* at 60 (citing Ex. 2014 ¶ 180); *see also* Sur-reply 7–8. Petitioner contends that Patent Owner's arguments are moot because the claims do not require a 3D stack of objects arranged chronologically. Reply 19. As explained in the Claim Construction section above, the challenged claims do not require Patent Owner's proposed chronological ordering. Accordingly, Patent Owner's argument is not persuasive.

Patent Owner also argues that "the windows in Tsuda are already active and interacting with one merely results in the window being displayed 'facing the front' in 3D space." PO Resp. 64 (citing Ex. 1008, 2:57–67). According to Patent Owner, "using Tsuda to function as a quick pick user-interface would not result in an active window in 2D space 'replacing' a plurality of images in 3D space. Instead, it would result in an active window in 3D space being rotated to face the front in 3D space (e.g., for editing)." *Id.* at 64–65. This argument is not persuasive, as Petitioner relies on Sauve to show a window within a 2D space. Pet. 73–74 (citing Ex. 1007 ¶¶ 18, 42–43; Ex. 1003 ¶¶ 192–193). *See also In re Keller*, 642 F.2d 413, 426 (CCPA 1981) ("[O]ne cannot show non-obviousness by attacking references individually where, as here, the rejections are based on combinations of references.").

As to replacing Tsuda's objects in 3D space with a window in 2D space per Sauve's teachings, Patent Owner argues that "[s]witching to 2D would be counterintuitive to the teachings of Tsuda, and therefore nonobvious." PO Resp. 66 (citing Ex. 2014 ¶ 225). As explained above, we find that Tsuda does not teach away from a combination with Sauve.

Patent Owner argues that "interacting with a thumbnail in Sauve does not result in displaying 'the [previously] rendered first webpage' in a window in 2D space. Instead, it results in the corresponding webpage being loaded (e.g., received and rendered) in tab window (312)." PO Resp. 60 (citing Ex. 1007 ¶¶ 2, 27). Patent Owner argues that "***tab UI (222) receives URLs for each webpage and links each URL to a corresponding graphical representation (i.e., thumbnail)***." *Id.* at 61 (citing Ex. 1007 ¶¶ 33, 35, Fig. 2; Ex. 2014 ¶ 117). Patent Owner argues that "URLs are used to load (retrieve and render) webpages in response to interactions with individual

72

graphical representations (or thumbnails) in the quick pick user-interface," typical of how web browsers operate. *Id.* (citing Ex. 1007 ¶ 2; Ex. 2014 ¶ 118). Patent Owner points to description in Sauve that "[t]abbed browsers load web pages in 'tabs' within the same browser window." *Id.* at 62–63 (quoting Ex. 1007 ¶ 4). According to Patent Owner,

> The "replacing" feature is . . . missing if the thumbnails disclosed in Sauve are arranged in Tsuda-like fashion (e.g., in a 3D space), which appears to be Petitioner's argument. This is because the thumbnails in Sauve do not result in "replacing" the images in 3D space with a window in 2D space "wherein the window includes the [previously] rendered first webpage."

*Id.* at 65. Patent Owner further cites to Sauve's description that

> By having multiple threads, at least one for each content window 202, the architecture prevents a potential bottleneck caused by having only one thread handle the messages for all HTML rendering across the multiple tabs. In addition, having multiple threads reduces the likelihood of unnecessary delays or timeouts when downloading web pages.

Ex. 1007 ¶ 27. We note that Dr. Schaefer does not state the basis for the inferences he draws from reading Sauve, rendering that testimony of little value. Ex. 2014 ¶¶ 116–118.

Petitioner disagrees with Patent Owner's reading of Sauve. Sauve describes:

> The user may select any one of the thumbnails to view its corresponding content in the tabbed window. . . .

> In this example, the user selected thumbnail 410 in the quick pick user-interface shown in FIG. 4. Thus, the tabbed window displays the tab (i.e., tab 340) associated with thumbnail 410 as the in focus tab. *Content of the in focus tab is displayed as the content 560 in the tabbed window 312.*

Ex. 1007 ¶¶ 43–44 (emphasis added). Petitioner argues that "is displayed" should be understood to mean that "the content displayed upon selection of

73

an object thumbnail is the same version of the webpage that was originally loaded and used to create the thumbnail." Reply 23. Dr. Fuchs testifies that "displaying the webpage content of a tab corresponding to a selected thumbnail does not require re-loading a new version of the webpage from the origin server," and that "[r]e-loading a page each time a user selects a new tab is nonsensical and would defeat the purpose of using a tabbed browser in the first place." Ex. 1060 ¶¶ 102–103. Dr. Fuchs also does not explain the basis for the inferences he draws from reading Sauve, rendering that testimony of little value. We note that the testimony Dr. Fuchs offers in support of the Petition is virtually silent as to whether Sauve displays a previously rendered version of a webpage or renders the webpage when a thumbnail is selected. Ex. 1003 ¶¶ 192–193.

We have analyzed the parties' citations to Sauve, and none clearly specifies whether selecting a thumbnail causes a webpage to be rendered anew or whether a previously rendered version of the webpage is displayed. Sauve states that

> By having multiple threads, at least one for each content window 202, the architecture prevents a potential bottleneck caused by having only one thread handle the messages for all HTML rendering across the multiple tabs. In addition, having multiple threads reduces the likelihood of unnecessary delays or timeouts when downloading web pages.

Ex. 1007 ¶ 27. Although this suggests that webpages for all tabs should not be rendered at the same time, and can perhaps be read to suggest that maintaining several rendered webpages simultaneously could run up against resource constraints, Sauve does not expressly state this. Paragraph 42 states that "[t]he thumbnails for each of the open tabs are readily available in memory," but does not state that the rendered webpages are available.

74

*Id.* ¶ 42. Paragraphs 43 and 44 state that a user may select a thumbnail and the tabbed window displays the corresponding content. *Id.* ¶¶ 43–44. However, the corresponding content would be displayed regardless of when the webpage was rendered. As noted above, neither party's expert provides helpful testimony on this point.

> "In an *inter partes* review, the burden of persuasion is on the petitioner to prove "unpatentability by a preponderance of the evidence," 35 U.S.C. § 316(e), and that burden never shifts to the patentee. "Failure to prove the matter as required by the applicable standard means that the party with the burden of persuasion loses on that point—thus, if the fact trier of the issue is left uncertain, the party with the burden loses."

*Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1378–79 (Fed. Cir. 2015) (quoting *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008)). As explained in the Claim Construction section above, "the rendered first webpage" means the rendered version of the webpage from which the corresponding image was captured. It is Petitioner's burden to prove that Sauve teaches that, in replacing the first and second objects with a window in 2D space, that window includes the rendered version of the webpage from which the corresponding image was captured, not a new version of the webpage rendered when the user selects a thumbnail. Petitioner has not met this burden. Accordingly, Petitioner has not proved, by a preponderance of the evidence, that claim 1 would have been obvious over Sauve and Tsuda.

In sum, we find that neither Sauve nor Tsuda teaches "replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes *the rendered first webpage*," as recited in claim limitation 1dii. As with Robertson, Gralla, and Gettman, this issue is dispositive for

75

claim 1 and independent claim 8, which similarly recites "replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space on the display screen in response to receiving the interaction, wherein the window includes *the rendered first webpage*." It also is dispositive for claims 2–7 and 9–13, which depend from claims 1 and 8, respectively. Nevertheless, we address the remaining limitations of claim 1, as it bears on the patentability of independent claim 14, as discussed in detail below.

As to claim limitations 1diii–1dv, Petitioner argues that Sauve's tabbed browser provides conventional point-and-click web surfing and browsing functionality, which would have included

> *receiving* a mouse click *interaction by the end user on a link provided in the rendered (first) webpage, the link corresponding to* a new webpage (*additional information*), per Element [1.d.iii]; *rendering* the new webpage (*additional information*), per Element [1.d.iv]; and *displaying* the rendered webpage (*additional information*) *in said window within the 2D space*, per Element [1.d.v].

Pet. 74–75 (citing Ex. 1007 ¶¶ 2–5, 25–27, 42–44; Ex. 1003 ¶ 194). Patent Owner does not present separate argument for claim limitations 1diii–1dv. We agree with Petitioner and find that Sauve teaches claim limitations 1div–1dv. We also find that Sauve and Tsuda teach receiving an interaction by a user on a link, corresponding to additional information, provided in the rendered webpage, as recited in claim limitation 1diii. However, as noted above for claim limitation 1dii, in Petitioner's combination, the rendered webpage in the window within the 2D space is of the current or live version of the webpage, rather than the "rendered first webpage." Thus, for the same reasons as given for claim limitation 1dii, the combination of Sauve

76

and Tsuda does not teach receiving an interaction on a link provided in "the rendered first webpage," as recited in claim limitation 1diii.

### 3. Claims 14–18

Petitioner and Patent Owner cite back to their arguments and evidence as to claim 1 for independent claim 14. Pet. 84–85; PO Resp. 68.

As explained for Robertson, Gralla, and Gettman, claim 14 is similar in most respects to claim 1. However, claim limitation 14dii differs from claim limitation 1dii in that claim limitation 14dii does not recite that the window includes a "rendered" first webpage; rather, it simply recites that the window includes the first webpage, which could be a version previously rendered or rendered in response to the receiving of limitation 14di. Thus, the deficiency in the Petitioner's evidence for claim limitation 1dii is not present for claim limitation 14dii.

We agree with Petitioner (Pet. 84–85) that the evidence and argument Petitioner presents for claim limitations 1a–1di and 1div–1dv are sufficient to show that Sauve and Tsuda teach claim limitations 14a–14di, and 14div, for the reasons given above. Aside from arguing that the claims have a chronological order requirement and that Tsuda does not teach displaying a first object/image in the foreground and a second in the background (claim limitations 1cii, 14cii), Patent Owner does not present separate arguments for these limitations. Like claim 1, claim 14 does not have Patent Owner's proposed chronological order requirement. For the same reasons as given for claim 1, Patent Owner's arguments on this point are not persuasive. And, as we explain above, Tsuda teaches displaying a first object in the

foreground and a second in the background; thus, this argument is not persuasive as to claim limitation 14cii.

As to claim limitation 14dii, we find that Sauve describes a user selecting a thumbnail image and the web browser replacing the quick pick user-interface. Ex. 1007 ¶¶ 18, 42–43. In Petitioner's proposed combination with Sauve, Tsuda's 3D space would be replaced by the web browser window within a 2D space. Ex. 1003 ¶¶ 192–193. As explained above, Sauve and Tsuda do not teach away from such a combination. And as explained above for claim limitation 1diii, Sauve and Tsuda teach that the user interacts with a link on the first webpage, which is all claim limitation 14diii requires. Ex. 1007 ¶¶ 2–5, 25–27, 42–44.

Thus, for the reasons given for claim 1, and as further discussed here, Sauve and Tsuda teach each limitation of claim 14, and a skilled artisan would have had reasons, with rational underpinning, to combine the teachings of Sauve and Tsuda, with a reasonable expectation of success.

Claim 15 depends from claim 14 and adds "wherein the additional information is displayed in the window, thereby replacing the first webpage in the window." Petitioner contends that Sauve and Tsuda teach the additional limitation of claim 15 for the same reasons as given for claim limitations 1dii and 1dv (which we analyze above). Pet. 84. We agree, and find that Sauve and Tsuda teach the additional limitation of claim 15.

Claim 16 depends from claim 14 and adds

[16a] generating a third image of at least a portion of the additional information; and

[16b] replacing the window with at least the second and third images within the 3D space, wherein the third image replaces the first image in the foreground of the 3D space, and the second image remains in the background of the 3D space.

78

Petitioner contends that Sauve and Tsuda teach the additional limitations of claim 16 for the same reasons as given for claim limitations 2a and 2c. Pet. 84–85.

As to limitations 2a and 2b, Petitioner contends that they essentially require repeating claim limitations 1cii and 1ciii. *Id.* at 76. Petitioner contends that a skilled artisan "would have appreciated that users of the Sauve-Tsuda tabbed browser would toggle back and forth between the quick pick user-interface and the tabbed browser view multiple times during a web browsing session," and, thus, "the *capturing* and *texturing* steps of Elements [1.c.ii] and [1.c.iii] are executed anew each time the user calls forth the quick pick user-interface." *Id.* at 76–77 (citing Ex. 1007 ¶¶ 4–5, 18, 41–42; Ex. 1003 ¶¶ 196–198).

As to limitation 2c, Petitioner argues that this limitation requires the 3D-GUI to revert the replacing step of claim limitation 1dii to re-enter 3D space, and that a skilled artisan "would have appreciated that users of the Sauve-Tsuda tabbed browser would toggle back and forth between the quick pick user-interface and the tabbed browser view multiple times during a web surfing session." *Id.* at 77 (citing Ex. 1007 ¶¶ 4–5, 18, 39; Ex. 1003 ¶ 199).

Patent Owner argues that the dependent claims "include features that are not disclosed in or suggested by Tsuda and Sauve," for example "[c]laim[] 2 . . . , which require[s] replacing the active webpage in 2D space with a plurality of images in 3D space, where a third image (of additional information) is captured and textured on the first object in 3D space (2D to 3D mirroring)." PO Resp. 68. Patent Owner does not elaborate on this argument or cite to evidence in support of it. Thus, it is not persuasive.

We agree that claim limitation 16a corresponds to claim limitation 2a and claim limitation 16b corresponds to claim limitation 2c. We find that

79

Sauve and Tsuda teach the additional limitations of claim 16 based on the evidence Petitioner presents for claim 2.

Claim 17 depends from claim 16 and adds "[17a] receiving a toggle interaction by the end user; and [17b] replacing the window with at least the second and third images within the 3D space in response to the toggle interaction." Petitioner contends that Sauve and Tsuda teach the additional limitations of claim 17 for the same reasons as given for claim limitations 2c, 3a, and 3b. Pet. 85. Petitioner, in turn, contends that Sauve and Tsuda teach the additional limitations of claim 3 for the same reasons given for claim limitations 2a–2c. *Id.* at 77. We find that Sauve and Tsuda teach the additional limitations of claim 17 based on the evidence Petitioner presents for claims 2 and 3.

Claim 18 depends from claim 17 and adds "[18a] receiving a navigation interaction by the end user; and [18b] moving said second image from the background of the 3D space to the foreground of the 3D space in response to the navigation interaction." Petitioner contends that Sauve and Tsuda teach the additional limitations of claim 18 for the same reasons as given for claim limitations 4a and 4b. Pet. 85. As to claim 4, Petitioner argues that Sauve teaches that objects in the quick pick user-interface are repositioned in response to a drag-drop operation, and that, in combination with Tsuda, this would have resulted in moving Tsuda's 3D windows forward or backward through the window stacks. *Id.* at 78 (citing Ex. 1003 ¶ 201).

We agree that claim limitation 18a corresponds to claim limitation 4a and claim limitation 18b corresponds to claim limitation 4b. We find that Sauve and Tsuda teach the additional limitations of claim 18 based on the evidence Petitioner presents for claim 4.

80

Patent Owner does not present separate arguments for claims 14–18. In sum, we find that Sauve and Tsuda teach each limitation of claims 14–18, and a skilled artisan would have had reasons, with rational underpinning, to combine the teachings of Sauve and Tsuda, with a reasonable expectation of success.

### 4. Conclusion of Obviousness

In sum, as detailed above, Petitioner's proposed combination of Sauve and Tsuda teaches each limitation of claims 14–18, but not claims 1–13. A skilled artisan would have had reasons, with rational underpinning, to combine the teachings of Sauve and Tsuda, with a reasonable expectation of success. Patent Owner's objective indicia of nonobviousness are unpersuasive and entitled to little weight. Upon consideration of all the evidence, we conclude that Petitioner has proved by a preponderance of the evidence that claims 14–18 would have been obvious over Sauve and Tsuda, but has not proved, by a preponderance of the evidence, that claims 1–13 would have been obvious over Sauve and Tsuda.

### III.  PATENT OWNER'S MOTION TO EXCLUDE

Patent Owner moves to exclude paragraph 79 of Exhibit 1060 (Dr. Fuchs' Supplemental Declaration), Exhibits 1055 and 1056, which Dr. Fuchs relies on in paragraph 79, and the portions of the Reply that rely on this new evidence (presumably the discussion in Section II.A.2 on pages 18–19). Paper 34. Patent Owner argues that Petitioner uses this new evidence to support an improper new ground of unpatentability presented in its Reply. *Id.* at 1.

81

Above, we explain that Petitioner's argument in Section II.A.2 of the Reply, and the evidence in support of it (Exs. 1055, 1056, 1060 ¶¶ 78–80) constitute an improper new prima facie case of obviousness, that Petitioner has forfeited this new argument, and that we disregard this new argument and evidence. Accordingly, we do not consider Exhibits 1055, 1056, and 1060 ¶ 78–80, and we dismiss Patent Owner's Motion to Exclude as moot.

## IV. CONCLUSION[7]

Petitioner has proved by a preponderance of the evidence that claims 14–18 would have been obvious over Robertson, Gralla, and Gettman, and also over Sauve and Tsuda. Petitioner has not proved by a preponderance of the evidence that claims 1–13 would have been obvious. We dismiss as moot Patent Owner's Motion to Exclude. The outcome for the challenged claims of this Final Written Decision follows. In summary:

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–18 | 103(a) | Robertson, Gralla, Gettman | 14–18 | 1–13 |

---

[7] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–18 | 103(a) | Sauve, Tsuda | 14–18 | 1–13 |
| **Overall Outcome** | | | **14–18** | **1–13** |

V.   ORDER

It is hereby:

ORDERED that claims 14–18 of the '048 patent are unpatentable;

FURTHER ORDERED that claims 1–13 of the '048 patent are not unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude (Paper 34) is dismissed as moot; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

83

IPR2023–00242
Patent 8,881,048 B2

For PETITIONER:

W. Karl Renner
Andrew Patrick
Kenneth Darby
Usman Khan
FISH & RICHARDSON P.C.
axf-ptab@fr.com
patrick@fr.com
kdarby@fr.com
khan@fr.com

Matthew Satchwell
Brent Yamashita
Chris Duerden
DLA PIPER LLP (US)
matthew.satchwell@dlapiper.com
brent.yamashita@dlapiper.com
chris.duerden@us.dlapiper.com

Erika Arner
Cory Bell
Yanyi Liu
Yinan Liu
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
erika.arner@finnegan.com
cory.bell@finnegan.com
yanyi.liu@finnegan.com
yinan.liu@finnegan.com

For PATENT OWNER:

Todd E. Fitzsimmons
FITZSIMMONS IP LAW, P.C.
todd@fitziplaw.com

Gregory Cordrey
JEFFER MANGELS BUTLER & MITCHELL LLP
gxc@jmbm.com



US008881048B2

## (12) United States Patent
### Bakhash

(10) **Patent No.:**     **US 8,881,048 B2**

(45) **Date of Patent:**     ***Nov. 4, 2014**

(54) **SYSTEM AND METHOD FOR PROVIDING THREE-DIMENSIONAL GRAPHICAL USER INTERFACE**

(76) Inventor: **E. Eddie Bakhash**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 472 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/751,879**

(22) Filed: **Mar. 31, 2010**

(65) **Prior Publication Data**

US 2011/0029907 A1     Feb. 3, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/531,676, filed on Sep. 13, 2006, now Pat. No. 7,735,018.

(60) Provisional application No. 60/717,019, filed on Sep. 13, 2005.

(51) **Int. Cl.**
| | |
|---|---|
| *G06T 15/20* | (2011.01) |
| *G11B 27/34* | (2006.01) |
| *G06F 17/30* | (2006.01) |
| *G06F 3/0481* | (2013.01) |

(52) **U.S. Cl.**
CPC .......... *G06T 15/20* (2013.01); *G06F 17/30873* (2013.01); *G06F 3/04815* (2013.01); *G06F 17/30864* (2013.01); *G11B 27/34* (2013.01); *G06F 17/30572* (2013.01)
USPC ........... **715/782**; 715/764; 715/766; 715/767; 715/781; 715/788

(58) **Field of Classification Search**
CPC ............ G06F 3/04815; G06F 3/04817; G06F 17/30864

USPC ......... 715/781, 848, 764, 766, 767, 782, 788; 707/706
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,319,387 | A | 6/1994 | Yoshikawa |
| 5,428,735 | A | 6/1995 | Kahl et al. |
| 6,121,969 | A | 9/2000 | Jain et al. |
| 6,499,029 | B1 | 12/2002 | Kurapati et al. |
| 6,577,330 | B1 | 6/2003 | Tsuda et al. |
| 6,725,427 | B2 | 4/2004 | Freeman et al. |

(Continued)

OTHER PUBLICATIONS

"Visualization Using Timelines", Gerald M. Karam; TRIO Telecommunications Software Methods Project; Published Aug. 17, 1994; pp. 125-137; XP000476876.

(Continued)

*Primary Examiner* — Ting Lee

(74) *Attorney, Agent, or Firm* — Fitzsimmons IP Law

(57) **ABSTRACT**

Methods and systems are provided for providing an improved three-dimensional graphical user interface. In one embodiment, the method generally comprises: receiving an input from an end user, and capturing computing output from at least one computer source in response to the received end-user input. The computing output can be presented as two or more objects within a three-dimensional virtual space displayed to the end user. In one embodiment, the method further comprises generating a timeline that includes an icon for each object presented within the virtual space. In another embodiment, the method further comprises providing a database for storing and categorizing data regarding each object presented within the virtual space.

**18 Claims, 30 Drawing Sheets**



APPLE 1001

(56)     **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,768,999 B2 | 7/2004 | Prager et al. |
| 2001/0050687 A1 | 12/2001 | Iida et al. |
| 2002/0033848 A1 | 3/2002 | Sciammarella et al. |
| 2003/0164827 A1 | 9/2003 | Gottesman et al. |
| 2003/0179231 A1 | 9/2003 | Kamiwada et al. |
| 2004/0268451 A1 | 12/2004 | Robbin et al. |
| 2007/0043700 A1* | 2/2007 | Dawson et al. .................. 707/3 |

OTHER PUBLICATIONS

"Execution Patterns in Object-Oriented Visualization", Wim De Pauw et al.; Watson Research Center; Published Apr. 27, 1998; pp. 219-234; XP002534202.

"Dissatisfaction Sows Innovation", Andrew Coulter Enright; The Treehouse + the Cave; Published Dec. 29, 2004; 6 Pages; XP-002466348.

* cited by examiner



FIG. 1A



**FIG. 1B**

4

Appx92



**FIG. 1C**



FIG. 2



FIG. 3



FIG. 4A



202 — Draw Results Page as First Page in a Visual Stack to be Drawn in 3D Cartesian Space to Act as Index for the Visual Stack of Web Browser Pages

204 — Draw Visual Output of Next Web Browser Control Page for the URL Connected to the Hyperlink from Search Origin's Search Results Page in the 3-D Cartesian Space Until End of Array is Reached

206 — Recalculate Geometry for Next Web Page Such that it Appears Further Away in Stack by Scaling it Down and Translating its Position in 3-D Space

208 — Allow End User to Load Custom Template to Program to Modify Layout of Visual Stack of Web Pages to be Drawn in 3D Cartesian Space through Button on Program's Interface Panel

210 — Allow End User to Plot all the Web Pages of the Hyperlinks that are Found on the Last Web Page Plotted in the 3D Cartesian Space and all the Web Pages that Link to the Last Web Page Plotted in an Adjacent Space to Current Web Browser Control Page - See Links In/Links Out Gestalt Diagram

212 — Allow End User to Sort Web Browser Pages in Visual Stack through Custom Interface - See Diagram Sort Array of Pages in Visual Stack

214 — Repeat Until End of Array is Reached

216 — Prompt User to Repeat Process for Next Set of Search Results Page by Starting New Visual Stack

218 — Save File to Local Computer, Network, Webserver or other Location Prompted By User

**FIG. 4B**



**FIG. 5A**



**FIG. 5B**

Appx98



FIG. 5C



FIG. 6



FIG. 7

Appx101



FIG. 8

Appx102





FIG. 10



FIG. 11



FIG. 12



FIG. 13A



FIG. 13B



**FIG. 14**



FIG. 15



FIG. 16A



FIG. 16B



FIG. 17A



FIG. 17B

Appx114



FIG. 17C



FIG. 18



**FIG. 19**

Appx117



FIG. 20

Appx118



FIG. 21

Appx119



FIG. 22

**1**

# SYSTEM AND METHOD FOR PROVIDING THREE-DIMENSIONAL GRAPHICAL USER INTERFACE

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 11/531,676, filed Sep. 13, 2006, now U.S. Pat. No. 7,735,018, which claims priority pursuant to 35 U.S.C. §119(e) to U.S. Provisional Application No. 60/717,019, filed Sep. 13, 2005, which application is specifically incorporated herein, in its entirety, by reference.

## COPYRIGHT NOTICE

This patent document contains material that is subject to copyright protection. The copyright owner has no objection to the reproduction of this patent document or related materials as they appear in the files of the patent offices of the United States or other countries, but otherwise reserves all copyright rights whatsoever.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention is directed toward graphical user interfaces for operating and accessing information on a computer, and more particularly, to a three-dimensional ("3D") interactive computing interface and sorting interface comprising information from real-time and static sources, including, but not limited to, meta search results from the Web; information from APIs, webservices, search engines, application programs, and networks; and files on the end user's desktop.

2. Description of Related Art

Currently, people use computers by inputting information into the computer to achieve a given output. Often this can be a series of tedious steps (mouse clicks and keyboard inputs) to run applications and documents or navigate to information. To get to new computing experiences, people often have to close their current applications and documents, hide them or overlap them on a finite desktop by drawing them on top of each other, and then mine through folders within folders to find them again at a later date. The user's desktop is finite, and one must redo the same tasks over and over again. This wastes time by (i) requiring many mouse clicks to open and close documents, (ii) requiring one to remember all the combinations of programs and documents one might need for a given purpose and (iii) requiring one to create elaborate hierarchical folder systems to aid in the process of storing and recalling applications and documents. This is primarily due to the limited space the end user has on their desktop.

People currently compute within operating systems that present computer output, such as documents, applications, and operating system's interface in a 2D (two-dimensional) visual display. After initially being loaded into the computer by the boot program, the operating system controls all the other programs in a computer. Typically, the component of the operating system that summons the style in which this output is displayed is called the GUI or graphical user interface. A successful GUI will use screen presentations including metaphors that utilize graphic elements such as icons to make an operating system's input and output easier to manage. Most computer operating systems incorporate a GUI that utilizes two-dimensional graphics to capture, process, and output all input from an end user in a 2D form—having height and width only.

This output is usually confined within a window that is drawn on a finite-sized desktop, i.e., the working area of a computer, that has a given length and width. When the computer's output exceeds this finite working graphical area, elements of the GUI (the windows) are typically drawn on top of each other such that the GUI components overlap one another other. In some operating systems, a shadow is drawn beneath these overlapping windows on the desktop to make them appear as if they have depth. This technique allows an end user to identify the overlapping windows more easily.

We live in a 3D (three-dimensional) world where we see that objects not only have a horizontal position (x) and vertical position (y) but also have depth (z) that is also known as time, according to the three-dimensional coordinate system of mathematics. This notion of expressing depth or time in a visual computer metaphor is important for the creation of a visual history of the end user's computing sessions. By plotting new output of the computer (instead of replacing) in a virtual space that does not overlap or substitute what exists on the finite desktop, a new virtual space through depth and time is created. For example, if one were to pull up the webpage for the URL http://www.yahoo.com, and then click on a hyperlink (e.g., finance), the current webpage in its window would be replaced by the webpage for Yahoo! finance.

3D has shown itself in computing primarily in the following areas: (1) games, (2) CAD/medical visualization, and (3) virtual worlds. A virtual world is a computer-simulated environment that its users can inhabit and interact with via avatars. This habitation usually is represented in the form of two- or three-dimensional graphical representations of humanoids (or other graphical or text-based avatars).

The navigation window of many desktop operating systems use controls and buttons to allow end users to navigate to other folders and windows in the hierarchical structure of the file system. Often, in navigating to new windows, the new windows replace the display of the current window. Accordingly, it would be very desirable to provide an improved graphical user interface that allows the user to efficiently navigate though a virtual space wherein groups of windows can be easily organized, stored, and retrieved.

## SUMMARY OF THE INVENTION

The present invention addresses the shortcomings of the prior-art systems and methods. In particular, the present invention is directed to a system and method for providing an improved 3D graphical user interface.

In accordance with one aspect of the embodiments described herein, there is provided a graphical user interface that uses the two-dimensional ("2D") display of a user's computer to display three-dimensional ("3D") objects in a simulated real-time 3D immersive Cartesian space.

In one embodiment, there is provided a system whereby new computing output occupies new virtual space near the original output, without losing the original output. When an end user clicks on a hyperlink on the webpage, there appears in the virtual space a new webpage that is linked to but does not replace the current webpage in its window; rather, the new webpage is drawn in a new virtual space. This way, the end user can visit past visual computing moments in time.

In accordance with another aspect of the embodiments described herein, there is provided a method for providing a three-dimensional graphical user interface, comprising receiving an input from an end user, capturing computing

Appx121

3

output from at least one computer source in response to the received end-user input, and presenting the computing output as at least two objects within a three-dimensional virtual space displayed to the end user.

In one embodiment, the method further comprises generating a timeline that includes an icon for each object presented within the virtual space, wherein the icons are organized in linear chronological order according to when the objects were presented within the virtual space and displaying the timeline within the virtual space. In another embodiment, the method further comprises providing a database module for storing and categorizing data regarding each object presented within the virtual space, providing a hyperlink within the database module to respective viewpoint of each object presented within the virtual space, and displaying the data regarding one or more of the objects within the database module presented along with virtual space.

In accordance with another aspect of the embodiments described herein, there is provided a system for providing a three-dimensional graphical user interface, comprising a display screen, an input device for receiving an input from an end user, a processor module operatively coupled to the display screen and the user input device, and a memory module operatively coupled to the processor module. The memory module preferably comprises executable code for the processor to capture computing output from at least one computer source in response to the received end-user input and present the computing output as at least two objects within a three-dimensional virtual space displayed on the display screen.

In one embodiment, the memory module further comprises executable code for the processor to generate a timeline that includes an icon for each object presented within the virtual space, wherein the icons are organized in linear chronological order according to when the objects were presented within the Cartesian space, and display the timeline within the virtual space. In another embodiment, the memory module further comprises executable code for the processor to provide a database module for storing and categorizing data regarding each object presented within the virtual space, provide a hyperlink within the database module to respective viewpoint of each object presented within the virtual space, and display the data regarding one or more of the objects within the database module presented along with virtual space.

In accordance with another aspect of the embodiments described herein, there is provided a system for providing a three-dimensional graphical user interface in a computer network, comprising a server connected to the computer network and a user-interface application executing in association with the server to provide the functions of receiving an input from an end user, capturing computing output from at least one computer source in response to the received end-user input, and presenting the computing output as at least two objects within a three-dimensional virtual space displayed to the end user.

In one embodiment, the user-interface application executing in association with the server further provides the functions of generating a timeline that includes an icon for each object presented within the virtual space, wherein the icons are organized in linear chronological order according to when the objects were presented within the Cartesian space, and displaying the timeline within the virtual space. In one embodiment, the user-interface application executing in association with the server further provides the functions of: providing a database module for storing and categorizing data regarding each object presented within the virtual space, providing a hyperlink within the database module to respective viewpoint of each object presented within the virtual space,

4

and displaying the data regarding one or more of the objects within the database module presented along with virtual space.

In accordance with another aspect of the embodiments described herein, there is provided a network system for providing a three-dimensional graphical user interface, comprising: a computer-server network comprising a plurality of servers in communication with each other; at least one display screen operatively coupled to the computer-server network; at least one input device for receiving an input from an end user, the input device being operatively coupled to the computer server network; and a software module for providing a series of screen displays to the end user, the software module being accessible by one or more of the servers of the computer-server network. The software module preferably comprises instructions for directing the servers to capture computing output from at least one network source in response to the received end-user input and to present the computing output as at least two objects within a simulated three-dimensional Cartesian space displayed on the display screen.

In one embodiment, the software module further comprises instructions for directing the servers to generate a timeline that includes an icon for each object presented within the Cartesian space, wherein the icons are organized in linear chronological order according to when the objects were presented within the Cartesian space and to display the timeline within the Cartesian space. In another embodiment, the software module further comprises instructions for directing the servers to provide a database module for storing and categorizing data regarding each object presented within the virtual space, to provide a hyperlink within the database module to respective viewpoint of each object presented within the virtual space, and to display the data regarding one or more of the objects within the database module presented along with virtual space.

In accordance with another aspect of the embodiments described herein, there is provided a computer-readable recording medium for storing a computer program that makes a computer execute: receiving an input from an end user; capturing computing output from at least one computer source in response to the received end-user input; and presenting the computing output as at least two objects within a simulated three-dimensional Cartesian space displayed to the end user.

In one embodiment, the computer program makes the computer generate a timeline that includes an icon for each object presented within the Cartesian space, wherein the icons are organized in linear chronological order according to when the objects were presented within the Cartesian space, and display the timeline within the Cartesian space. In another embodiment, the computer program makes the computer provide a database module for storing and categorizing data regarding each object presented within the virtual space, provide a hyperlink within the database module to respective viewpoint of each object presented within the virtual space, and display the data regarding one or more of the objects within the database module presented along with virtual space.

In accordance with another aspect of the embodiments described herein, there is provided a 3D graphical user interface that takes a user from one computing place to another while creating the illusion of infinite space in three dimensions ("3D"). By capturing the output of the user's traditional two-dimensional desktop, the 3D GUI stages this output seamlessly in a 3D space by plotting the windows or other graphical representations of programs in 3D. In one embodiment of the present invention, the 3D GUI anticipates what

34

5 6

the user may seek next (for example, the next webpage in a search result), eliminates dormant computing time, and puts the user in a reduced-click computing environment by automatically plotting the new computing experience while visually recording the old.

Because the 3D GUI creates the illusion of infinite space in 3D, it can create a visual history of the user's computing session, whereby the user can visit past visual computing events (or a snapshot in time) by simply navigating to previously recorded states or viewpoints. Accordingly, the 3D GUI can function as a visual chronological history of the user's computing session, whereby the user can name the computer experience they are currently having through their position (or viewpoint) in a 3D space and revisit it by recalling the name or title at a later time. The 3D GUI automates computing by remembering where the user left off last—visually—such that the next time the user requires the same series of inputs to achieve that same given output, the 3D GUI will navigate the user through a 3D space that is the visual history of where the user last left off.

In one embodiment, the 3D GUI can run as an Active X control within a browser window on the desktop of a computer (in conjunction with a web-browser program, such as Internet Explorer). In addition, the present invention can run as a stand-alone application or embedded within an HTML page. For example, a 3D virtual space (that was saved in the 3D GUI) of a series of photographs of a model wearing different jewelry styles can be embedded on a jewelry e-commerce site by embedding the code for the Active X control version of the 3D GUI into the markup language of the HTML page according to the syntax for the component.

The program may run, for example, in conjunction with Internet Explorer, other web browsers, or stand-alone applications. The 3D GUI allows the user to create a 3D space on their computer or the web. Through programmatic access or helper applications (e.g., represented by interactive icons within the 3D space), the 3D GUI allows the user to locate data, applications, files created by applications, desktop windows, HTML pages, and 3D applications, and it facilitates or invites the graphical output of these files and programs in their interactive 3D spaces. In general, the present invention displays graphics from the user's 2D finite desktop in 3D infinite space while retaining the functionality of the 2D programs and documents. Users will be able to use these files and applications, without restrictions, within 3D spaces.

In accordance with another aspect of the embodiments described herein, the 3D GUI allows the user to create one or multiple 3D spaces on the fly to facilitate the graphical output of files and applications. For example, the user may have the option of linking multiple 3D spaces together, thereby creating a network of 3D spaces. Regardless of where the files or applications are located (e.g., within the same folder, in a subfolder, on a different computer, within the network, on a different network, across the Internet, etc.), the user will have full access to the file through its native program, or to the website through the default browser. In this way, the 3D GUI allows the output of disparate computer programs to visually converge in one expandable, changeable 3D space.

A more complete understanding of the disclosed 3D graphical user interface will be afforded to those skilled in the art, as well as a realization of additional advantages and objects thereof, by a consideration of the following detailed description of the preferred embodiment. Reference will be made to the appended sheets of drawings which will first be described briefly.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A-1C provide a block diagram detailing one embodiment of the process for providing in improved three-dimensional graphical user interface.

FIG. 2 is a flowchart illustrating the process for cyclically redrawing a 3D Cartesian space based on user input.

FIG. 3 is a flowchart illustrating an exemplary approach to processing information achieve interactive composite texture mapping, as well as interactivity and persistency, in a virtual space.

FIGS. 4A and 4B provide a flowchart illustrating a process for creating a 3D output of webpages or other content from hyperlinks.

FIG. 5A is a block diagram of one embodiment of a system for providing a 3D GUI.

FIG. 5B is a block diagram of one embodiment of a system for providing a 3D GUI in a computer network.

FIG. 5C is a block diagram of one embodiment of a network system for providing a 3D GUI.

FIG. 6 is a block diagram detailing a process for sorting an array of webpages in a 3D stack.

FIG. 7 is a flowchart showing a process for sorting an array of webpages in a 3D stack.

FIG. 8 is a flowchart for a process and system wherein multiple users can simultaneously vie and modify virtual spaces in collaborative fashion.

FIG. 9 illustrates one embodiment of a 3D GUI application window.

FIG. 10 illustrates another embodiment of a 3D GUI application window.

FIG. 11 illustrates an embodiment of a 3D GUI application window with an opened database module.

FIG. 12 illustrates an arrangement of windows within the virtual space of one embodiment of a 3D GUI application window.

FIGS. 13A and 13B illustrate another embodiment of a 3D GUI application window with an opened database module.

FIG. 14 illustrates an embodiment of a 3D GUI having a paintbrush feature.

FIG. 15 illustrates an exemplary arrangements of windows and timeline icons in a 3D GUI application window.

FIGS. 16A and 16B illustrate exemplary arrangements of 3D stacks and timeline icons in a 3D GUI application window.

FIGS. 17A-17C illustrate exemplary arrangements of windows and timeline icons in a 3D GUI application window.

FIG. 18 illustrates another exemplary arrangement of 3D stacks and timeline icons in a 3D GUI application window.

FIG. 19 illustrates an embodiment of a 3D GUI that delivers advertisements into the virtual space for the end user.

FIG. 20 shows a 3D GUI with the Favorites helper application opened within the database module.

FIG. 21 shows a 3D GUI with the Searches helper application opened within the database module.

FIG. 22 shows a 3D GUI with an exemplary helper application for a music file opened within the virtual space.

## DETAILED DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

The present invention satisfies the need for a system and method of providing an improved three-dimensional graphical user interface. In particular, the present invention is directed to a system and method for displaying a three-dimensional graphical user interface by receiving an input from an end user, capturing computing output from at least one

35

## Appx123

computer source in response to the received end-user input, and presenting the computing output as at least two objects within a three-dimensional virtual space displayed to the end user. The method preferably further comprises generating a timeline that includes an icon for each object presented within the virtual space, wherein each of the icons are organized in linear chronological order according to when the objects were presented within the virtual space. In the detailed description that follows, like element numerals are used to describe like elements illustrated in one or more of the figures.

Described herein is a system for (i) selectively capturing computing output and information (webpages, applications, documents, desktops and/or anything that can be visualized on a computer) from disparate sources (local computer or network); (ii) allowing the captured output and information to visually converge by staging or drawing it in a common 3D virtual space; (iii) organizing this staged output in a meaningful way utilizing a novel 3D GUI to allow end users an easier and more efficient way to organize, visualize, search, and sort this captured output and information; and (iv) sharing these virtual spaces by saving them, publishing them to the web, e-mailing them, or allowing multiple users to collaborate by simultaneously viewing and modifying them.

Described herein is a system for creating and managing this new 3D computing experience, based on the existing infrastructure of a 2D operating system's output. A preferred embodiment of this system, diagrammed in FIGS. 1A-1C, is described in further detail below. In accordance with one aspect of the embodiments described herein, there is provided a system and method for creating a 3D interactive computing interface and sorting interface that includes information from real-time and static sources, including meta search results from the web; information from APIs, webservices, search engine outputs, application program outputs, and networks; and files on the end user's desktop/laptop in a unique interactive 3D interface.

"Meta search" refers to a search wherein a query is submitted to more than one search engine or directory, and wherein results are reported from all the engines, possibly after removing duplicates and sorting. "API" refers to an interface that enables one program to use facilities provided by another, whether by calling that program or by being called by it. At a higher level, an API is a set of functionality delivered by a programming system, and as such, the mix of APIs in a particular system explains what that system can do. "Web" refers a network of servers linked together by a common protocol, allowing access to millions of hypertext resources. It is also known as WWW, W3 and the World Wide Web. "Webservices" refers to a standard approach to interoperating between different software applications, running on a variety of platforms and frameworks, over the Internet. It is software that runs over a network and provides information services based on XML standards that are accessed through a URI (Universal Resource Identifier) address and an XML-defined information interface. "Real time" refers to a transmission or data-processing mode in which the data is entered in an interactive session where an application can respond fast enough to affect later data input.

The invention provides a Graphical User Interface (GUI) that uses the two-dimensional display of an end user's computer to display information (e.g., webpages and other information mapped onto 3D objects) in a simulated real-time 3-D immersive Cartesian space. The program runs within web browsers (e.g., Internet Explorer and Mozilla Firefox) or as a stand-alone application compatible with the local operating system. The 3D GUI program creates the appearance of a 3-D space within a 2-D window on the desktop of a computer, as

illustrated in the embodiment of FIG. 10. The program can utilize a ubiquitous interactive and immersive 3D rendering browser or player which will process 3D drawing instructions based on higher-level language code (the program) written in the drawing language native to the browser.

The program creates what seems to be an infinite simulated 3-D Cartesian space within the two-dimensional display or window of an end user's computer by abiding by the visual rule of perspective whereby geometry or objects that are supposed to be closer to oneself appear larger concerning their spatial attribute and objects or geometry that are further away appear smaller, as shown in the exemplary embodiments of FIGS. 10-12. The program simulates a 3-D space within a 2-D window by redrawing objects in the space relative to one another as determined by their perceived distance from the viewer. Objects that are supposed to be further away are smaller whereas objects that are supposed to be closer are larger.

The program creates interactivity of the simulated real-time 3-D immersive Cartesian space. While the user is immersed in this 3D space, the program will take instructions from the user processed by the event handler presented by the Graphical User Interface initiated controls that can change their perspective or viewpoint (as defined as a location or visual perspective in the local coordinate system or three-dimensional space) by moving closer to it, away from it, changing their angle or both. Once the program receives user-initiated input to change the visual perspective of the scene, the program will redraw the scene to reflect the user-initiated input, as well as changes to the visual perspective.

In accordance with one aspect of the embodiments described herein, there is provided a system and method for providing a three-dimensional graphical user interface. With reference to FIG. 5A, in one embodiment, the system 710 comprises a display screen 712 and input devices 714, 716 for receiving an input from an end user. The system 710 further comprises a processor module 718 (operatively coupled to the display screen 712 and the user input devices 714, 716) and a memory module 720 (operatively coupled to the processor module 718).

The memory module 720 preferably comprises executable code for the processor module 718 to capture computing output from at least one computer source in response to the received end-user input, and to present the computing output as at least two objects within a three-dimensional virtual space displayed on the display screen 712. In one embodiment, the memory module 720 preferably further comprises executable code for the processor module 718 to generate a timeline 340 that includes an icon for each object presented within the virtual space 300, wherein the icons are organized in linear chronological order according to when the objects were presented within the Cartesian space 300. In another embodiment, the memory module 720 preferably further comprises executable code for the processor module 718 to provide a compass or database module 440 for storing and categorizing data regarding each object presented within the virtual space, to provide a hyperlink within the database module to respective viewpoint of each object presented within the virtual space, and to display the data regarding one or more of the objects within the database module 440 presented along with virtual space 300.

In accordance with another aspect of the embodiments described herein, there is provided a system for providing a three-dimensional graphical user interface in a computer network. With reference to 5B, in one embodiment, the system 730 comprises a server 732 connected to the computer network (734, 736, 738, 740) and a user-interface application

executing in association with the server **732** to provide the functions of receiving an input from an end user; capturing computing output from at least one computer source in response to the received end-user input; and presenting the computing output as at least two objects within a three-dimensional virtual space displayed to the end user. In one embodiment, the user-interface application executing in association with the server **732** preferably provides the functions of generating a timeline **340** that includes an icon for each object presented within the virtual space **300** wherein the icons are organized in linear chronological order according to when the objects were presented within the Cartesian space **300** and displaying the timeline **340** within the virtual space **300**. In another embodiment, the user-interface application executing in association with the server **732** preferably provides the functions of providing a compass or database module **440** for storing and categorizing data regarding each object presented within the virtual space, providing a hyperlink within the database module to respective viewpoint of each object presented within the virtual space, and displaying the data regarding one or more of the objects within the database module **440** presented along with virtual space **300**.

In accordance with another aspect of the embodiments described herein, there is provided a network system for providing a three-dimensional graphical user interface. With reference to **5C**, in one embodiment, the network system **750** comprises: a computer-server network **751** comprising a plurality of servers (**752**, **754**, **756**, **758**) in communication with each other; at least one display screen **712** in operative communication with or operatively coupled to the computer-server network **751** (directly or indirectly); at least one input device (**714**, **716**) for receiving an input from an end user, the input devices (**714**, **716**) being operatively coupled to the computer-server network **751**; and a software module **760** for providing a series of screen displays to the end user, the software module **760** being accessible by one or more of the servers (**752**, **754**, **756**, **758**) of the computer-server network **751**.

The software module **760** preferably comprises instructions for directing the servers (**752**, **754**, **756**, **758**) to capture computing output from at least one network source in response to the received end-user input, and present the computing output as at least two objects within a simulated three-dimensional Cartesian space **300** displayed on the display screen **712**. In one embodiment, the software module **760** further comprises instructions for directing one or more of the servers (**752**, **754**, **756**, **758**) to generate a timeline **340** that includes an icon for each object presented within the Cartesian space **300**, wherein the icons are organized in linear chronological order according to when the objects were presented within the Cartesian space **300**, and to display the timeline **340** within the Cartesian space **300**. In another embodiment, the software module **760** further comprises instructions for directing one or more of the servers (**752**, **754**, **756**, **758**) to provide a compass or database module **440** for storing and categorizing data regarding each object presented within the virtual space, to provide a hyperlink within the database module to respective viewpoint of each object presented within the virtual space, and to display the data regarding one or more of the objects within the database module **440** presented along with virtual space **300**.

Within the 3D immersive space that the 3D GUI creates, the user's viewpoint can be changed, where "viewpoint" is defined as a specific location or perspective in the local coordinate system (3D space) from which the user can view the scene or file. As such, an interface called a compass **440** can be used to help the user name, map, and navigate the view-

points in a 3D space, as illustrated in the exemplary embodiment of FIG. **11**. Here, the compass or database module **440**, which is located to the left of the display of the virtual space **300**, can be used to record the user's current viewpoint at any time while immersed in the 3D space. For example, the entry **442** shows the viewpoint "Yahoo!" indexed in the compass **440**. The compass **440** can be used to assign one or multiple names to the recorded viewpoint, and/or to store the names of viewpoint(s) as one name in a collection of names in a relational database. The names constitute a map of the 3D space as well as a method to navigate the map. For example, in one embodiment, there is provided a linear map, called a timeline **340**, having a plurality of icons (**502**, **504**, **506**, **508**). The icons **502**, **504**, **506**, **508** in the timeline represent viewpoints indexed in the compass **440** and correspond to the windows **510**, **512**, **514**, **518**, respectively. The compass can also serve as the user interface to the relational database of stored names/viewpoints. The compass can have drop-down menus, wherein each menu is a record (in the relational database) that stores the name(s) and/or fields of viewpoints assigned by the user or automatically generated by the application program. The compass can be expandable to facilitate an infinite array of menus or records, thereby creating a table or group of records.

In the embodiment shown in FIG. **11**, the explorer pane of the 3D GUI window serves as the compass **440** as it pertains to the Windows environment. In this pane, one can see tabs labeled Saved Spaces **450**, Desktop **451**, Favorites **452**, Web Browsers **453**, Searches **454**, Images Searches **455**, Movies Searches **456**, Searches **457**, Pictures **458**, Sound/Music **459**, 3D **460**, and Memos **461**. These tabs represent programmatic access or helper applications, which are described in further detail below.

As shown in the embodiment of FIG. **11**, the tab called Web Browsers **453** is selected, revealing the Web Browsers menu below it, and the name of the viewpoint of the webpage (shown in the main window or virtual space) whose URL is http://www.yahoo.com and whose viewpoint name as it relates to the compass **440** is "http://www.yahoo.com—Yahoo!" **442**. More specifically, listed in the menu of the compass **440** are the names of four viewpoints of the webpages (shown in the main window or virtual space) whose URLs are http://www.yahoo.com, http://www.google.com, http://www.ebay.com, and http://www.msn.com and whose viewpoint names as they relate to the compass (and are listed as such) are "http://www.yahoo.com—Yahoo!" **442**, "http://www.google.com—Google" **443**, "http://www.ebay.com—ebay" **444** and "http://www.msn.com—MSN" **445**. In this way, the end user can use the programmatic access or helper applications (**450-461**) to have their content staged in a 3D virtual space, can have the viewpoint representation of their content automatically indexed and organized in the compass **440**, and can have a linear representation of the graphical events in the compass **440** indexed on the timeline **340** via 3D icons (**502**, **504**, **506**, **508**).

In a preferred embodiment of the present invention, the helper applications are adapted to display the output of files and programs within windows (e.g., within the 3D spaces). In an alternate embodiment of the present invention, the programmatic access or helper applications are adapted to display information via customized interfaces whose graphical designs look like the real-world objects they seek to represent. For example, with reference to the embodiment of FIG. **22**, a user may run a helper application or programmatic access for a music file. After clicking on the icon for the helper application for sounds/music, the 3D GUI will prompt the user to locate the music file on either their local computer, a net-

worked computer, or the World Wide Web. The helper application will then draw the interface (**680**, **682**, **684**) for the music file, preferably in the form of a compact disc, in the 3D space (**300**). The user can then interact with the graphical representation of the music file (e.g., the graphical representation of a CD) to run and play the music file shown in interface **690**.

The naming of stored viewpoints can exist as a single name in one menu in the compass or as a combination of multiple names in multiple menus. In one embodiment, each viewpoint is associated with only one name in each menu. This way, the user can select multiple names in multiple menus to create meaningful combinations of names that dynamically retrieve stored viewpoints based on the relationship of names selected. The user can edit the menus of the compass, thereby adding or removing categories or expanding the menus. All of this can happen in real time, as the user authors and interacts with his or her 3D scene(s). The user may also be able to combine two or more disparate compass interfaces, thereby creating a larger virtual map and navigation system for one or more 3D spaces. A named viewpoint in the compass can link to a viewpoint in the current scene, a viewpoint in another 3D file on the local desktop, or a viewpoint in another 3D file hosted on the World Wide Web. This way, the compass creates a means of navigation that creates abstraction between viewpoints in any given files (local desktop files, files on the web, etc.).

In one embodiment of the present invention, the 3D GUI is further adapted to generate custom 2D maps of stored viewpoints and their names for specific menu items in the compass. Specifically, the 3D GUI creates 3D icons for each viewpoint named and created via the compass and plots them into the 3D space with the respective names assigned to them as signposts, allowing the user to map all of the viewpoints for a 3D space and to draw lines among the viewpoints to see relationships among disparate viewpoints.

With reference to the embodiment of FIG. **11**, there is provided a linear map **340** (drawn on the bottom margin of the virtual space **300**), in an infinite possibility of maps, whereby the 3D GUI is adapted to express the map of stored viewpoints as 3D icons with their names (should the end user mouse-over them) for specific menu items in the compass **440** expressed as a timeline **340**. Here, the timeline **340** is a map which represents the linear progress of animation from the first viewpoint to the last viewpoint, should the end user click each 3D icon in such a sequence, originally created and indexed in the compass **440**. In essence, each 3D icon (**502**, **504**, **506**, **508**) is a hyperlink or graphic that jumps to a new location or viewpoint (when clicked).

The present system utilizes a unique graphical user interface called a timeline that allows end users to (i) index and keep track of, (ii) navigate to and (iii) replay every visual event and important action that occurs within a virtual space as it is happening (on-the-fly) by drawing icons for these visual events in linear chronological order within the virtual space (see FIG. **18**). As used herein, "visual event" refers to a change in appearance to the 3D virtual space typically caused by adding information and output captured from other sources (automatically through programmatic access or manually by the end user) and drawn within the 3D virtual space (see FIGS. **1** and **2**—boxes **22**, **24**, **26**).

In one embodiment, each new action, initiated as a result of input from the end user or otherwise initiated by programmatic access, that results in a visual event, is automatically stored in the compass and then plotted as an icon on a dynamic timeline linear map **340** (see FIGS. **11**, **12**, and **13A**). Those skilled in the art will understand that it would be

impossible to list every possible kind of computing event that would constitute a visual event that would be drawn as an icon on the timeline **340**. In one embodiment (shown in FIGS. **11**, **12**, and **13A**), the timelines **340** are drawn horizontally on the bottom margin of the page in a straight line. In another embodiment (not shown), the timeline can be drawn vertically on the left or right margin of the page.

Each item plotted in the timeline is an icon that represents the action the end user initiated to cause a visual event for which the icon on the timeline was created. For example, with respect to a horizontal timeline, items to the left of a given item on the timeline occurred before the given item, whereas items to the right of the given item on the timeline occurred after the given item. With reference to the illustrative embodiment of FIG. **18**, the visual event (**610**) for which icon **612** was drawn on the timeline **340** occurred before the visual event (**620**) for which icon **622** was drawn on the timeline **340**. Similarly, the visual event (**630**) for which icon **632** was drawn on the timeline **340** occurred after the visual event (**620**) for which icon **622** was drawn on the timeline **340**.

This way, end users can go back to past computing experiences (what was drawn at some viewpoint or x,y,z coordinate in the virtual space at the time an icon was created and added to the timeline) by clicking any icon on the timeline (in a linear order, random order, etc.) which binds the end user to a viewpoint for which information regarding the visual event is plotted within the virtual space; in this case in its own unique 3D or visual stack in the current embodiment.

With reference to FIG. **13A**, in one embodiment, there is provided a helper application called Desktop **451** that allows the user to drag and drop items shown in the menu **441** of the database module **440** into the virtual space **300**. A dynamic linear map (drawn on the bottom margin of the virtual space) in the form of the timeline **340** is provided to express the actions of the end user's input as icons on the timeline **340**. Should the user click any icon on the timeline **340**, the user's viewpoint will change to the first item in the 3D stack (i.e., stack visualized in 3D) created for the action or visual event. Ultimately, the timeline **340** is a linear map for all the items or output the helper applications (**450-461**) capture and draw within the 3D GUI's stage or virtual space **300**.

In another embodiment, illustrated in FIG. **16A**, an end user selects the helper application called Yahoo! Search (**520**), and types a search term (e.g., "Albert Einstein" or "Thomas Edison") into the helper application's text input field (**530**). The helper application gathers the information for the search request through a webservice or other technique (FIGS. **4A** and **4B**) and plots the search results in a unique 3D stack **560**, which is represented in the timeline **340** by an icon **562**. The plotting of the search results in its own 3D stack by a helper application constitutes a visual event or change to the 3D virtual space for which an icon is drawn and added to the timeline.

An end user can select another helper application called Yahoo! Image Search (**520**) and enter the same search term in the search field (**530**) of the Yahoo! Image Search text input field. The Yahoo! Image Search helper application gathers the information for this search request by interfacing with Yahoo!'s webservices and then plots the search results in its own unique 3D stack **570** translated to the right (+x in the 3D Cartesian virtual space) of the previously plotted 3D stack or stack visualized in 3D. In addition, the drawing of the new visual stack within the virtual space constitutes a visual event whereby another icon **572** representing stack **570** is added to the timeline (to the right of the last icon **562**).

With reference to FIG. **16B**, should an end user create a web-browser page within the virtual space (FIGS. **1A-1C**—

box **60**) such as http://www.google.com through the "address": command-line interface **464**, whereby an end user can input a URL and have it added to the virtual space (FIGS. 1A-1C—box **60**), the new webpage would be drawn in its own 3D stack **580** translated to the right (+x in the 3D Cartesian virtual space) of the previously plotted 3D stacks **560**, **570**. This would add another icon **582** to the timeline (to the right of the last icon **572**). If the end user navigated within the virtual space and changed their viewpoint and selected the "record viewpoint" feature of the 3D GUI system (FIGS. 1A-1C—box **50**), the would records the x, y, and z position (viewpoint) within the virtual space, adds this to the database module, such as under a tab called favorites.

As shown in FIG. **20**, when the user clicks on the "record viewpoint" icon **650**, the system records the x, y and z position ("viewpoint") within the virtual space, and adds this to the compass **440** as an item **652** under the tab called favorites **452**. The system preferably allows the user to name the viewpoint and draw a 3D icon **654** within the 3D virtual space indicating the position of the stored viewpoint within the virtual space as a signpost. The system preferably draws the 3D icon **656** for the newly created viewpoint on the timeline **340** translated to the right of the previously drawn icon on the timeline as this would be categorized as a visual event. In this way, each visual event added to the virtual space is archived and expressed on-the-fly on the timeline through its icon.

Clicking each of the icons on the timeline from left to right in succession would result in successive changes to the end user's viewpoint. In this way, visual events within the virtual space are archived as they happen and expressed on the timeline in linear order. The user can travel back in time by simply clicking the icon on the timeline that represents the "visual events" that were drawn in the virtual space, for which the icon on the timeline was created. Clicking the item on the timeline would change the end user's viewpoint to the position in the virtual space where the visual events were originally drawn; in this case, the first item in each 3D stack.

Within the 3D GUI system, the addition of items to the timeline is dynamic and happens when new visual events are created. Furthermore, the timeline becomes an important component of the GUI system when a virtual space is viewed by an end user other than its author (either through e-mail or visiting a published URL of the saved space on a server). Upon viewing for the first time a virtual space that another end user authored, an end user can click the icons on the timeline from left to right in linear fashion and experience in chronological order what the author of the virtual space experienced as they created it. In this way, the timeline captures or records the visual changes of a virtual space in chronological order so others viewing it can re-experience the virtual space by clicking the icons on the timeline in succession from left to right.

The 3D GUI preferably utilizes an application program or run-time environment that is used to execute code programmed for it based on this system. For example, the program can utilize an interactive and immersive 3D-rendering browser that processes 3D drawing instructions based on higher-level language code (the program) written in the drawing language native to the browser program. There are numerous programming languages as well as run-time environments/3D-rendering browsers that can be used to achieve this. The run-time environment or browser can be (1) a stand alone application, (2) an Active X control or object within a web browser, and/or (3) an embedded object in webpages.

This system or 3D interactive computing interface will create what is known as a virtual space on the computer desktop for which it runs through the browser program. A

virtual space is simply a program (running within the run-time environment/3D-rendering browser) simulating a 3D space within a flat 2D display by redrawing objects in the virtual space relative to one another as determined by their perceived distance from the viewer, FIG. **2**. Objects that are supposed to be further away are drawn smaller whereas objects that are supposed to be closer are drawn larger.

Furthermore, the subject matter of a simulated 3-D Cartesian space drawn within the two-dimensional display or Window of an end user's computer is preferably redrawn in a cyclical fashion (FIGS. **1** and **2**—boxes **22**, **24**, **26**) to refresh the scene such that changes to the objects drawn must happen quickly enough based on the responses of the end user such that the experience feels truly interactive.

The information that is responsible for a virtual space is not unlike any other file where the information that composes the file can be stored, named, and amended at will (FIGS. 1A-1C—box **94**). In addition, because a 3D virtual space is used (1) to express the graphical user interface it utilizes for input and output and (2) as a stage to visualize the information to be sorted and searched on the system, many of the commands that are part of an operating system's file system can also apply to saved virtual spaces. In addition, each saved virtual space (FIGS. 1A-1C—box **96**) can act as a container for all of the items that were added to the virtual space through the helper applications (FIGS. 1A-1C—boxes **32**, **34**, **36**, **38**, **40**) that act as a bridge allowing information to stream into the system's virtual spaces. As one of the more popular functions of the Internet is to download and transfer files from one computer to another, the notion of utilizing a virtual space to output and add files, content, and information into as a medium to e-mail or transfer these files is novel and useful. Those skilled in the art will realize that once a virtual space is archived as a file, it can easily be e-mailed or sent via FTP to another server or computer as easily as any other e-mail or file.

In the current computing paradigm, e-mail messages are sent to one another as messages with attachments of binary files such as pictures, videos, sounds, and executable files. Once an e-mail message is received, to view an attachment, the recipient must (i) select the file, (ii) decode each file using their e-mail software, (iii) download it, and (iv) launch the file in its own new window using a separate program that created it or can view it. In contrast, in the 3D GUI, all the files, such as pictures, video, sounds, webpages, or other content, that are added to a virtual space (see FIGS. 1A-1C—boxes **32**, **42**, **50**, **58**, **60**, **62**, **72**, **74**, **84**, **86**, **88**, **90**, **92**, **94**, **104**) can be e-mailed as a whole in one file. Once the recipient of the e-mail receives the e-mail, they can access the virtual space with all of its content with one click, by clicking the hyperlink to the saved space whether it is (i) attached to the e-mail or (ii) saved on a server (FIGS. 1A-1C—box **98**). Doing so opens the virtual space and stages all of the content without the end user needing to open files separately one by one.

More specifically, once the virtual space is received via e-mail or downloaded to an end user's computer from a server or via FTP on the Web, the hyperlink to the saved space in the webpage responsible for showing the e-mail or FTP file sees the embedded HTML <object> tag for the Active X control or application that can execute the e-mailed or transferred file with one click. In general, this tag contains information needed to execute the control, which can be located on the GUI server or elsewhere. In this way, the 3D GUI system (configured in this embodiment of the invention as an Active X control) can run on any computer, allowing saved virtual 3D spaces with an end user's content to be sent to any other

computer via e-mail, file transfer protocol or other method and have all the content within the virtual space accessible to an end user with one click.

In one embodiment of the present system, the 3D GUI program allows the end user to publish their spaces to a GUI server (FIG. **8**—box **282**), such as by clicking a publish button or the like within the program. The 3D GUI program saves the file by uploading it or pushing it to the server and creates an address for this file as a URL (FIG. **8**—boxes **284** and **286**). One or multiple users (FIG. **8**—boxes $290_1$-$290_n$) could visit this published URL at the same time. Visiting this URL would launch the 3D GUI Active X control on each of the end users' client computers and independently download the most recent version of the file to each of the multiple users' computers (FIG. **8**—box **288**) so they could interact with and use the virtual space. Initially, each end user would be executing the same version of the virtual-space file initially downloaded on their client computer. The server would keep an index of all the end users who downloaded the file (known as the "multiple users") through network communication among the client(s) and the server computer.

Any change through a visual event to any of the multiple users' virtual spaces would be journalized in its own file. Here, visual event refers to a change in appearance to the 3D virtual space, typically caused by adding information and output captured from other sources and drawn within the 3D virtual space (FIG. **2**—box **22**, **24**, **26**). The term "journalizing" refers to a file system that logs changes to a journal before actually writing them to the main file. Each file for each journalized change for each new visual event from every client computer would be pushed to the server (FIG. **8**—box **296**), through a network connection, and added to the original file as a journal entry. Once the server received a journal entry to a file it would push the additions to the original file to all the multiple users' client computers except the client computer for which the change originated. In this way, the new visual events or journalized files from all the multiple users would be updated to the virtual spaces of all the multiple users. This process preferably recurs quickly in a cyclical fashion, thereby allowing all the changes from all of the multiple users to be reflected in real time.

The 3D GUI program provides interactivity of the simulated real-time 3-D immersive Cartesian space. While the end user is immersed in this 3D space, the program will take instructions from the user processed by the event handler presented by the Graphical User Interface initiated controls that can change their perspective or viewpoint, which refers to a location or visual perspective in the local coordinate system or three-dimensional space. As such, the end user will be able to achieve multiple, unique viewpoints in a virtual space by moving closer to or away from an object in the virtual space (e.g., a webpage), and/or changing the angle or perspective of the webpage in the virtual space.

In one embodiment of the invention, the Graphical User Interface control that assists the end user in changing their perspective in the virtual space is called a navigator, and it can be seen in FIGS. **11** and **12**. By clicking on the icons on the navigator, the end user can change their perspective or viewpoint in the 3D virtual space. In the embodiment shown in FIGS. **11** and **12**, (1) the "+" button on the navigator moves the end user forward along the z-axis in the 3D Cartesian space; (2) the "−" button on the navigator moves the end user backward along the z-axis in the 3D Cartesian space; (3) the "up arrow" moves the end user up along the y-axis in the 3D Cartesian space; (4) the "down arrow" moves the end user down along the y-axis in the 95

3D Cartesian space; (5) the "left arrow" moves the end user left along the x-axis in the 3D Cartesian space; and the (6) "right arrow" moves the end user right along the x-axis in the 3D Cartesian space.

Once the program receives user-initiated input to change the visual perspective of the scene, the program will redraw the scene to reflect the user-initiated input as well as changes to the visual perspective, as illustrated in FIG. **2**. The program recalculates the shapes and sizes of objects or geometry in the scene/3D Cartesian space to reflect the location or visual perspective of the end user in the local coordinate system. In order to achieve a realistic real-time experience, the program will redraw the scene in a cyclical fashion.

The event handler is a part of a computer program created to tell the program how to act in response to a specific event (e.g., the clicking of a mouse, the dragging of a scrollbar, or the pressing of a button). The program's custom event-handling functions will be executed by the event dispatcher, which is a part of the operating system that detects graphical user interface (GUI) events and calls functions in the executing program to handle those events (see en.wikipedia.org/wiki/Event_handler).

The program recalculates the shapes and sizes of objects or geometry in the scene/3D Cartesian space to reflect the location or visual perspective of the end user (based on the input gathered by the event handler) in the local three dimensional coordinate system. In order to achieve a realistic real-time experience, the program will redraw the scene in a cyclical fashion. In this way, the end user can control their navigation, position, and viewpoint in the 3D immersive space, giving them the freedom to visualize any geometry within the 3D space at any angle or viewpoint chosen (see FIG. **2**).

In accordance with one aspect of the embodiments described herein, there is provided a method and system for creating a 3D output of webpages from hyperlinks via interactive meta search results from search-engine outputs. With reference to the embodiment of FIGS. **4A** and **4B**, there is provided a graphical user interface, such as an input interface or helper application (box **162**) within the 3D scene, that allows the end user to input a search term or combination of search terms once an end user is within their 3D space. The helper application or programmatic access can allow the end user to input not only the search term(s), but the source from which the search results should originate (e.g., eBay, Yahoo!, Google, e-mail, desktop, MySpace, MSN, or any other available source of information (as shown in FIGS. **4A** and **4B**—box **164**). Accordingly, the proper helper application must be customized to capture or interface the 3D GUI system with the origin of information. Most search engines, portals and publishers of information on the world wide web require different programmatic access techniques to expose their information through webservices to allow other systems to connect with their information. Workers who are skilled in this art will understand that slight changes must be made to bridge the 3D GUI to this information without departing from the system. For example, the method can comprise connecting with http://www.google.com to facilitate the bridge of information into the 3D GUI system.

Similar to the way a search engine's crawler roams the world wide web by visiting hyperlinks, storing the URLs, and indexing the keywords and text of each page encountered, in one embodiment, the 3D GUI program can conduct a world wide web search on-the-fly, using these search terms in the search system or website of the end user's choice by opening one 2D HTML page of the homepage of the chosen search engine (in this case http://www.google.com FIGS. **4A** and **4B**—box **184**), drawn off screen (hidden) through the oper-

17

18

ating system's web browser control (FIGS. **4**A and **4**B—box **184**) as a child window within the 3D GUI. Our program will then enter the search term into the off screen text input field of the search engine's homepage (FIGS. **4**A and **4**B—box **188**), emulate a carriage return, retrieve the search results (FIGS. **4**A and **4**B—box **192**), parse the search results found in each HTML page, identify each hyperlink that the search engine returned to the end user as a search result, and store this in an array. In one approach, the program will open one new webpage or window in the 3D space (behind the search results page) for each element of this array or each hyperlink found on the search system's results page that would display the webpage found at the URL for the given hyperlink.

If the end user conducts a new search, the program will open a new browser window with the URL of the search system of their choice off screen for each search phrase entered into the input interface, transfer the keyword phrase to this search page as a staging area and emulate the carriage return. Once the search results appear, they can be brought into the program again. However, each new search result much have its own browser window drawn off screen and then brought back into the 3D Cartesian space.

In addition, it should be noted that the web browser control in the Windows operating system adds browsing, document viewing, and data downloading capabilities to applications. Applications using this control will allow the user to browse sites on the World Wide Web, as well as folders in the local file system and on a network. The web browser control is used in certain embodiments of the present invention. However, it will be noted that the 3D GUI system can utilize any part of the operating system shell or other component, other than the web browser control, as the method to capture and display output from the computer.

The 3D GUI program can open one new webpage or window in the 3D virtual space (behind the search results page FIGS. **4**A and **4**B—box **202**) for each element of this array or hyperlinks found on the search system's results page that would display the webpage found at the URL for the given hyperlink. In this way, the 3D GUI is not unlike a search engine's crawler except here the system visualizes the actual webpages, information and hyperlinks it encounters on-the-fly in a 3D virtual space instead of storing it in a database as an index. In FIGS. **4**A and **4**B—box **202**, one can identify the search results page drawn in front of two webpages. The system as a default draws each new webpage in what we call a "3D stack" (i.e., a stack visualized in 3D, sometimes referred to as a 3D stack) as shown where each new webpage occupies an x,y,z coordinate similar to the position of the existing webpage; except it is drawn further into the distance along the z axis (where it appears smaller from the given perspective) and is translated on the x or y or both x, y axis to allow the end user to see multiple webpages from any given perspective. For example, in the embodiment of FIG. **9**, one can see a bird's eye view of four 3D stacks **302**, **304**, **306**, **308** drawn in a virtual space **300** where each 3D stack (each containing about ten items in this embodiment) represents a new search.

With reference to the embodiment of FIG. **10**, frames **366** and **371** provide two search results conducted using a search engine (e.g., Google). Each search results in the creation of its own 3D stack (**360**, **370**), each stack including about ten webpages. The dynamic creation of these 3D stacks (**360**, **370**) in the 3D virtual space **300** is the default gestalt that the 3D GUI display engine uses to output the elements found within the 3D virtual space's organized output of information. In another embodiment, the display engine has the abil-

ity to load other custom templates to achieve one or more different gestalts (e.g., 3D stacks, etc.).

With continued reference to FIG. **10**, there is provided another embodiment of a navigator **380**. By clicking on the icons on the navigator **380**, such as next page **382** and previous page **384**, the end user can easily change his/her perspective or viewpoint to coincide with the meaning of the buttons on the navigator **380**. For example, clicking the next page **382** on the navigator **380** binds the end user to a close-up viewpoint of the next page in a 3D stack (e.g., moving from page/frame/window **361** to page/frame/window **364**). Additionally, (a) the + button **390** moves the end user forward along the +z axis in the 3D Cartesian space, (b) the − button **392** moves the end user backward along the −z axis in the 3D Cartesian space.

There are also provided a group of navigation buttons **396** near the bottom of the screen. Clicking the button **324** brings up the first page of a 3D stack (e.g., page **361** of stack **360**), whereas button **406** pulls up the last page of a 3D stack (e.g., page **368** of stack **360**). Stated another way, clicking button **398** binds the end user to a close-up viewpoint of the first page in the 3D stack, whereas clicking button **406** binds the user to a close-up viewpoint of the last page in the stack. Similarly, clicking button **400** brings up the previous page, whereas button **404** pulls up the next page in a given stack. Clicking button **402** causes the program to take a snapshot of the current Cartesian space arrangement of windows and objects, which makes it possible for the user to pull up the current Cartesian space at a later time. Clicking the "next 10 pages" button (now shown) draws the next ten pages in the 3D stack, adding it to the original ten pages to create a total of twenty pages in the 3D stack. Clicking the previous 10 pages button **408** binds the end user to a close-up viewpoint of the previous 10 pages in a 3D stack (for example, moving from the twentieth page back to the tenth page).

Also illustrated in the embodiment of FIG. **10** is a supplemental navigation button **410** for changing his/her perspective or viewpoint in the 3D virtual space **300**. For example (a) the up arrow **412** moves the end user up along the +y axis in the 3D Cartesian space, (b) the down arrow **414** moves the end user down along the −y axis in the 3D Cartesian space, (c) the left arrow **418** moves the end user left along the −x axis in the 3D Cartesian space and the (d) right arrow **416** moves the end user right along the +x axis in the 3D Cartesian space.

When an end user clicks the close button **420** on any texture map of a web browser control represented in the 3D stack, the 3D GUI removes the page from the 3D stack, animates the next page after removed page forward to replace position of removed page in stack, animates page after previously animated page to original position of previously animated page before it was moved, animates forward next page in 3D visual stack to replace position of previously animated page, animates next page in stack to position of previously animated page, and repeats this process until the end of the 3D stack or last element in the array is reached.

In addition, the 3D GUI can be easily customized in another embodiment of the invention to accommodate a formula to dynamically compute the position or x,y,z coordinates of each webpage (or other item) drawn within a 3D stack to take on the overall look of what we call a custom gestalt whereby the configuration or pattern (x,y,z coordinates in the virtual space) of elements are so unified as a whole that it cannot be described merely as a sum of its parts. For example, in one embodiment (not illustrated), a different gestalt or pattern for drawing webpages takes on the shape of a three-dimensional cube where each webpage is plotted at

the point of intersection of three sides of the cube (different than the column gestalt in FIG. **9**).

In another embodiment, the 3D GUI retrieves images from a helper application which are then presented in a matrix wherein four pictures are drawn into two rows and two columns for each 3D stack along the x and y plane within the virtual space. In yet another embodiment, the visual gestalt is of a matrix where sixteen pictures are drawn into four rows and four columns for each 3D stack along the x and y plane within the virtual space's gestalt.

In accordance with another aspect of the embodiments described herein, the 3D GUI "gestalt" can be adapted to provide a "Links In/Links Out" feature in combination with a gestalt for any object or web page in the search results within the virtual space. First, should the user request, the program will automatically allow the end user to plot all of the web pages or objects that "link out" of any given web page or object within the 3D virtual space. Second, should the user request, the program will automatically allow the end user to plot all of the web pages or objects that "link in" to any given web page or object within the 3D virtual space.

The 3D GUI system's display engine can also be adapted to output a custom gestalt suitable for e-mail. The labels drawn in the 3D Cartesian space, their positions and angles for Links In/Links Out can be customized to display any titles which correspond to the kind of data presented. Each coordinate or position in the 3D Cartesian space for plotting the information displayed in 3D stacks and Links In/Links Out, are variables that can be amended within a custom template that is compatible with the program to alter the look of the gestalt in the 3D Cartesian space. This can be accomplished by using xml encoded data in the template that utilizes the extensible nature of the program. Those skilled in the art will be able to create these extensible data tables that work with the system. The program can handle multiple templates at once through template files and switch between different themes on-the-fly at the request of the end user through their input from the interface panel.

In one approach, each coordinate or position in the 3D Cartesian space displayed in the 3D stacks are variables that are amended by a custom template that is compatible with the program to alter the look of the gestalt in the 3D Cartesian space. This is accomplished by using xml encoded data in the template file that utilizes the extensible nature of the program. For example, a cluster of eight windows can be arranged at the corners of a cube configuration, wherein the each window can be rotated through the cube arrangement to sort through the pages in the cluster. The Links In and Links Out feature can be represented by line segments that connect each cluster. It will be noted that a cube cluster is only exemplary and that clusters having variable numbers of pages to display are contemplated as well. For example, in another embodiment, five windows are represented in a cluster having a pyramid configuration, wherein the pyramid comprises a rectangular base with four points and a single point located above the rectangular base.

In one embodiment of the invention, the 3D GUI can be a historical visual chronology of the user's computing session, whereby the application can archive the date and time of each new visual event by recording the viewpoint at that date and time of the computing session and revisit these visual events by restoring the viewpoint at that date and time. Here, we are calling a "visual event" as any change in appearance to the 3D virtual space usually caused by adding information and output captured from other sources and drawn within the 3D virtual space (FIG. **2**—boxes **22**, **24**, **26**). In one embodiment of the present invention a virtual space is created as shown in FIG. **21**. Furthermore, the helper application called "Yahoo!

Search" is utilized to conduct a search and plot the webpages for the search result in the 3D virtual space in its own 3D stack. The searches tab **454** in the compass **440** is selected showing the date and time that each search result or webpage was plotted within the virtual space in the window pane below it in chronological order (see entries **660-672** in menu **441** of compass **440**).

We are calling the "compass" an area in the program that can store information in the 3D GUI that is related to the program such as viewpoints. The compass can have categories where information is stored. Changing the categories gives the end user access to different information, allowing one to filter or discover information based on the category selected where the information resides.

Here we see that the events (**674**, **676**) shown or drawn in the virtual space **300** correspond to the archived date and time indexed for each event in the searches tab of the compass. Since 3D virtual spaces have a (i) horizontal position known as (x), (ii) vertical position known as (y) and (iii) a position of depth (z) which is also known as time, one can see how it is possible to create a visual history of the end user's computing session by plotting new output in a new position further along the (z) axis and date and, time stamp it (e.g., entry **670** which reads Aug. 8, 2006-6:00 p.m.) In fact, the system can be programmed to archive any information combined with the proper operating system controls or other output at the next visual event to be drawn in the 3D virtual space by the help of custom helper applications. For example, a graphical event could be the creation of a webpage in the GUI's 3D virtual space by typing a URL such as http://www.yahoo.com followed by a carriage return on the command line interface labeled "address:" **464**.

The 3D GUI automates navigation in computing by remembering where the user left off last—visually—such that the next time the user requires the same series of inputs to achieve that same given output, the 3D GUI will navigate the user through a recorded 3D space that is the visual history of where the user last left off and the items that were output into the virtual space will be staged just as they were.

With reference to FIG. **13**A, in one embodiment, the application the 3D GUI runs as an Active X control within the Internet Explorer web browser. The Saved Spaces tab can be selected in the explorer pane to reveal all the saved spaces in the menu below it. Clicking a saved space will load the 3D virtual space into the main window. Window **490** shows the output of another helper application called Desktop **451** whose name is shown as a tab in the compass **440**. In the illustrated embodiment, a saved Microsoft Word document **500** is running in a window **490** within a 3D virtual space **300** alongside items **492**, **494**, **496**, **498**. All of the outputs of these items were captured through the input of the end user through helper applications using the method called "Interactivity and Persistency" (see exemplary approach shown in FIG. **3**). This output saved here as a virtual space **300** can be combined together from disparate sources and saved together as one in a virtual space **300**.

Furthermore, the Microsoft Word document **500** whose output is running in the 3D virtual space window **490** was input (into the 3D virtual space **300**) by the end user by drag-and-drop (FIGS. **1**A-**1**C—box **78**) from the menu of the helper application labeled Desktop **451**, in the explorer pane of the 3D GUI application shown as a graphical event. Using the helper application called Desktop **451**, any file, document, application or desktop can be added to a 3D GUI virtual space by drag-and-drop (FIGS. **1**A-**1**C—box **78**) in the same way the Microsoft Word document **500** was added to the virtual space **300**. Furthermore, once the file, document, application

or desktop is added to the virtual space **300**, it is fully interactive and functional and appears no different from, or close to, the original way the program functions when it was not in the 3-D Cartesian space **300**.

FIG. **13**B shows a saved virtual space whose file name is called ncn (**510**) whose itemized output from helper application called "Yahoo! Search" (**520**) is indexed in the explorer pane **441** of the 3D GUI window. Clicking one of these indexed names (viewpoints) will bind the end user to a viewpoint created by the helper application that brings a favorable viewpoint/perspective of the output for this particular webpage in the 3D virtual space to the end user's view. As such, each name indexed in the explorer pane of the window (compass or database module **440**) under the searches tab **454** serves both as an index of the search results gathered by the helper application as well as a hyperlink or trigger to a favorable viewpoint within the 3D virtual space of each webpage within the search results.

In certain cases it may be difficult to interact with a file, document, application, desktop or other output within a 3D virtual space. This can be the case if the end user is occupying an unfavorable viewpoint in the virtual space where objects are drawn in skew within the virtual space. In such a case, the 3D GUI system uses a technique called "Bind to the HUD", which involves bringing a file, document, webpage, application, desktop or other output into view by drawing it on the HUD. Those skilled in the art will recognize that the term "HUD" or "heads-up display" refers generally to a way of projecting information directly into a human's visual field. This technique was pioneered for military aviation, but has been used experimentally in other applications as well. This can be accomplished by changing the viewpoint of the end user within the virtual space so it is directly in an end user's visual field.

When the viewpoint of the end user within a virtual space has caused the webpage to be drawn in skew, there will often be a distortion in shape of the normal distribution toward one side or the other. In such a case, the 3D GUI system utilizes the Bind to the HUD feature whereby clicking an icon or bottom (analogous to the minimize in windows operating system environment) triggers a change to the viewpoint of the end user within the virtual space so that the webpage is directly in an end user's visual field, thereby making it easier to interact with. In one embodiment, this is accomplished by revealing the 2D version of the webpage that was initially hidden or drawn off screen and positioning it in a layer that is in front of the 3D virtual space such that the end user can interact with this layer in 2D. Furthermore, the end user has the freedom to unbind to the hud or hide the 2D webpage again that was initially hidden or drawn off screen by clicking the appropriate button (again, analogous to the minimize button in the windows operating system environment). As such, an end user can toggle or switch between 2D and 3D for any selectively captured computing output and information (webpages, applications, documents, desktops or anything that can be visualized on a computer) that was drawn within a 3D virtual space at will by using this technique.

Since the 3D GUI takes advantage of seemingly unlimited space, the output of applications and documents need not be closed, hidden or filed. They are staged and can permanently exist visually open (by recording their output in a 3D virtual space) where they are and how the user last left them. The 3D GUI does this by allowing the user to record everything they ever did, visually, and letting them revisit it through unlimited space. Should the user require a new computing experience, they simply create more virtual space and plot new applications and documents within this newly created virtual space through helper applications or programmatic access.

Should the user require an old computing experience, the 3D GUI changes the graphical output of the screen to visually represent what they saw during the old computing experience (e.g., data at a particular viewpoint recorded at a particular date and time or archived under a file name). This old computing experience can be saved in a file as what we call a "saved space". A saved space is not unlike any other file as it stores the information that can be seen in a virtual space by the 3D GUI program at any time the end user chooses by utilizing the save space command. In addition, the 3D GUI can systematically archive any new visual change or addition to the virtual space by date and time and recall what was seen in a past virtual space by date and time. This way, the 3D GUI lets one travel back (visually) in computing time.

In accordance with one embodiment of the present invention, the 3D GUI provides full functionality and interactivity of the 2D display of a user's computer (including the selective and isolated capturing of graphical windows, desktops, HTML pages, and general program outputs) redrawn into a novel simulated real-time 3D immersive Cartesian space, whereby the 2D graphics are drawn or mapped onto 3D objects.

The 3D GUI invention is a novel system that offers a 3D stage to bridge information into and handle this information from an operating system's output. The 3D GUI system disclosed here can be adapted to capture any output from any operating system, in the language of the operating system, regardless of any programmatic or structural changes to the operating system, the way it outputs or the sequence of programmatic events used to program the operating system or interact with it.

In one embodiment, the 3D GUI system implements interactive composite texture mapping of operating system controls or other operating system outputs into infinitely immersive interactive 3D Cartesian space to facilitate search, sort and a browsing GUI system of information (e.g., but not limited to webpages, applications, documents, windows, networks, webservices, etc.).

Regardless of the (1) kind of information brought into (through the output of the operating system) the program whether it be webpages, pictures, windows, applications, desktop screens, pdf files, etc. or (2) the method by which the information is captured by the program whether it be through APIs, Meta Search, or webservices, or (3) the programmatic access by which it is delivered (controls, windows, desktops, images, VNC) it is critical that the program bring the information into the simulated 3-D interactive Cartesian space in such a manner that the information being brought in is fully interactive and functional and appears no different from, or close to, the original way the program functions when it was not in the 3-D Cartesian space.

In accordance with one aspect of the embodiments described herein, there is provided a special control from the operating system such that the information being dealt with (e.g., webpages) functions properly in the 3-D Space as it would in 3D. Accordingly, in the world of computing, a "CONTROL" is defined as an object that enables user interaction or input, often to initiate action, display information or set values. For example, in order for a webpage on the World Wide Web to function properly in the operating system in a typical window on the 2-D desktop of an end user's computer, the language of that webpage (HTML) must be read by an operating system program or CONTROL in order for the webpage in question to be displayed and function properly. One such particular control used by the Windows Operating

23

Systems is called a Web Browser control that deals with webpages as well as typical desktop windows. Currently, most Windows controls are visualized using a 2-D paradigm. The name of one such control is called MSHTML/web-browser control for rendering HTML webpages and other content on the Windows desktop within a window.

Webpages, unlike pictures that the end user simply view, require interactivity to function properly in a virtual space. Because the viewpoint of an end user within a 3D interactive virtual space can change, so to do the shapes and sizes of the objects being drawn change based on the end user's navigation within the virtual space. If the objects being drawn within a 3D virtual space having operating system output such as controls mapped onto them, a special system must be created to insure that the end user can interact with the mapped object in a 3D virtual space with the same responsiveness of input and output that one would find in a 2D desktop. As such, described herein is a interactive 3D composite texture mapping to serve as a visual bridge of information from an operating system's 2-D output (e.g., the programmatic access for which the 2-D is being displayed utilizes a control, and all the information a control is capable of displaying) to the 3-D interactive Cartesian space, wherein the represented objects remains fully functional in the immersive space from any viewpoint that the end user selects (see FIG. 3).

As such, the program delivers full functionality and inter-activity of the two-dimensional display of an end user's computer (including the selective and isolated capturing of graphical windows, desktops, HTML pages, and general program outputs or any information a control can display or non-control item) redrawn into a novel simulated real-time 3-D immersive Cartesian space whereby the two-dimensional graphics are drawn or mapped onto three-dimensional objects.

While immersed in this 3D space, end users can see their two-dimensional computer display components that were captured and redrawn and fully interact with them, creating an entirely new way of computing. While interacting with their mapped or redrawn two-dimensional displays, end users can change their perspective or viewpoint (as defined as a location or visual perspective in the local coordinate system or three-dimensional space) by moving closer to it, away from it, changing their angle or both.

In one exemplary embodiment, the visual output of an operating system's control that one would normally find output on the 2D desktop (e.g., webbrowser control/msHTML) is texture mapped onto 3D geometry (e.g., a cube, pyramid, etc.) in the GUI system's 3D immersive virtual space. This is one operating system control chosen from an infinite library of possible operating system controls, APIs or any outputs whose output can be captured by the 3D GUI and drawn onto any object in the 3D space. In addition, the origin and method for the visual output of an operating system's control can be texture-mapped onto the 3D Geometry in the GUI system's 3D immersive virtual space regardless of what it is or how it was captured.

With reference to FIG. 3, there is provided an Interactivity and Persistency Diagram illustrating the processing of information required to achieve both interactive composite texture mapping as well as interactivity and persistency in a virtual space. In the diagram, this process is initiated with the launching of the 3D GUI application which can be installed on either a client computer or a server computer.

The 3D GUI running on a server can deliver information and software to other computers linked by a network. Here, the client is the requesting application program or user in a client/server relationship. For example, the 3D GUI client

24

application is effectively making client requests for information from the 3D GUI server over the Web. The 3D GUI program itself is a client in its relationship with the computer that is getting and returning the requested information. The computer handling the request and sending back the information is the 3D GUI server.

In this embodiment, the 3D GUI application program will run locally on the computer rather than as a web-application or network-application over a network connection. However, both configurations are possible. Should the invention execute on a server or other such computer, this would provide a user of the client computer to have access to other computers' operating system's output. Initially, the application is launched as described by Launch Application in the diagram. A virtual space is created, "Create Interactive 3D Cartesian Space", on the computer desktop for which it runs through the program. Virtual space is simply a program (running within the run-time environment/3d rendering browser) simulating a 3D space within a flat 2D display by redrawing objects in the virtual space. Depending on the application or computing purpose at hand, the program will capture user input request based on the intended program customization.

Through programmatic access, the application will transfer and initiate user requests from the 3D virtual space to 2D desktop or directly to the operating system of the computer through an API call. If this transfer of user requests from 3D to 2D is done directly to the 2D desktop without an API call, the user requests are transferred by simulating/emulating or reproducing the request or device input from event handler off-screen onto the hidden 2D mirror component and capturing the response or change in output from the 2D mirror again in a synchronous fashion and mapping it back to arbitrary 3D geometry. We say off-screen because the 2D desktop or operating system control is hidden from the end user to focus attention on the 3D virtual space. In this way, end users can compute with the same outputs from their 2D desktop through a 3D virtual space that acts as 3D window into 2D output, setting the stage for computing with seamlessly unlimited virtual space.

Based on program customization, the application will "Determine proper OS control to retrieve the kind of information requested" by the end-user to the purpose at hand. For example, this could include (but not limited to): (1) opening a webpage, (2) opening a file or document, (3) launching an application, (4) create a window or (5) executing any other program locally or over a network connection.

As such, once the proper operating system control is specified and located, an application program interface call is executed for this system control. In order to enable the usability and functionality of this control or other operating system application program interface within a virtual space, the 3D GUI will blit or map visual output of OS control, bit map or API onto arbitrary 3D geometry. The phrase arbitrary 3D geometry is used to clarify that this geometry can be unique to the theme of the virtual space that the 3D GUI is customized to through a template that utilizes a specific gestalt.

It will be noted that the 3D GUI is not limited to one method for capturing this map or "visual output of OS control" or simulating or passing the user's request to the mirror as each operating system has a unique method for handling controls and their output.

Within the 3D virtual space, a device input event handler is utilized to pass mouse clicks, cursor positions, keyboard input and movements from the operating system control mapped onto the 3D geometry to the mirror control running on 2D environment.

44
Appx132

Currently, this method or cyclical process of capturing operating system output and drawing it into a 3D virtual space is a workaround or manual procedure implemented in order to overcome a shortcoming of the operating system to the problem at hand. In another embodiment, the operating system can incorporate this feature or similar to it with one simple API call in the future at which time the 3D GUI system could utilize this API.

This process of (1) mapping visual out of operating system control on 3D geometry in a virtual space, (2) scanning the device input event handler and (3) passing this input to the mirror control running in 2D environment or directly to the operating system is repeated in a cyclical fashion to create a real time experience of interacting with said operating system controls or operating system output in a virtual space, regardless of the viewpoint or perspective of the end-user in the virtual space. The 3D GUI application runs in real time in which information is received and immediately responded to without any time delay among the virtual space and the 2D map or operating system API output. This synchronous communication is advantageous as too much delay would make the system lag.

As one can discern from FIG. **3**, in the situation that there is no operating system control or programmatic access to capture the map or visual output of an operating system control, a contingency is incorporated to periodically capture the on-screen output of an operating system control or output (e.g., window) as a bit map from the frame buffer, video driver, operating system graphics API or video memory by blit (to copy an image, or part of an image, from one place to another). With further reference to FIG. **3**, it will be noted that the method and system for providing a 3D GUI as described herein allows the system to capture the visual output from any computer source regardless of its origin or how it was output. For example, while boxes **128**, **140**, **142** in FIG. **3** refer to OS Control and/or say "Execute Proper OS Control Specific to the Kind of information Requested . . . ," it will be noted that the invention is not limited to applications involving OS Control, but can relate more generally to applications involving Programmatic Access or the like. For example, in certain embodiments, box **140** of the flowchart of FIG. **3** can read "Execute Proper Programmatic Access to the Kind of Information Requested which will act as a Mirror to its 3D Representation."

By capturing the output of the user's traditional two-dimensional desktop, the GUI stages this output in a seamlessly 3D space by plotting the windows or other graphical representations of programs in 3D. In one embodiment of the present invention, 3D GUI anticipates what the user may seek next (for example, the next webpage in a search result), eliminates dormant computing time, and puts the user in a reduced-click computing environment by automatically plotting the new computing experience (in a new space, rather than overlapping it onto something else) while visually recording the old. Because the 3D GUI creates the illusion of infinite space in 3D, it can create a visual history of the user's computing session, whereby the user can visit past visual computing events (or a snapshot in time) by simply navigating to previously recorded states. This can be accomplished because new information expressed graphically in a virtual space does not replace old information by replacing it or overlapping it. Instead, it is drawn in new virtual space. Accordingly, the 3D GUI can serve a historical visual chronology of the user's computing session, whereby the user can name the computer experience they are currently having through their position(s) (or viewpoint) in a 3D space and revisit it by recalling the name or title at a later time.

While immersed in this 3D space, the user can see their 2D computer display that was captured and redrawn and fully interact with it, creating an entirely new way of computing. While interacting with their mapped or redrawn 2D display, the user can change their perspective or viewpoint (as defined as a location or visual perspective in the local coordinate system or 3D space) by moving closer to it, away from it, changing their angle or both.

The 3D objects that are being drawn onto (or next to) can collectively represent a theme or backdrop for the content that is redrawn, such as a house, library or even neighborhood. For example, electronic music files may be mapped onto 3D pictures of CDs or Records, electronic videos files may be mapped onto televisions or movie screens, etc. (see FIG. **22**) The redrawing of 2D computer screens onto interactive 3D objects increases the visual computing space and allows the user to organize the computer output onto objects or near objects whose 3D visual construct may represent the real world object the computer output is associated with.

In accordance with one aspect of the present invention, the 3D GUI is adapted to create a visual computing history, whereby normal changes to a 2D computer display output are drawn or mapped onto new 3D objects, rather than replace the current output or 2D display once a change is made. For example, in one embodiment, when the user clicks on a hyperlink on webpage A, this results in the creation of a new webpage B instead of replacing A. For example, as the user browses the internet by interacting with a two-dimensional output mapped onto a three-dimensional object, pages that the user would normally hyperlink to by clicking a link would replace the 2D computer display. The 3D GUI, however, is adapted to create an entirely new 3D object whose surface is mapped with the new display content that would normally replace the original 2D interactive page.

By storing and archiving the date and time of each new graphical event, the user creates a visual chronology of their computing session, which can be recalled by clicking icons on a timeline where each icon on the timeline represents the action of the end user at a specific date and time. The programmatic access that is responsible for a past graphical event would also be archived. For example, in the case of viewing a second HTML page that one hyperlinked to, the previous URL would be saved. This way, a user could always look back at what the computer previously displayed before it output the current view and interact and function with a previously saved computing state as represented graphically. This process of capturing visually the computing history in 3D can continue on indefinitely, whereby the 3D visual space can be saved, archived and revisited and the timeline would grow dynamically with additions of icons to represent this.

In accordance with one embodiment of the present invention, a compass (or database module) application is provided. The user is allowed to click at least one button on the compass (while immersed in a three-dimensional interactive space) and assign one or multiple names to a viewpoint (as defined as a location or visual perspective in the local coordinate system or three-dimensional space). The user may then view the three-dimensional image associated with the viewpoint and save this viewpoint (or visual perspective) along with its corresponding name in a file whose content or data can be accessed by the compass. In one embodiment of the present invention, the compass acts as an electronic combination lock, whereby the combination or sequence of one or multiple names assigned by the user and added to the dials of the compass identify the stored location.

For example, consider the situation whereby a user is immersed in a 3D interactive space showing 3D objects of

27 28

compact discs from The Beatles. To view the current viewpoint, the user could assign multiple names such as MUSIC, ROCK, FOREIGN, BRITISH INVASION whereby each name would occupy one space on one of many dials of the graphical user interface. By turning the dials to the names MUSIC, ROCK, FOREIGN, BRITISH INVASION the program would initiate a change of viewpoint to the 3D interactive space showing the 3D objects of compact disks from The Beatles. The use of the interface feature for naming, storing and re-visiting viewpoints in a 3D space is universal and can be applied to a local file of a 3D space on the user's computer, a networked file or a file on the world wide web.

In accordance with one aspect of the present invention, the user is able to access stored viewpoints on a graphical interface called a compass, which may serve as an electronic combination lock. In this embodiment, the compass will open (or visually visit) a stored viewpoint when its dials are turned through a predetermined sequence of positions identified on the dials' face by the appropriate names assigned to each dial. Therefore, the compass can be used to connect a series of viewpoints together and visually visit a series of connected stored viewpoints.

In accordance with one aspect of the present invention, the user is immersed in a 3D space and provided with a button called new space or the like. When this button is clicked, another file for a completely new 3D interactive space is created, whereby the new 3D interactive space is accessible from the current space by clicking a 3D object or portal button. The portal button, which electronically links the new space to the current one, may be represented by a picture of a viewpoint or visual perspective of the new space. By clicking the new space button, the 3D GUI will automatically create the portal button within the current space that links to the new space. Furthermore, the 3D GUI may also allow the user to concurrently assign one or multiple names to the new space, and add these name(s) to the database module (also known as the compass).

Should a user create a new space and then save this space or e-mail it (FIGS. 1A-1C—boxes **96**, **98**) the 3D GUI may be adapted to automatically create a table of contents page (FIGS. 1A-1C—box **100**) by writing the markup for an HTML page that describes the new space, the names assigned to the new space via the compass, and pictures of the new space through snapshots of different viewpoints or visual perspectives of the 3D file. All this information may be assembled into an HTML file that will be automatically published or sent by file transfer protocol (FTP) to one or many world wide web servers for promotion as to be found and crawled by the many search engines that traverse the world wide web.

One purpose of creating these HTML table of content pages for newly created 3D spaces on-the-fly and publishing them to the world wide web is so that they can be used as portal pages, whereby a user could (i) search the world wide web using keywords, (ii) find a table of contents page whose subject corresponds to the keywords, and (iii) hyperlink the end user from a 2D table of contents page to a 3D interactive space whose subject matter corresponds to the table of contents page. For example, the HTML table of contents page may contain (i) the name of the new space as the title of the HTML page, (ii) meta tags whose names would be taken from the names assigned to viewpoints of the compass interface, (iii) a raster image or picture of the original viewpoint or visual perspective of the new space, (iv) a list of all hyperlinks found within the new space, (v) a description of the scene, (vi) the author of the scene, (vii) remote desktop connection settings and/or (viii) URLs to the desktops for all remote desktop connection links shown within the new space.

Because the search engines that index information on the world wide web mainly do so for HTML (webpages), pictures and (in some occasions) files, the HTML table of content pages disclosed here serve as a doorway for saved 3D virtual spaces to be included in a search engine's index. Information about the 3D GUI Active X control that is responsible for running the control is coded into the HTML table of contents page through use of the HTML <object> tag along with other information disclosed here that make up a table of contents page. In this way, the 3D GUI system allows end user's to author content through their 3D virtual spaces, publish them on a server through a table of contents page and insure that these pages can be crawled and seen by search engines through the current paradigm of the world wide web where search engines primarily use crawlers or spiders to examine hyperlinks and words on webpages.

In accordance with one aspect of the present invention, the display of 3D on a computer screen may involve a run-time execution model that plays a previously programmed 3D space like a tape-recording in a window or web browser as a one-way broadcast medium. The programming of this 3D space is accomplished by hand coding a program or using an editor which prepares a file for the player. In one embodiment of the present invention, the helper applications can be accessed from the player (while an end user is using and immersed within a 3D space) through a graphical user interface of interactive icons that facilitate the display output of a file or functionality of a program within windows within a 3D space.

In one embodiment, content output into the 3D GUI application's virtual space is generated by running a helper application, such as eBay Search or Yahoo Images Search. The resulting first product image output and their product information, generated by helper application whose functional diagram is shown in FIGS. **4**A and **4**B. The output preferably comprises a linear map (e.g., drawn on the bottom margin of the virtual space), whereby the 3D GUI is adapted to express the map of stored searches as 3D icons with their names (should the end user mouse-over them) for specific search items expressed as a timeline. Here, the timeline is a map which represents the linear progress of animation from the first viewpoint of the first item in each 3D stack to the last viewpoint of the first item in the last 3D stack should the end user click each 3D icon in such a sequence, originally indexed in the compass. In essence each 3D icon is a hyperlink; a graphic, when clicked, that jumps to a new location or viewpoint in the current virtual space corresponding to the 3D icon. In this embodiment of the invention, each new search results in a new 3D stack created for that search result plotted in the 3D virtual space with its corresponding 3D icon drawn.

For example, in the embodiment of FIG. **9**, one can see three 3D icons (**342**, **344**, **346**, **348**) in the timeline **340** representing four unique searches (i.e., rolex Daytona, ibm laptop, plasma tv, and treo **650**) done with the eBay Search helper application. Each unique search resulted in the creation of its own 3D stacks **302**, **304**, **306**, **308** (each stack showing ten items at a time in this embodiment) as well as their own unique 3D icons plotted in a timeline map **340** at the bottom margin of the 3D virtual space **300**. In this embodiment of the invention, should the end user click on any hyperlink or 3D icon, the 3D GUI would visually take the end user to the viewpoint of the first eBay search result item within its 3D stack.

In this way, end users can (1) successively enter in new search terms into the eBay helper application, (2) press the

46

**Appx134**

carriage return to initiate their searches, (3) visualize the search results plotted into their own unique visual column, (4) visualize the map of 3D icons expressed as a timeline on the bottom margin of the virtual space, (5) quickly navigate among (through the viewpoint of the first item in each unique 3D stack) searches as they are expressed in 3D stacks by simply clicking the hyperlink of 3D icons on the timeline and shuffle or sort through each item in each 3D stack by clicking the commands on the navigator **320**, such as next page **322**, last page **324**, next 10 pages **326**, and last 10 pages **328**. Also, by clicking on the icons on the navigator **320**, the end user can change their perspective or viewpoint in the 3D virtual space **300**. For example, (1) the + sign **337** moves the end user forward along the +z axis in the 3D Cartesian space, (2) the − sign **338** moves the end user backward along the −z axis in the 3D Cartesian space, (3) the up arrow **330** moves the end user up along the +y axis in the 3D Cartesian space, (4) the down arrow **334** moves the end user down along the −y axis in the 3D Cartesian space, (5) the left arrow **336** moves the end user left along the −x axis in the 3D Cartesian space and the (6) right arrow **332** moves the end user right along the +x axis in the 3D Cartesian space.

In the embodiment of FIG. **11**, there is provided an address: command line **464** interface or helper application whereby an end user can input a URL or address for a window, document or application in the local file system of a local operating system, etc. When an end user types http://www.yahoo.com on the address field of the command line interface, the application then draws the HTML page through the proper web browser control into the 3D virtual space as depicted. This process can be repeated indefinitely, entering in additional URLs on the command line labeled address: to have them filed in a 3D stack. Four webpages (**510**, **512**, **514**, **516**) are created in a 3D GUI virtual space having sequentially typed in http://www.yahoo.com followed by a carriage return, http: www.google.com followed by a carriage return, http://www.ebay.com followed by a carriage return and then http://www.msn.com followed by a carriage return. The command line interface, helper application **464** is one way for the user to create and author HTML pages, desktop windows, documents, applications, vnc desktop, or anything else able to be visualized in a virtual space on the fly at their behest.

In an alternate embodiment of the present invention, each helper application is adapted to display information via a customized 3D interface whose graphical design and construct resembles the real world object it seeks to represent. For example, one may run a helper application for a music file. After clicking on the icon for the helper application, the 3D GUI may prompt the user or automatically locate the music file(s) on either their local computer, networked computer or world wide webservice. The helper application may then draw the interface for the music file(s) in the 3D space. The user can then interact with the graphical representation of the music file (e.g., a graphical representation of a CD) to run and play the music file.

Regardless of where the file or application displayed in the 3D GUI is located (e.g., within the same folder, subfolder, a different computer, within the network, a different network, across the internet, etc.), the user has full access to the file through it's native program, or to the website through the default browser. In this way, the 3D GUI allows the output of disparate computer programs to visually converge into one expandable, changeable 3D space. The 3D GUI may also prompt the user to search or scan folders and subfolders in the local computer, network computers, webservers or the internet for any files of a given kind or criteria and display their output as windows or customized 3D real world object icons

en masse in the 3D space via the helper application. This way, the user can use this feature selectively to choose only one file or automatically to choose all the files available to them.

In accordance with another aspect of the embodiments described herein, the end user is provided with the ability to selectively capture computing output and information (webpages, applications, documents, desktops or anything that can be visualized on a computer) and allowing it to visually converge within a 3D virtual space. In one embodiment of the invention, the 3D GUI offers the ability to drag-and-drop content in the form of files, folders, applications, windows, documents or anything else expressed on the end user's desktop (or networked desktop) to a 3D virtual space by locating it on the desktop or within a window on the desktop and dragging the icon(s) of the item (or the open item through its window) to the 3D GUI window's virtual space to add it to. Drag and drop describes a particular action you can make with the mouse. Click an object, such as a folder, then hold down the mouse button as you drag the object to a new location. One can drop the object by releasing the mouse button. Drag and drop can be used to easily move or embed an object or file into another.

Once the icons are dragged into the virtual space, the document, application, file or other can (i) open within a window in the virtual space or (ii) can be represented by its icon within the virtual space. In one embodiment of the invention, if the drag-and-dropped item is represented by an icon within the virtual space, it can then be double-clicked to open it within the virtual space or outside of the virtual space on the 2D desktop. For example, the icon of the Internet Explorer application within a virtual space can be dragged-and-dropped into the 3D GUI and shown as an icon.

If the end user double clicks this icon, the interne explorer window can open within the 3D virtual space. In one approach, if the end user double clicks this icon and holds the shift key at the same time, the Internet Explorer window will open in front of the 3D virtual space in a 2D window as part of the desktop. Each time the end user completes one drag-and-drop operation, all of the items in the single drag-and-drop are filed in their own 3D stack and an icon is plotted on the timeline to represent this.

In another embodiment of the invention, if an end user drags-and-drops a folder containing multiple items from the desktop, all of those items that are in the folder are drawn individually (outside of the folder) in their own 3D stack within the 3D virtual space. In addition, an icon representing this visual event through a drag-and-drop action by the end user to alter the 3D virtual space is preferably added to the timeline in accordance with its function. In this case, an icon of a folder is drawn on the timeline representing this action (drag-and-drop of a folder into the virtual space) as it is indexed in the timeline

In accordance with one aspect of the present invention, the end user can re-order, move around or further organize items plotted within the 3D virtual space automatically through the script or program of a helper application (FIGS. **1A-1C**—box **32**) written for a specific purpose such as sorting or manually by clicking on one item or multiple items as a group (ctrl-click) and moving them to their new location through drag-and-drop. Drag and drop describes a particular action you can make with the mouse. Click an object, such as a picture or webpage, then hold down the mouse button as you drag the object to a new location. You drop the object by releasing the mouse button.

For example in one embodiment, illustrated in FIG. **17A**, one can see five items (**590**, **592**, **594**, **596**, and **598**) in the virtual space **300**, wherein the five items are represented in the

timeline **340** by icons **600**, **602**, **604**, **606**, and **608**, respectively. The end user has the ability to move any item in the 3D virtual space to any other location within the virtual space by translating it along the x, y axis simply by clicking it, holding down the mouse button, dragging the object to the new location and releasing the mouse button. For example, if the end user clicks the webpage **590**, holds down the mouse button and drags the webpage to the left (–x) and up (+y) within the 3D virtual space and releases the mouse button, the webpage will occupy a new location (see FIG. **17**B). The end user can also move items closer to their viewpoint (appearing larger) or further away from them (appearing smaller) within the virtual space by translating them along the z axis. In order to accomplish the translation of an item within the virtual space in the –z (further away) or +z (closer) direction, the end user holds down the shift key at the same time they initiate a drag-and-drop of said item. For example, with reference to FIGS. **17**A-**17**C, if the end user clicks the image **596**, holds down the mouse button and shift key down at the same time and drags the mouse backwards closer to their person, the picture **596** will be translated forward in the +z direction, appearing larger, and will occupy a new location in the virtual space. Similarly, if the end user clicks a webpage, holds down the mouse button and shift key down at the same time and drags the mouse away from their person in a forward direction, the webpage will be translated backward in the –z direction, appearing smaller, and will occupy a new location in the virtual space (not illustrated).

In accordance with one aspect of the present invention, the user is able to access helper applications while immersed in a 3D interactive scene, by clicking on icons located on a task bar at the base of the screen. By clicking on these animated 3D icons, the icons may duplicate themselves or animate themselves into the 3D scene and provide the beginning of functionality as 3D graphical objects for the tasks at hand for which the icon was initially clicked. For example, the icon on the task bar to initiate this helper application may be of an open doorway. Once the 3D open doorway icon on the task bar is clicked, a picture of a viewpoint or visual perspective of the new space may be animated from the task bar into the scene. If this picture were to be clicked from within the 3D scene, it would act as a doorway that would hyperlink the user from the current scene to another scene.

In accordance with one aspect of the present invention, the display of 3D on a computer screen may involve a run-time execution model that plays a previously programmed 3D space like a tape-recording in a window or web browser as a one-way broadcast medium. The programming of this 3D space is accomplished by hand coding a program or using an editor which prepares a file for the player. A helper application for geometry can be accessed from the player (while an end user is using and immersed within a 3D space) through a graphical user interface of interactive icons that facilitate the display or input of 2D and 3D objects into the 3D scene based on a user interface of geometrical objects (cube, spheres, cones) or real world objects (room, desk, building, stairs, CD rack). This addition of geometry into the 3D scene on-the-fly helps give meaning to an otherwise endless connection of 3D spaces for which users can fill their output with. The 3D GUI may further include a special Search and Browse application to locate 3D geometry files. The user may use the Search and Browse application, for example, to search for geometry files in (or beyond) folders and subfolders located on the local computer, network computers, webservers or the world wide web.

In accordance with one aspect of the present invention, the display of 3D on a computer screen may involve a run-time

execution model that plays a previously programmed 3D space like a tape-recording in a window or web browser as a one-way broadcast medium. The programming of this 3D space is accomplished by hand coding a program or using an editor which prepares a file for the player. A helper application for audio, sound and music can be accessed from the player (while an end user is using and immersed within a 3D space) through a graphical user interface of interactive icons that provide pre-recorded audio, sound and music and may also facilitate the recording of sound through a microphone connected to the computer and inserted into the 3D scene through an icon (e.g., of a speaker, etc.) on-the-fly as a way to label (or narrate) the scene and record thoughts next to objects in the scene to further give them meaning. The user may further use the Search and Browse application, for example, to search for audio, sound, or music files in (or beyond) folders and subfolders on the local computer, network computers, webservers or the world wide web.

In accordance with one aspect of the present invention, the display of 3D on a computer screen may involve a run-time execution model that plays a previously programmed 3D space like a tape-recording in a window or web browser as a one-way broadcast medium. The programming of this 3D space is accomplished by hand coding a program or using an editor which prepares a file for the player. The 3D GUI is unique in that it combines authoring capabilities to the end user within the interactive 3D virtual space (FIG. **2**—boxes **22**, **24**, **26**). For example, a helper application for pictures, animations, movies and video can be accessed from the player through a graphical user interface of interactive icons that help locate such pictures, animations, movies and video and insert such media into the 3D scene on-the-fly at the end user's behest (see FIGS. **1**A-**1**C—boxes **74**, **86** while a user is using and immersed within a 3D space).

In one embodiment, shown in FIG. **13**A, the end user selects the Desktop helper application **451** in the database module **440**. The selection of the desktop tab **451** reveals files on the end user's local hard drive or network in the window pane or menu **441** below. One can view files shown on the end user's local hard drive within this window pane **441**. One can also drag-and-drop (FIGS. **1**A-**1**C—box **78**) one or more of these files into the GUI 3D virtual space **300** which results in the display of said picture, video and webpage incorporated into the 3D virtual space along with their 3D interactive icons represented in the timeline **340** of the 3D virtual space **300**.

In another embodiment, shown in FIG. **15**, content output into the 3D GUI application's virtual space results from a search initiated with the helper application **522** (e.g., Yahoo! Image Search). This helper application shows the search term van gogh, having been input into this helper application's text input field **530**. The resulting first four image outputs (**552**, **554**, **556**, **558**), generated by helper application **522** (see functional diagrams in FIGS. **4**A and **4**B), created the 3D output of images and information from Yahoo! webservice, as shown in the 3D virtual space. The beginnings of a map or timeline **340** are provided (namely, an icon **550** on the bottom margin of the virtual space) whereby the 3D GUI is adapted to express the map as a timeline of stored searches through 3D icons with their names (should the end user mouse-over them). Here, the timeline **340** is a map which represents the linear progress of events within the virtual space. Clicking the 3D icons (e.g., icon **550**) would animate from the first viewpoint of the first item in each 3D stack to the last viewpoint of the first item in the last 3D stack should the end user click each 3D icon in such a sequence, originally indexed in the database module.

33

34

In essence the 3D icon **550** is a like hyperlink—namely, a graphic that jumps (when clicked) to a new location or viewpoint in the current virtual space corresponding to the 3D icon. In the exemplary embodiment of FIG. **15**, each new Yahoo! Image Search results in a new 3D stack created for that search result plotted in the 3D virtual space with its corresponding 3D icon drawn on the timeline. The search for information could be images, video or any other content available from a webservice. The user may further use the Search and Browse application, for example to search for pictures, animations, movies and video files in (or beyond) folders and subfolders on the local computer, network computers, webservers or the world wide web.

In accordance with another aspect of the present invention, the display of 3D on a computer screen may involve a run-time execution model that plays a previously programmed 3D space like a tape-recording in a window or web browser as a one-way broadcast medium. The programming of this 3D space is accomplished by hand coding a program or using an editor which prepares a file for the player. The 3D GUI is unique in that it combines authoring capabilities to the end user within the interactive 3D virtual space. In one embodiment, illustrated in FIG. **14**, the user can access a paintbrush feature by selecting the 3D helper application tab **460** in the database module or compass **440**, and then selecting the Add Paint Brush feature in the menu **441**. A user interface of interactive icons **542**, **544** appear in the virtual space **200**, wherein the icons **542**, **544** facilitate the display or output of 2D and 3D free formed lines and drawings **546** based on mouse events painted into the scene on-the-fly as a way to annotate or decorate objects in the scene or create drawings next to objects to further give them meaning. More specifically, clicking on paintbrush icon **542** causes a painting tool to appear in the virtual space **300**.

In this embodiment of the invention, the 3D GUI system redraws the 3D virtual space in a cyclical fashion to reflect the changes of content and perspective within the 3D space based on the end user's input (see FIGS. **1** and **2**—box **22**). The program scans the event handler for input from one of the many helper applications (FIGS. **1A-1C**—box **30**). In this present exemplary embodiment, the helper application is the Add Paint Brush. The end user chooses the paintbrush icon **542**, which changes the end user's cursor to the brush icon. The 3D GUI captures the mouse movements of the end user and draws or paints this movement (if the mouse button is depressed) which in this example is (i) an arrow, (ii) an underline and (iii) the word important painted in red (**546**) on to the x and y plane of the end user's viewpoint within the virtual space's 3D Cartesian space in the color red.

In accordance with another aspect of the present invention, there is provided a helper application for text that can be accessed from the player (while a user is using and immersed within a 3D space) through a graphical user interface of interactive icons that facilitate the display or output of 2D and 3D text into the scene on-the-fly as a way to label objects in the scene and write down thoughts next to objects in the scene to further give them meaning.

In one embodiment, the helper application is an Add Text Command (FIGS. **1A-1C**—box **72**). For example, as shown in the embodiment of FIG. **14**, when the end user chooses the add text command by clicking on the icon **544**, the end user's cursor changes to the text I-beam icon. The 3D GUI captures the keyboard input of the end user and draws or paints this text onto the x and y plane of the end user's viewpoint within the virtual space's 3D Cartesian space.

In accordance with another aspect of the present invention, the display of 3D on a computer screen may involve a run-time execution model that plays a previously programmed 3D space like a tape-recording in a window or web browser as a one-way broadcast medium. The programming of this 3D space is accomplished by hand coding a program or using an editor which prepares a file for the player. Once an end user is viewing a 3D space or scene on their computer through a player on either their web browser or stand alone application, a Search application can be used to input a search term or search terms.

The 3D GUI will then conduct a world wide web search using these search terms in at least one search engine (Google, MSN, Yahoo!) by opening one 2D HTML page drawn into a window or other object into the 3D scene for each of the search engines to display the output of the HTML page for each search. The 3D GUI may then parse the search results found in each HTML page and identify each hyperlink that the search engine returned to the end user as a search result. Once identified, the 3D GUI may then open one new window in the 3D space (behind the search results page) for at least one hyperlink found on the search results page that would display the webpage found at the URL for the Hyperlink (e.g., next set of search results, a particular search results, a particular advertisement, etc.).

In one embodiment of the present invention, the 3D GUI may do this for each hyperlink found on the search results page en masse for one or more search engines, and tile them in space. This plotting of search results into a 3D scene is beneficial to consumers as it expands the visual computing space one has available for both web searches and internet browsing.

In another embodiment of the present invention, the 3D GUI makes use of dormant computing time while the end user is connected to a network. For example, most users will conduct a search, scan the page and click one link. Once they realize that the link they clicked was insufficient, they will click the back button on their browser, scan the page again, and click another link. The time the consumer is scanning the page, clicking one link, reading the page at the new link and returning back to the original search results page is dormant computing time where the computer is connected to the world wide web and able to download all (or portions of) the hyperlink pages found on the original search results page, continuously, and draw these results into the 3D scene. The 3D GUI allows users to systematically visit a viewpoint that shows each search results page one at a time for easy viewing. The graphical user interface will have options for saving the current search results into a file and post the name of the search, name of the hyperlink, URL, date/time and/or source onto the database module.

Using this same seemingly unlimited 3D visual space, the 3D GUI may allow the user to automatically parse any open or active webpage to (i) determine which HTML pages are links to it, (ii) determine which HTML pages it links to, and (iii) plot these pages as groups or clusters. There may further be a visual grouping or cluster of pages drawn in a 3D space that link to any given active webpage. In this way, the user can determine in one glance at a given viewpoint of a clustering of webpages in the 3D space which pages to click that either link to their active page or from their active page. In addition, the user may be able to visually expand this network of webpages by choosing any active webpage in any cluster drawn in the 3D space and creating a new cluster of webpages that this active page links to or by creating a new cluster of webpages that is linked to this active page. In this way, the 3D GUI creates a visual gestalt of the world wide web at the behest of the user.

35

In accordance with another aspect of the present invention, the display of 3D on a computer screen may involve a run-time execution model that plays a previously programmed 3D space like a tape-recording or animation in a window or web browser as a one-way broadcast medium. The programming of this 3D space is accomplished by hand coding a program or using an editor which prepares a file for the player. Once an end user is viewing a 3D space or scene on their computer through a interactive player on either their web browser or stand alone application, the 3D GUI may deliver textual, audio, video, multimedia, web advertisements and/or 3D advertisements whose presentation is automatically incorporated into the programming that is responsible for the current view of 3D. This way, based on user inputs that help define the subject or context for which they are either searching or computing, the 3D GUI may deliver one or a combination of advertisements (e.g., advertisements previously mentioned into the 3D space, etc.).

The 3D GUI described herein is an improvement over existing players that play 3D animation in that 3D GUI described herein anticipates an end user's input to navigate and add content to the 3D virtual spaces (through helper applications), on-the-fly, that it allows an end user to create; merging the editor concept and player concept of 3D into one hybrid editor and player. In doing so, the GUI system redraws the 3D virtual space in a cyclical fashion to reflect the changes of content and perspective within the 3D space based on the end user's input (FIGS. 1 and 2—box 22). The program scans the event handler for input from one of the many helper applications (FIGS. 1A-1C—box 30).

The helper applications can initiate the output of content into the 3D virtual space such as but not limited to (i) loading a custom script and its icon to alter the application logic of the 3D virtual space through programmatic access to stream in new information and take on a new theme (a.k.a. helper application such as eBay Search, (ii) visit a viewpoint command to change the visual perspective of the end user in the current virtual space or another virtual space that is hyper-linked to, (iii) record the current viewpoint in the virtual space, (iv) add the output of the desktop the virtual space, (v) add a web browser to the virtual space to view a document, webpage or files and folders on the desktop through a window in the 3D virtual space, (vi) add text command to virtual space, (vii) add a picture to the 3D virtual space, (viii) add music to the 3D virtual space (FIG. 22—Item A), (iv) add video to the 3D virtual space, (x) record sound and at add it to the 3D virtual space, (xi) add a map to the 3D virtual space, (xii) add 3D through a VRML, X3D or other file format to the 3D virtual space, and/or (xiii) add advertising to the 3D virtual space in the form of text, pictures, video or other multimedia (e.g., the embodiment of FIG. 19, described in further detail below). The addition of such content to a 3D virtual space within the 3D GUI system is diagrammed in FIGS. 1A-1C—boxes 32, 42, 50, 58, 60, 62, 72, 74, 84, 86, 88, 90, 92, 94, 104.

Once the 3D GUI scene recalculates the geometry in the scene (FIGS. 1 and 2—box 24) based on the addition of output, information and content to the 3D virtual space it then redraws the scene (FIGS. 1 and 2—box 26), to reflect the addition of this new content. The 3D GUI system will determine the subject or meaning of the output, information and content within the 3D virtual space by indexing all the words associated with (i) the names of the files, HTML pages, view-points, hyperlinks and any other available information associated with the 3D virtual space content in the scene, (ii) actual data within the files, HTML pages, viewpoints, hyper-links and other available information within the 3D virtual

36

space or words entered into the input field of helper application (FIGS. 1A-1C—box 106), (iii) sort the indexed words by frequency to determine subject of 3D virtual space by identifying most frequently appearing words or utilize other method to determine meaning, (iv) send subject of 3D virtual space to advertising server through internet request (FIGS. 1A-1C—box 110), (v) return appropriate text, picture(s), video, sound, music, hyperlinks or other advertisement content and respective software code from advertising server, webservice or other location, (vi) draw text, picture(s), video(s), sound(s), music, hyperlinks or other ad content from advertising server or other location into 3D virtual space using program code (FIGS. 1A-1C—box 114) and (vii) redraw the scene (FIGS. 1 and 2—box 26). Those skilled in the art may identify this process of making an advertising request through the internet as many web sites utilize this technology for delivering advertising through the internet.

In one embodiment, shown in FIG. 19, when the end-user inputs the search term news into the helper application 640 (e.g., Yahoo! Search), the helper application 640 returns a webpage 642 (e.g., URL http:www.ncn.com). The 3D GUI system can further utilizes the input term (in this case news) (see FIGS. 1A-1C—box 104) and returns a group of advertising text 644. The advertising text 644 can be incorporated into the 3D virtual space 300 by presenting the text along with its: (a) hyperlink and associated title (News on eBay); (b) description (Find news items at low prices. With over 5 million items for sale every day, you'll . . . ); and (c) url www.e-bay.com, thereby resulting in a more detailed advertisement 646. Currently, text advertisements are prevalent on the world wide web and therefore have been incorporated in this embodiment of the invention. However, it will be understood that other forms of advertising, such as, for example, picture(s), video(s), sound(s), music, hyperlinks, and/or multimedia, and/or combinations thereof, can be incorporated into the 3D virtual space 300.

The present invention provides many advantages over the prior art, including, but not limited to, increased space on the user's desktop, eliminating the need to constantly open and close programs or hide and reveal them each time the user needs them, utilizing dormant computing time to download and/or display information, reducing mouse-clicks and offering a more natural alternative to accessing programs and documents than the traditional folders-within-folders storage system. For example, in the exemplary embodiment of FIG. 12, forty webpages are output into the 3D virtual space 300 organized into their respective 3D stacks 470, 472, 474, 476, and 478, wherein the stacks are represented in the timeline 340 as icons 480, 482, 484, 486, and 488, respectively. As explained above, the present invention also improves the web browser and desktop experience by offering a novel 3D graphical user interface.

In accordance with yet another aspect of the embodiments described herein, there is provided a memory management method whereby computer memory is allocated to the 3D GUI system at the program's request and freed up for reuse when it is no longer needed by unloading memory. More specifically, there is provided a method of using virtual memory whereby a portion of the hard disk is used to swap out this data when insufficient RAM exists to hold all such data. In one embodiment, an end user plots the output of information into the 3D GUI within 3D stacks whereby each new visual event additionally marked with an icon on the timeline. Additional output of information into the 3D GUI virtual space results in the creation of new 3D stacks along with new icons drawn in succession on the timeline creating what is called linear path of the end user's actions through a

50

virtual space as expressed with through a timeline and 3D stack. If this process continues indefinitely, the memory or electronic holding place for this data that the 3D GUI system can access quickly will be used up. In order to create an ending computer experience whereby the end user need not reach such a memory limit, provided herein is a system whereby once a memory limit is reached, the 3D GUI system marks a point in the program representing the position of the end user on this linear path and unloads the memory by saving it to virtual memory. This freeing up of memory will allow the end user to continually output new information into the virtual space. This process of unloading memory to virtual memory and continually outputting new information into the virtual space can go on indefinitely. Should the end user backtrack or retrace one's course over a portion of the linear path (or track) that has already been completed, the 3D GUI system will reload to memory the information stored in virtual memory once the end user revisits any mark on the linear path.

The present invention can be used in a number of applications, including, but not limited to, search engines, desktops, visual music download services, shopping malls, collaborative space for shared documents, collaborative space for video conferencing, tool for publishing webpages, virtual networked computer system, interface for cable TV sets or multimedia PCs, computing interface for large flat panel displays, forum for educational training and visualization, and e-mail visualization programs, just to name a few. Even though the present invention is described here within the embodiment of an operating system that utilizes a desktop personal computer with a monitor, those skilled in the art will be able to adapt the system to work on other electronic devices, such as, for example, cell phones, pdas, handheld mobile devices, flat panel displays, or the like, etc., without giving up the spirit of the invention.

Having thus described a preferred embodiment of a method and system for providing an improved three-dimensional graphical user interface, it should be apparent to those skilled in the art that certain advantages of the within system have been achieved. It should also be appreciated that various modifications, adaptations, and alternative embodiments thereof may be made within the scope and spirit of the present invention. For example, the improved 3D GUI has been presented in the context of a windows operating system, but it should be apparent that many of the inventive concepts described above would be equally applicable for other operating systems and devices.

What is claimed is:

1. A method for providing a three-dimensional (3D) graphical user interface, comprising:

receiving at least first and second inputs from an end user;

receiving first and second webpages from at least one server in response to said first and second inputs, wherein the first and second inputs are website addresses corresponding to said first and second webpages, respectively;

displaying at least a portion of the first webpage on a first object within a 3D space, and at least a portion of the second webpage on a second object within the 3D space, comprising;

rendering the first and second webpages;

capturing first and second images of the at least a portion of the first webpage and

the at least a portion of the second webpage, respectively; and

texturing the first image on the first object and the second image on the second object, the first object being displayed in a foreground of the 3D space and the second object being displayed in a background of the 3D space; and

displaying additional information, comprising:

receiving an interaction by the end user on the first image;

replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes the rendered first webpage;

receiving an interaction by the end user on a link provided in the rendered first webpage, the link corresponding to the additional information;

rendering the additional information; and

displaying the rendered additional information in said window within the 2D space.

2. The method of claim 1, further comprising:

capturing a third image of at least a portion of the rendered additional information;

texturing the third image on the first object, the third image thereby replacing the first image on the first object; and

replacing the window within the 2D space with at least the first and second objects within the 3D space, wherein the first object is displayed in the foreground of the 3D space and the second object is displayed in the background of the 3D space.

3. The method of claim 2, further comprising:

receiving a toggle interaction by the end user; and

replacing the window within the 2D space with at least the first and second objects within the 3D space in response to the toggle interaction.

4. The method of claim 2, further comprising:

receiving a navigation interaction by the end user; and

moving said second object from the background of the 3D space to the foreground of the 3D space in response to the navigation interaction.

5. The method of claim 1, further comprising:

receiving a toggle interaction by the end user; and

replacing the window within the 2D space with at least the first and second objects within the 3D space in response to the toggle interaction.

6. The method of claim 1, further comprising:

receiving at least a third input from the end user;

receiving a third webpage from the at least one server in response to the third input; and

displaying at least a portion of the third webpage on a third object within the 3D space, comprising:

rendering the third webpage;

capturing a third image of the at least a portion of the third webpage; and

texturing the third image on the third object, the third object being displayed in a further background of the 3D space, behind the second object.

7. The method of claim 1, wherein the step of receiving the first and second webpages from the at least one server in response to said first and second inputs further comprises receiving the first webpage from a first server in response to said first input and receiving the second webpage from a second server in response to said second input.

8. A system for providing a three-dimensional (3D) graphical user interface, comprising:

a display screen;

an input device for receiving at least one input from an end user

a processor module operatively coupled to the display screen and the user input device; and

a memory module operatively coupled to the processor module, the memory module comprising executable code for the processor module to:

receive at least first and second inputs from an end user;

receive first and second webpages from at least one source in response to said first and second inputs, wherein the first and second inputs are website address corresponding to said first and second webpages, respectively;

display at least a portion of the first webpage on a first object within a 3D space on the display screen, and at least a portion of the second webpage on a second object within the 3D space on the display screen, comprising;

rendering the first and second webpages;

capturing first and second images of the at least a portion of the first webpage and the at least a portion of the second webpage, respectively; and

texturing the first image on the first object and the second image on the second object, the first object being displayed in a foreground of the 3D space and the second object being displayed in a background of the 3D space; and

display additional information, comprising:

receiving an interaction by the end user on the first image;

replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space on the display screen in response to receiving the interaction, wherein the window includes the rendered first webpage;

receiving an interaction by the end user on a link provided in the rendered first webpage, the link corresponding to the additional information;

rendering the additional information; and

displaying the rendered additional information on the display screen in said window within the 2D space on the display screen.

9. The system of claim 8, wherein said executable code is further configured to:

capture a third image of at least a portion of the rendered additional information;

texture the third image on the first object, the third image thereby replacing the first image on the first object; and

replace the window within the 2D space with at least the first and second objects within the 3D space, wherein the first object is displayed in the foreground of the 3D space and the second object is displayed in the background of the 3D space.

10. The system of claim 9, wherein said executable code is further configured to:

receive a toggle interaction by the end user; and

replace the window within the 2D space with at least the first and second objects within the 3D space in response to the toggle interaction.

11. The system of claim 9, wherein said executable code is further configured to:

receive a navigation interaction by the end user; and

move said second object from the background of the 3D space to the foreground of the 3D space in response to the navigation interaction.

12. The system of claim 8, wherein said executable code is further configured to:

receive a toggle interaction by the end user; and

replace the window within the 2D space with at least the first and second objects within the 3D space in response to the toggle interaction.

13. The system of claim 8, wherein said executable code is further configured to:

receive at least a third input from the end user;

receive a third webpage from the at least one server in response to the third input; and

display at least a portion of the third webpage on a third object within the 3D space, comprising:

rendering the third webpage;

capturing a third image of the at least a portion of the third webpage; and

texturing the third image on the third object, the third object being displayed in a further background of the 3D space, behind the second object.

14. A method for providing a three-dimensional (3D) graphical user interface, comprising:

receiving at least first and second website addresses from an end user;

using said first and second website addresses to retrieve first and second webpages from at least one source in response to said first and second inputs;

displaying at least a portion of the first webpage within a 3D space, and at least a portion of the second webpage within the 3D space, comprising;

generating first and second images of the at least a portion of the first webpage and the at least a portion of the second webpage, respectively; and

displaying the first image and the second image in the 3D space, the first image being displayed in a foreground of the 3D space and the second image being displayed in a background of the 3D space; and

displaying additional information to said end user, comprising:

receiving an interaction from the end user with the first image;

replacing the first and second images within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes the first webpage;

receiving an interaction by the end user on a link provided in the first webpage, the link corresponding to the additional information; and

displaying the additional information to the user.

15. The method of claim 14, wherein the additional information is displayed in the window, thereby replacing the first webpage in the window.

16. The method of claim 14, further comprising:

generating a third image of at least a portion of the additional information; and

replacing the window with at least the second and third images within the 3D space, wherein the third image replaces the first image in the foreground of the 3D space, and the second image remains in the background of the 3D space.

17. The method of claim 16, further comprising:

receiving a toggle interaction by the end user; and

replacing the window with at least the second and third images within the 3D space in response to the toggle interaction.

18. The method of claim 17, further comprising;

receiving a navigation interaction by the end user; and

moving said second image from the background of the 3D space to the foreground of the 3D space in response to the navigation interaction.

* * * * *