Nos. 2025-1022, -1051, -1082

_____

# United States Court of Appeals for the Federal Circuit

_____

**APPLE INC., GOOGLE LLC,**

*Appellants*

v.

**SPACETIME3D, INC.,**

*Cross-Appellant*

_____

Appeals from the United States Patent and Trademark Office,

PTAB, in Nos. IPR2023-00242, IPR2023-00577

_____

## APPELLEE'S RESPONSE BRIEF AND CROSS-APPELLANT'S OPENING BRIEF

_____

Todd E. Fitzsimmons
FITZSIMMONS IP LAW, P.C.
P.O. Box 199
Gardena, CA 90248
(571) 210-8000
todd@fitziplaw.com

Gregory Cordrey
JEFFER MANGELS BUTLER
& MITCHELL LLP
3 Park Plaza, Ste 1100
Irvine, CA 92614
(949) 623-7236
gcordrey@jmbm.com

*Attorneys for Appellee and Cross-Appellant*

# EXEMPLARY PATENT CLAIMS

**Claim 1**: A method for providing a three-dimensional (3D) graphical user interface, comprising:

[1a]   receiving at least first and second inputs from an end user;

[1b]   receiving first and second webpages from at least one server in response to said first and second inputs, wherein the first and second inputs are website addresses corresponding to said first and second webpages, respectively;

[1c]   displaying at least a portion of the first webpage on a first object within a 3D space, and at least a portion of the second webpage on a second object within the 3D space, comprising:

[1ci]   rendering the first and second webpages;

[1cii] capturing first and second images of the at least a portion of the first webpage and the at least a portion of the second webpage, respectively

[1ciii] texturing the first image on the first object and the second image on the second object, the first object being displayed in the foreground of the 3D space and the second object being displayed in a background of the 3D space; and

[1d]   displaying additional information, comprising:

[1di]   receiving an interaction by the end user on the first image;

[1dii] replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes the rendered first webpage;

[1diii] receiving an interaction by the end user on a link provided in the rendered first webpage, the link corresponding to the additional information;

[1div] rendering the additional information; and

[1dv] displaying the rendered additional information in said window within the 2D space.

**Claim 14**: A method for providing a three-dimensional (3D) graphical user interface, comprising:

[14a] receiving at least first and second website addresses from an end user;

[14b] using said first and second website addresses to retrieve first and second webpages from at least one source in response to said first and second inputs;

[14c] displaying at least a portion of the first webpage within a 3D space, and at least a portion of the second webpage within the 3D space, comprising;

[14ci] generating first and second images of the at least a portion of the first webpage and the at least a portion of the second webpage, respectively; and

[14cii] displaying the first image and the second image in the 3D space, the first image being displayed in a foreground of the 3D space and the second image being displayed in a background of the 3D space; and

[14d] displaying additional information to said end user, comprising:

[14di] receiving an interaction from the end user with the first image;

[14dii] replacing the first and second images within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction, wherein the window includes the first webpage;

[14diii] receiving an interaction by the end user on a link provided in the first webpage, the link corresponding to the additional information; and

[14div] displaying the additional information to the user.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

**Case Number** 25-1022, 25-1051, 25-1082

**Short Case Caption** Apple Inc. v. SpaceTime3D, Inc.

**Filing Party/Entity** SpaceTime3D, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/10/2025

Signature: /s/ Todd Fitzsimmons

Name: Todd Fitzsimmons

i

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| SpaceTime3D, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable          ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)   ☐ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................................... i

TABLE OF AUTHORITIES ...................................................................... vii

TABLE OF ABBREVIATIONS ................................................................. ix

STATEMENT OF RELATED CASES ........................................................ x

STATEMENT OF JURISDICTION ........................................................... 1

INTRODUCTION ....................................................................................... 1

STATEMENT OF THE ISSUES ................................................................. 5

STATEMENT OF THE CASE ..................................................................... 8

   I.   U.S. Patent No. 8,881,048 ................................................................. 8

   II.  IPR Petition And Asserted Grounds ............................................... 14

       A.    Gralla Reference ................................................................... 14

       B.    Robertson-Gettman Combination ......................................... 15

       C.    Sauve-Tsuda Combination .................................................... 19

   III.  Board's Final Written Decision ...................................................... 23

       A.    Board's Construction of "the Rendered First Webpage"
and Finding Claims 1-13 Not Unpatentable ......................... 23

       B.    Board's Construction of "the First Webpage" and Finding
Claims 14-18 Unpatentable .................................................. 26

       C.    Board's Construction of "a Window With a 2D Space"
in Limitation [1dii] .............................................................. 27

       D.    Board's Findings Concerning the "Foreground" and
"Background" Features in Limitation [1ciii] ......................... 28

STANDARD OF REVIEW ....................................................................... 28

SUMMARY OF THE ARGUMENT IN APPEAL 25-1022, -1051 ...................... 30

ARGUMENT IN APPEAL 25-1022, -1051 ....................................................... 32

**Page**

I. THE BOARD PROPERLY CONTRUED "THE RENDERED FIRST WEBPAGE" AND FOUND CLAIMS 1-13 NOT UNPATENTABLE.......... 32

    A. The Board's Construction of "the Rendered First Webpage" is Supported by the Claim's Use of Proper Antecedent Basis ..................... 33

    B. The Board's Construction of "the Rendered First Webpage" is Supported by the Specification ................................................................ 36

    C. Appellants' Other Arguments Concerning Claim Construction are Equally Unavailing.................................................................. 40

    D. This Court Should Affirm the Board's Finding of Not Unpatentable Even if it Reverses the Board's Claim Construction of "the Rendered First Webpage"........................................................................ 44

II. APPELLANT'S SECONDARY ARGUMENTS CONCERNING VACATEUR ARE EQUALLY UNAVAILING ........................................... 46

    A. The Board did not Violated the APA in Refusing to Consider Petitioners' New Prior Art References Which Were Submitted for the First Time With Their Reply ....................................... 46

    B. The Board did not Apply the Wrong Legal Standard for Obviousness..... 52

SUMMARY OF ARGUMENT IN CROSS-APPEAL 25-1082 ........................... 56

ARGUMENT IN CROSS-APPEAL 25-1082 ...................................................... 57

I. THE BOARD ERRED IN CONSTRUING "THE FIRST WEBPAGE" AND FINDING CLAIMS 14-18 UNPATENTABLE ................................... 57

    A. The Board Improperly Construed "the First Webpage" in Limitation [14dii].................................................................. 57

    B. The Board's Finding of Unpatentable for Claims 14-18 is Based on an Erroneous Construction of "the First Webpage" ........................... 60

II. THE BOARD ERRED IN FINDING OTHER CLAIMED FEATURES OBVIOUS OVER PRIOR ART CITED IN GROUNDS 1 AND 2 ................ 62

**TABLE OF CONTENTS**
**(continued)**

**Page**

A.  The Board's Obviousness Findings With Respect to "a Window
Within a Two-Dimensional (2D) Space" in Limitation [1dii] are
Based on an Erroneous Claim Construction ...............................................62

B.  The Board Erred in Finding That Substantial Evidence Supports
a Finding of Obviousness With Respect to the "Foreground" and
"Background" Features in Limitation [1ciii] ............................................67

CONCLUSION ..........................................................................................70

# TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*Apple Inc. v. Omni MedSci, Inc.*, No. 2023-1034, 2024 WL 3084509
(Fed. Cir. June 21, 2004) ................................................................................ 48

*Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374 (Fed Cir. 2023) ..........29, 48, 49, 50

*Baldwin Graphics Systems, Inc. v. Seivert, Inc.* 512 F.3d 1338
(Fed. Cir. 2008) ................................................................................ 29, 34, 58

*Baran v. Medical Device Techs., Inc.,* 616 F.3d 1309 (Fed. Cir. 2010) ................ 40

*Intelligent Bio-Sys., Inc.. v. Illumina Cambridge Ltd.*, 821 F.3d 1359
(Fed. Cir. 2016) ................................................................................ 25, 48, 49

*Convolve, Inc. v. Compaq Computer Corp.,* 812 F.3d 1313 (Fed. Cir. 2016) ...... 35

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005
(Fed. Cir. 2006) ................................................................................ 28, 29

*Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375
(Fed. Cir. 2015) ................................................................................ 55

*Graham v. John Deere Co. of Kansas City,* 383 U.S. 1 (1966) ............................ 30

*GUI Glob. Prods., Ltd. v. Samsung Elecs. Co.*, No. 2022-2156, 2024 WL
1564694 (Fed. Cir. Apr. 11, 2024) ...................................................... 30

*Medtronic, Inc. v. Teleflex Innovations S.A.R.L.,* 70 F.4th 1331
(Fed. Cir. 2023) ................................................................................ 30

*Natural Simulation System Inc. v. Autodesk, Inc.*, 50 F.4th 1358
(Fed. Cir. 2022) ................................................................................ 28

*Oatey Co. v. IPS Corp.*, 514 F.3d 1271 (Fed. Cir. 2008) ...................................... 40

**Cases**                                                                                    **Page(s)**

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ...........................29, 34, 35

*Salazar v. AT&T Mobility LLC*, 64 F.4th 1311 (Fed. Cir. 2023) ..........................58

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283
(Fed. Cir. 2015) ..................................................................................29, 35, 36

*Technical Consumer Prods., Inc. v. Lighting Science Group Corp.*,
955 F.3d 16 (Fed. Cir. 2020) ...................................................................35

*Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316 (Fed. Cir. 2008) ..............55


**Statutes**                                                                                 **Page(s)**

35 U.S.C. §§ 311 et seq. ...................................................................................1

35 U.S.C. § 103 ...........................................................................................1, 14, 55

28 U.S.C. § 1295(a)(4)(A) ...............................................................................1

35 U.S.C. § 141(c) ...........................................................................................1

35 U.S.C. § 319 ...............................................................................................1

35 U.S.C. § 316(e) ..........................................................................................55

# TABLE OF ABBREVIATIONS

The following abbreviations are used in this brief:

Parties

| Abbreviation | Term |
| --- | --- |
| Appellants or Petitioner(s) | Apple Inc. and Google LLC |
| Cross-Appellant or Patent Owner | SpaceTime3D, Inc. |

Citations

| Abbreviation | Term |
| --- | --- |
| Appx__ | Joint Appendix at page(s) __ |
| AOB at __ | Appellants Opening Brief at page(s) __ |

Terms

| Abbreviation | Term |
| --- | --- |
| '048 Patent | U.S. Pat. No. 8,881,048 |
| Robertson | U.S. Pat. No. 6,414,677 |
| Gralla | Preston Gralla, Que, How the Internet Works (6th Ed. 2002) |
| Gettman | U.S. Pub. No. 2005/0086612 |
| Sauve | U.S. Pub. No. 2006/0230356 |
| Tsuda | U.S. Pat. No. 6,577,330 |
| The Board | The Patent Trial and Appeal Board |
| Challenged Claims | Claims 1-18 of the '048 Patent |
| IPR | *Inter Partes Review* |
| POSITA | A person of ordinary skill in the art at the time of the invention |

*Additionally, throughout this brief, all emphasis is added unless otherwise noted, and all internal citations and quotations are omitted unless otherwise noted.*

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for SpaceTime3D, Inc. states that the following cases will be directly affected by this Court's decision in the pending case: *SpaceTime3D, Inc. v. Apple Inc.*, No. 1:23-cv-00553-ADA (W.D. Tex.) and *SpaceTime3D, Inc.*, Reexamination Control No. 90/019,352 (P.T.O.).

## STATEMENT OF JURISDICTION

SpaceTime3D, Inc.'s appeal arises from two IPR proceedings filed by Apple Inc. and Google LLC before the Patent Trial and Appeal Board pursuant to 35 U.S.C. §§ 311 et seq.: IPR2023-00242 and -00577 (consolidated by the Board). On June 13, 2024, the Board entered a Final Written Decision holding Claims 14-18 of the '048 Patent unpatentable under 35 U.S.C. § 103 over Robertson in view of Gralla and Gettman and Sauve in view of Tsuda (Appx1-84), and SpaceTime3D timely filed a notice of appeal on October 14, 2024 (Appx5081-5168). This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) and 319.

## INTRODUCTION

The invention disclosed in the '048 Patent is directed to an unconventional graphical user interface ("GUI") that allows a user to easily switch between a plurality of webpages—webpages that otherwise may be hidden or hard to find on a traditional desktop (*i.e.*, 2D space)—by displaying *images* of the webpages within a *3D space*. The user can then quickly shuffle through the images to switch from one webpage to another in a manner that allows the user to *pick up where they last left off*.

To this end, Claim 1 provides "receiving an interaction by the end user on the first image" and, in response thereto, "replacing" the images (or objects with images textured thereon) in 3D space with a window in 2D space, wherein "the

window includes *the rendered first webpage*," *i.e.*, the rendered version of the webpage from which the image was captured, allowing the user to resume where they last left off (*e.g.*, in the middle of watching a movie, playing a video game, etc.). It is this limitation that is the subject of Appellants' appeal.

In the Board's FWD, the Board correctly found that "the rendered first webpage" is "not referring to the webpage generally, but *the rendered version from which the corresponding image was captured*." Appx23 (emphasis in original). Appellants incorrectly argue that "[n]othing in the claim language or specification supports this understanding of the plain claim language." AOB at 2.

On the contrary, the Board explained that its construction is the plain and ordinary meaning of this feature, as the claim term "'[r]endered' is in the past tense, suggesting a webpage that previously has been rendered," which "is a clear reference to [the prior] limitation 1ci, 'rendering the first and second webpages.'" Appx20-21.

The Board also pointed out that its construction is consistent with the specification, where the "replacing" step is accomplished by "revealing the 2D version of the webpage that was initially hidden or drawn off screen," which "is the 'old version' of the first webpage rendered, captured, and textured in other steps of claim 1, and not the new 'live' version." Appx20-22. Appellants, however, argue for a construction that is not only divorced from the surrounding

2

claim language (*i.e.*, Appellants interpret portions of the claimed invention in isolation), but ignores how this claimed feature is disclosed in the specification.

Appellants' other arguments are equally flawed and based on misrepresentations of the record. For example, Appellants argue that the Board violated the Administrative Procedure Act ("APA") by refusing to consider arguments and evidence concerning Ground 1 and this construction. What Appellants fail to state is that these arguments and evidence were based *exclusively* on new prior art that was submitted together with the Reply—prior art that "was not included in the Petition" and was necessary "to make out a prima facie case of unpatentability" (*i.e.*, to "supply the missing teachings of web browser caching"). Appx46-47. As such, the Board properly found this new prior art and testimony based thereon to be "improper" and, accordingly, "will not be considered." Appx47.

Appellants' final argument that the Board applied an incorrect legal standard for obviousness is equally flawed. The Board did not require "express disclosure" of "the rendered first webpage" limitation as Appellants argue. Instead, the Board considered testimony from both experts on a POSITA's understanding of the prior art with respect to this limitation and found that neither expert "state the basis for the inferences [they] draw[] from reading Sauve." Appx73-74. The Board then noted, however, that "[i]n an *inter partes* review, the burden of persuasion is on the

petitioner to prove 'unpatentability by a preponderance of the evidence'" and found that "Petitioner has not met this burden." Appx74-75.

Turning to the Board's decision regarding Claims 14-18, while the Board's construction of "the rendered first webpage" in limitation [1dii] is correct, the Board erred by failing to apply the same construction to limitation [14dii], which led to the erroneous finding that Claims 14-18 are unpatentable. Claim 14, like Claim 1, uses antecedent basis to identify that the "replacing" webpage is "the first webpage," *i.e.*, the version from which the corresponding image was generated.

While Claim 14 does not include a "rendering" step, the version from which the corresponding image was generated is clearly the rendered version. Petitioners' expert, Dr. Fuchs, testified that "a skilled artisan 'would have known that webpage rendering was *a ubiquitous process* for converting raw HTML code received from a web server *into visible content*,'" and that "***rendering is a prerequisite step to obtaining 'screen snapshots of actual web pages*.'" Appx21. As such, the Board erred in <u>not</u> construing "the first webpage" in limitation [14dii] to be "the *rendered version* from which the corresponding image was generated," or at the very least, "the *previous version* from which the corresponding image was generated."

While the Board also committed other errors in Petitioners favor, including improperly construing the feature "a window within a two-dimensional (2D)

space" in limitation [1dii] and adopting Dr. Fuchs' unsupported conclusions with respect to Ground 2's "foreground" and "background" features in limitation [1ciii]—conclusions that are unsupported by any evidence, let alone substantial evidence, these errors only need to be addressed if the Court (a) reverses the Board's construction of "the rendered first webpage" and findings of not unpatentable with respect to Claims 1-13 or (b) affirms the Board's construction of "the first webpage" and findings of unpatentable in Claims 14-18.

## STATEMENT OF THE ISSUES

1.     On *de novo* review, did the Board error in failing to construe "the first webpage" feature in limitation [14dii] in Claim 14 as either "the *previous version* from which the first image was generated" or "the *rendered version* from which the first image was generated," and therefore finding Claims 14-18 unpatentable over Grounds 1 and 2, when:

(a) antecedent basis provides that "the first webpage" is the same webpage from which the first image was generated in limitation [14ci] (*i.e.*, "generating first and second images … of the first webpage and … the second webpage, respectively");

(b) Petitioners' expert, Dr. Fuchs, testified that "webpage rendering is a ubiquitous process for converting raw HTML code received from a web

server into visible content" and that "rendering is a prerequisite to obtaining 'screen snapshots of actual web pages'" (Appx715, [104]-[105]); and

(c) limitation [14diii] in Claim 14 (*i.e.*, after the "replacing" step) provides the step of "*receiving an interaction* by the end user on a link provided in *the first webpage*," which, according to Dr. Fuchs, could only be accomplished if "the first webpage" was rendered (Appx715, [128]-[129]; *see also* Appx21).

2.      On *de novo* review, did the Board error in failing to properly construe the "window within a two-dimensional (2D) space" feature in limitation [1dii] in Claim 1 (and identical or similar features recited in Claims 8 and 14) by finding that this feature is met by "a window in which 2D webpages are displayed (Appx13), even though the claim language requires ***the window to be within a 2D space***, and ***<u>not</u> a 2D space within a window***.

3.      With respect to the "window within a two-dimensional (2D) space" feature in limitation [1dii] (and identical or similar limitations in Claims 8 and 14), did the Board error in concluding that Petitioners have established by a preponderance of the evidence that this feature is taught in Ground 1 by finding that the "Internet Explorer browser rendering a webpage in its window" in Robertson (Appx39) and the "'two dimensional, conventional-style browser display box' rendering a webpage" in Gettman (Appx40) are "windows within a

two-dimensional (2D) space" *without considering the space in which the browser windows reside*.

4.     With respect to limitation [1ciii] ("the first object being displayed in a *foreground* of the 3D space and the second object being displayed in a *background* of the 3D space") (and identical or similar limitations in Claims 6, 8, 13 and 14), did the Board error in concluding that Petitioners have established by a preponderance of the evidence that this feature is taught by Tsuda in Ground 2 even though (1) Petitioners' *only purported evidence* is Dr. Fuchs' "understanding from Petitioner's counsel," and not a person of ordinary skill in the art (Appx775, [181]), and (2) Tsuda:

(a) criticizes displaying windows in a background, or "deep within the 3D space … reduced in size … making it impossible to distinguish any of the display content of the window" (Appx1384, 2:23-32);

(b) solves this problem by displaying each window "included in a depth direction, so that the key part of the display content is near the front of the 3D space" (Appx1384, 2:20-25); and

(c) provides that, in the embodiment relied upon in the Petition, "the windows are stacked horizontally an equal distance apart with the left side of each window appearing near the front" (Appx1392, 18:12-14).

## STATEMENT OF THE CASE

### I.    U.S. PATENT NO. 8,881,048

The claimed invention is directed toward an unconventional GUI that allows a user to easily switch between a plurality of webpages by displaying images of the webpages within a 3D space. The user can then interact with a particular image in 3D space to *resume interacting* with the corresponding webpage in 2D space (*i.e.*, to pick up where they last left off). To this end, limitation [1dii] in Claim 1 provides "replacing the first and second objects [textured with first and second images] within the 3D space with a window within a two-dimensional (2D) space in response to receiving the interaction [on the first image], wherein the window includes ***the rendered first webpage*.**"

As the Board found, "the rendered first webpage" is "not referring to the webpage generally, but the rendered version from which the corresponding image was captured." Appx23. By replacing the images in 3D space with the previously received and rendered first webpage, from which the image was captured, the user can resume interacting in 2D space with the first webpage where they last left off.

In coming to this construction, the Board stated that in the claim language "'[r]endered' is in the past tense, suggesting a webpage that previously has been rendered" and that "[t]his is a clear reference to limitation 1ci, 'rendering the first and second webpage.'" Appx21-22. In other words, the method recited in Claim 1

8

begins by receiving first and second inputs (*i.e.*, website addresses) from a user. Appx139, 37:51 (limitation [1a]).  In response thereto, first and second webpages are then received and rendered.  Appx139, 37:52-61 (limitations [1b] and [1ci]).

As shown in Demonstrative 1 below, the received and rendered webpages can then be displayed (*e.g.*, in browser windows) on the user's 2D desktop (*e.g.*, using "MSHTML/web-browser control for rendering HTML webpages and other content on the Windows desktop within a window") (Appx132, 22:61-23:6) and interacted with in a traditional manner (*e.g.*, by clicking on a link provided in the rendered webpage to acquire additional information).



**<u>Demonstrative 1 – Received and Rendered Webpages Displayed in a 2D Space</u>**

In one embodiment, instead of displaying the received and rendered webpages on the user's 2D desktop, the webpages may be hidden or "drawn off

screen." *See*, *e.g.*, Appx129, 17:21-23. "We say off-screen because the 2D desktop or operating system control [may be] hidden from the end user to focus attention on the 3D virtual space." Appx132, 24:34-36. Either way, ***the requested first and second webpages are <u>received and rendered</u> as recited in Claim 1***.

In the example provided in Demonstrative 1 above, the first webpage is one minute and forty-eight seconds (1:48) into "The Lion King," displayed on the 2D desktop in a Google Chrome web browser window and the second webpage is Yahoo! news displayed on the 2D desktop in an Internet Explorer web browser window. The present invention provides a solution to the problem when many webpages are displayed on the 2D desktop, "typically drawn on top of each other such that the GUI components overlap one another" (Appx121, 2:4-10), requiring the user to "mine through folders within folders to find them again at a later date" (Appx121, 1:38-55).

After the webpages are received and rendered, Claim 1 provides "capturing first and second images of … the first webpage and … the second webpage, respectively," and "texturing the first image on the first object and the second image on the second object, ***the first object being displayed in <u>a foreground of the 3D space</u>*** and ***the second object being displayed in <u>a background of the 3D space</u>***." Appx139, 37:62-38:3 (limitations [1cii] and [1ciii]).

The specification discloses that a key feature of the present invention is that the claimed 3D space is created via a "3D GUI [that] can run as an Active X control within *a browser window __on the desktop of the computer__*."  Appx123, 5:22-25.  This can be seen in Demonstrative 2 below, where Figure 10 (*i.e.*, the 3D GUI) is *__on the user's 2D desktop__* and includes images of webpages (361, 364, 366, etc.) that were previously received and rendered (*e.g.*, like the first and second webpages shown in Demonstrative 1) and captured in limitation [1cii].  *See also* Appx124, 7:66-8:1 ("The 3D GUI program creates the appearance of a 3-D space within a 2-D window *on the desktop of the computer*, as illustrated in the embodiment of FIG. 10.").[1]



**<u>Demonstrative 2 – Figure 10 (3D GUI) on the 2D Desktop</u>**

---

[1] The importance of the 3D GUI window being on the user's desktop will become apparent below with respect to limitation [1dii], when the objects in 3D space are

11

The user can then scroll through the images of webpages in 3D space and resume interacting with a particular webpage by selecting (or interacting with) a corresponding image. To this end, Claim 1 provides "receiving an interaction by the end user on the first image," which results in "replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space … wherein the window includes the rendered first webpage." Appx139, 38:7-10 (limitations [1di] and [1dii]).

There are two key features recited in limitation [1dii], *i.e.*, the "replacing" limitation. First, the objects within the 3D space (having images textured thereon) are replaced with ***a window within a 2D space***. Second, the window includes ***"the rendered first webpage,"*** *i.e.*, the previously received and rendered webpage, allowing the user to resume where they last left off. According to the specification, these features are accomplished by "revealing the 2D version of the webpage that was initially hidden or drawn off screen and positioning it [on the 2D desktop] in a layer that is in front of the 3D virtual space." Appx131, 21:45-49.

This can be seen in Demonstrative 3 (below), where the plurality of images within the 3D space are replaced with a window (*i.e.*, browser window) within a 2D space (*i.e.*, on the 2D desktop), where the window includes the previously received and rendered first webpage, allowing the user to resume where they last

replaced with a window in 2D space, where the 2D space is the user's desktop.

12

left off.  In other words, not only is the window that is "replacing" the objects in 3D space *on the 2D desktop* (*i.e.*, ***within a 2D space***), but it is "the [previously received and rendered] 2D version of the webpage" (*i.e.*, "***the rendered first webpage***") from which the corresponding images was created, thereby allowing the user to pick up where they last left off.



**<u>Demonstrative 3 – "the Rendered First Webpage" Within a 2D Space</u>**

In the example provided in Demonstratives 1 and 3, where the first webpage is a video of "The Lion King," the images in 3D space are replaced by a window (*e.g.*, browser window) that includes "the rendered first webpage," or the rendered version from which the corresponding image was captured, thereby allowing the user to resume watching "The Lion King" from where they last left off (*i.e.*, one minutes and forty-eight seconds into the video).

After the "replacing" step, Claim 1 goes on to provide that the user can resume interacting with the first webpage by "receiving an interaction by the end user on a link provided in ***the rendered first webpage***, the link corresponding to the additional information; rendering the additional information; and displaying the rendered additional information in said window within the 2D space."  Appx139, 38:4-17 ([1diii], [1div], and [1dv]).

## II.    IPR Petitions And Asserted Grounds

In 2023, Apple and Google each filed IPR Petitions challenging the claims of the '048 Patent under 35 U.S.C. § 103.  Each of the Petitions asserted that Claims 1-18 were unpatentable for being obvious over Robertson in view of Gralla and Gettman (Ground 1) and Suave in view of Tsuda (Ground 2).  The IPR Petition filed by Google was substantially identical to the one filed by Apple.  As such, the Board consolidated it with the one filed by Apple.

### A.    Gralla Reference

Gralla (Appx907-1240) does not disclose any graphical user interface ("GUI"), let alone a 3D GUI, and was merely cited by Petitioners for its general disclosures on "how webpages work" and "how web browsers work."  Appx173-174.  For example, Gralla explains that "[p]ages on the Web are built using a markup language called Hypertext Markup Language (HTML)" and that "[t]he language contains commands that tell your browser how to display text, graphics,

and multimedia files." Appx1039. "In a Web browser, you type the URL for a location you want to visit." Appx1040. "When Web browsers contact servers, they're asking to be sent pages built with Hypertext Markup Language (HTML)." Appx1047.

Gralla further provides that once HTML pages are received, the browser then "interpret[s] those pages and display[s] them on your computer." Appx1047. This "interpretation" is commonly referred to as "rendering" (Appx1045), which, as Dr. Fuchs testified, is required "for converting raw HTML code … into visible content" (Appx715, [104]).

## B. Robertson-Gettman Combination

Unlike the present invention where there is both 2D and 3D space, both Robertson (Appx827-906) and Gettman (Appx1241-1300) disclose a 3D desktop where ***everything takes place in 3D space***. As such, neither ***Robertson nor Gettman disclose*** replacing objects in 3D space with a window within a 2D space, let alone a window that includes "<u>the rendered</u> first webpage," as recited in Claim 1.

In both of these references, objects (*e.g.*, thumbnails) are displayed within a 3D space (*e.g.*, a "three-dimensional environment" or "virtual three-dimensional space"). Appx897, 13:55-14:10 (Robertson); Appx1268, [0046] (Gettman). This can be seen in Figure 8A of Robertson and Figure 1 of Gettman, both of which are

reproduced below.



**Robertson's 3D Desktop**





**Gettman's 3D Desktop**

In both references, interacting with an object in 3D space does not result in the object being replaced with "a window within a two-dimensional (2D) space" as

claimed. In Robertson, "[t]he selected object thumbnail 902 is displayed in a preferred viewing position … *at the center foreground in the three-dimensional environment*." Appx897, 13:60-62. This is shown in Figure 9 (reproduced below), where the object is presented as either "a high-resolution bit map" or a "live" object within its associated application (*e.g.*, a web browser) "for editing or otherwise working on a selected object." Appx897, 13:55-62. Significantly, whereas Robertson allows editing of an object in 3D space, the claimed invention takes a different approach of replacing the objects with a window in 2D space.



**Robertson's Web Browser on the 3D Desktop**

Gettman provides that "[i]n Figure 4 [reproduced below] the viewer is facing a display window and could potentially interact with the window in the manner of a conventional two-dimensional browser." Appx1274, [0128]. Like Robertson, this 2D browser is displayed *within the 3D space*, not a 2D space as claimed.

17

Appx1277, [0164] ("[T]he result of the interaction may cause the target Web site to open in a conventional two-dimensional web browser which forms another 'view' *within the virtual [3D] space browser*.").

Fig.4.

**Gettman's Conventional 2D Browser on the 3D Desktop**

Not only does the Robertson-Gettman combination not teach replacing objects in 3D space with a window in 2D space, but the window that is displayed (*e.g.*, a browser window) does not include "the rendered first webpage." Instead, it expressly uses a "live" version of the webpage. *See, e.g.*, Appx901, 22:12-16 (Robertson) ("the actual object 'live' on an associated application, such as an HTML page on an Internet browser"). Dr. Fuchs testified to this understanding of a person of ordinary skill in the art: "selecting the thumbnail causes [the] Internet Explorer [in Robertson] to retrieve, render, and display the webpage represented by

the thumbnail." Appx686-687, [65]. He reached the same conclusion with Gettman: "This functionality [is] also disclosed in Gettman" where "the target [w]eb site [will] open in a conventional two-dimensional browser." Appx687-689, [66]-[69].

As such, the Robertson-Gettman combination fails to disclose several limitations recited in the Challenged Claims, including "a window within a two-dimensional (2D) space" and "the rendered first webpage" features in limitation [1dii]. While the Board erred in concluding that this combination teaches a window within a 2D space (due to a flawed claim construction), it did correctly conclude that this combination fails to teach "the rendered first webpage." Appx43-47.

### C.    Sauve-Tsuda Combination

Tsuda (Appx1319-1412) is a reference that was considered by the Examiner during prosecution where, like Robertson and Gettman, everything occurs in 3D space. However, unlike Robertson and Gettman, Tsuda criticizes traditional 3D desktops where "windows [are] positioned deep within the 3D space … making it impossible to distinguish any of the display content of the window. Appx1384, 1:23-31. Tsuda's solution is to arrange the windows horizontally in the foreground, "inclined in a depth direction, so that the key part of the display content is near the front of the 3D space." Appx1384, 2:13-26. This can be seen

in Figure 11B, reproduced below, which is the embodiment relied upon in the Petition. Appx214-215.

FIG. 11B



**Tsuda's Object Within 3D Space**

As there is no 2D space disclosed in Tsuda, the Petition combines Tsuda with Sauve (Appx1301-1318), which discloses a traditional 2D tabbed web browser operating in 2D space. *See*, *e.g.*, Figure 4 (reproduced below). Sauve further discloses a "quick-pick user interface" for easily switching, entirely in 2D space, between a plurality of "content windows" (*e.g.*, different web pages). Appx1313, [0025].



**Sauve's Quick-Pick User Interface Within 2D Space**

Petitioners asserted that it would have been obvious for a POSITA to combine these two references as illustrated in the "visual aid" reproduced below. Appx236. Even if Petitioners are correct (they are not), the proposed combination does not disclose several of the claimed features.

For example, this combination does not include a "first object being displayed in a *foreground* of the 3D space" and a "second object being displayed in a *background* of the 3D space" as recited in Claim 1, or "a third object *further in the background* of the 3D space, behind the second object," as recited in Claim 6. According to Tsuda, the objects in this embodiment are arranged "horizontally" with each object "inclined in the depth direction" so that each object is (at least partially) in the foreground of the 3D space. Appx1384, 2:17-26; Appx1392, 18:8-15.

21



**Petitioners' Visual Aid for the Sauve-Tsuda Combination**

Petitioners' only "evidence" that the rightmost window is in the foreground, a window to the left is in the background, and so forth, is attorney argument, *i.e.*, "Petitioner's understanding" (Appx226, fn. 7), which is also the bases for Dr. Fuchs' testimony with respect to limitation [1ciii] (Appx775-776, [181]) ("my analysis … is based on my understanding from Petitioner's counsel").

This combination also does not disclose the claimed "replacing" feature where the window in 2D space includes "the rendered first webpage." As Dr. Schaefer testified, Sauve provides that interacting with a thumbnail results in the corresponding live webpage being loaded (*e.g.*, received and rendered) in tab

window (312). Appx3501-3502, [92]. To this end, Sauve notes that while receiving and rendering multiple live webpages "may cause a brief to extensive delay" (Appx1312, [0002]), it solves this problem through the use of "multiple threads," which "prevents a potential bottleneck caused by having only one thread handling the messages for all HTML rendering across the multiple tabs" (Appx1314, [0027]).

As such, the Sauve-Tsuda combination fails to disclose several features recited in the Challenged Claims, including the "foreground" and "background" features in Claims 1 and 6 and "the rendered first webpage" feature in limitation [1dii]. While there is no evidence, let alone substantial evidence, to support the Board's conclusion that this combination teaches the "foreground" and "background" features, the Board correctly found that this combination does not teach, or render obvious, "the rendered first webpage." Appx72-77.

## III. Board's Final Written Decision

### A. Board's Construction of "the Rendered First Webpage" and Finding Claims 1-13 Not Unpatentable

In its FWD, the Board correctly determined that "the rendered first webpage" in limitation [1dii] is "not referring to the webpage generally, but the rendered version from which the corresponding image was captured." Appx23. In doing so, the Board explained that this construction is **(a)** supported by the claim language (Appx20-21), **(b)** consistent with the specification (Appx22-23), and **(c)**

supported by Petitioners' own expert testimony (Appx21-22). The Board further explained that Petitioners' construction is clearly incorrect as it ignores (or renders superfluous) the term "rendered." Appx22. It also ignores the claim's use of antecedent basis (*i.e.*, "the rendered"), which "is a clear reference to limitation 1ci, 'rendering the first and second webpage.'" Appx20-21.

The Board also correctly determined that this feature is not taught in any reference cited in the Petition. Appx43-45; Appx72-76. With respect to Ground 1, the Board determined that "both Robertson and Gettman teach that, when a user selects an object with an image of a webpage, and a web browser is invoked, the web browser ***renders the webpage anew*** and ***does not display the version of the webpage that was rendered previously*** in the step of claim limitation 1ci." Appx44. This conclusion was also supported by Petitioners' expert, Dr Fuchs, who testified that in Robertson "selecting the thumbnail caused the Internet Explorer to ***retrieve, render, and display*** the webpage represented by thumbnail" (*i.e.*, rendered anew; not the version of the webpage that was previously rendered). Appx44 (quoting Appx686-687, [65]).

In Petitioners' Reply, Dr. Fuchs attempted to walk back his prior testimony by citing to new prior art—prior art submitted for the first time with the Reply— arguing that a POSITA would have known that "Internet Explorer include[s] a built-in *browser cache* that stores copies of previously retrieved webpages" and,

without any supporting evidence, stated that it "would have presented the stored copy to the user *instead of retrieving a new copy*." Appx4113-4115, [79] (citing to Appx3816-3976 (new exhibit EX1055) and Appx3977-3985 (new exhibit EX1056)). As this contradicted his earlier testimony that the Internet Explorer in Robertson would "*retrieve, render, and display* the webpage" (Appx686-687, [65]), the Board aptly recognized that Dr. Fuchs' new testimony "is directly contradicted by the testimony he submitted with the Petition" and as such his testimony "is inconsistent, unreliable, not credible, and entitled to little weight" (Appx45-46).

The Board went on to hold that "[e]ven if we were to find Dr. Fuchs' testimony credible," Petitioner' new argument and new testimony which "relies on new evidence (Exhibits 1055, 1056, and 1060 (new testimony from Dr. Fuchs)) that was not included in the Petition" and will therefore "not be considered." Appx46-47. The Board explained that, under this Court's well-settled authority and applicable rules, a "Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g., to make out a prima facie case of unpatentability." Appx46-47 (citing Office Patent Trial Practice Guide at 73 and *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016)).

With respect to the new evidence, the Board stated:

Petitioner's Reply argument is an attempt to present a new prima facie case of obviousness, i.e., that a skilled artisan would have known that web browsers such as those in Robertson and Gettman could present cached webpages and that it would have been obvious to do so when such pages are 'fresh' and not 'stale.' ***Tellingly, Petitioner does not cite to evidence presented with the Petition*** to support this new argument; ***rather, Petitioner introduces new expert testimony and supporting exhibits that supply the missing teachings of web browser caching***. Petitioner's new arguments and new testimony is improper, has been forfeited, and will not be considered.

Appx47.

With respect to Ground 2, the Board found that "neither Sauve nor Tsuda teaches … 'the rendered first webpage' [limitation]." Appx75. In doing so, the Board noted that Dr. Fuchs "does not explain the basis for the inferences he draws from reading Sauve, rendering that testimony of little value" and "the testimony [he] offer[ed] in support of the Petition is virtually silent as to whether Sauve displays the previously rendered version of a webpage or renders the webpage when a thumbnail is selected." Appx74.

As "the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,'" the Board correctly found that "Petitioner has not met this burden." Appx75. In light of the foregoing, the Board correctly concluded that "Petitioner has not proven by a preponderance of the evidence that claims 1-13 would have been obvious." Appx82.

## B. Board's Construction of "the First Webpage" and Finding Claims 14-18 Unpatentable

The Board did error, however, in finding Claims 14-18 unpatentable over

Robertson, Gralla, and Gettman (Ground 1) and Sauve and Tsuda (Ground 2). Appx82. This finding was based on an incorrect construction of the analogous language in Claims 14-18 that "the first webpage" feature in limitation [14dii] "does not recite that the window includes a 'rendered' first webpage; rather, it simply recites that the window includes the first webpage." Appx50.

What the Board failed to consider is the antecedent basis recited in this limitation (*i.e.*, "<u>the</u> first webpage") and the fact that Petitioners' expert, Dr. Fuchs, testified that in order for a webpage to be captured or generated it must first be rendered. Appx21 ("rendering is a prerequisite step to obtaining 'screen shots of actual webpages'"). As such, the correct construction for "the first webpage" in Claim 14 is the same as "the rendered first webpage" in Claim 1, *i.e.*, "the rendered version from which the corresponding image was captured," or at the very least, "the previous version from which the corresponding image was captured."

### C. Board's Construction of "a Window Within a 2D Space" in Limitation [1dii]

The Board also erred in construing "a window within two-dimensional (2D) space" in limitation [1dii] as "a browser window … that allows the user to interact with a 2D version of a webpage." Appx14. In other words, even though the limitation clearly provides that ***the window is within a 2D space***, the Board found that ***a 2D space within a window*** (the exact opposite) is met by this limitation. Not only is this construction inconsistent with the claim language and the specification,

but it led to an erroneous finding of obviousness with respect to Ground 1. Appx38-43.

### D. Board's Findings Concerning the "Foreground" and "Background" Features in Limitation [1ciii]

Lastly, the Board erred in finding substantial evidence of obviousness with respect to Ground 2 and limitation [1ciii], which requires "the first object being displayed in a ***foreground*** of the 3D space and the second object being displayed in a ***background*** of the 3D space."[2] Despite the fact that the Board's ruling is contrary to the teachings of Tsuda (*see* Section II(C) above), the only "evidence" cited by Petitioners in support of this feature is "Petitioner's understanding" (Appx226, fn. 7; Appx775-776, [181]), which is not evidence and therefore cannot constitute substantial evidence of obviousness.

### STANDARD OF REVIEW

"Claim construction is a question of law and receives a *de novo* review on appeal." *Natural Simulation Systems Inc. v. Autodesk, Inc.*, 50 F.4th 1358, 1360 (Fed. Cir. 2022). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy*

---

[2] The Board also erred in finding that Ground 2 disclosed "the third object being displayed in a ***further background*** of the 3D space, behind the second object" in Claims 6 and 13.

*Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006).

Moreover, "the context in which a term is used in the asserted claim can be highly instructive." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). For example, "the use of a definite article ('said' or 'the') [may be used] to refer back to an initial indefinite article." *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1343 (Fed. Cir. 2008); *see also Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) (citing *Baldwin*, 512 F.3d at 1343, for "noting that claims using the term 'said' are 'anaphoric phrases, referring to the initial antecedent phrase'").

Appellants cite to *Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374 (Fed. Cir. 2023) for the proposition that "before the Board decides a case under a construction adopted after the institution decision, it must give a petitioner an opportunity to respond to the new construction." AOB at 21. This "opportunity," however, does not extend to "new evidence or argument in reply that [petitioner] could have presented earlier, e.g., to make out a prima facie case of unpatentability." *Axonics*, 75, F.4th at 1380. In other words, "petitioner may not in reply rely on new prior art to teach a claim limitation." *Id*. at 1383 ("That is not to say a petitioner may rely on new prior art in response to a new claim construction presented in the patent owner response.").

Further, "[o]bviousness is a question of law based on underlying facts." *Medtronic, Inc. v. Teleflex Innovations S.A.R.L.*, 70 F.4th 1331, 1336 (Fed. Cir. 2023). This Court "review[s] the Board's ultimate determination of obviousness *de novo* and its underlying findings of fact for substantial evidence." *Id*.

Appellants cite to *GUI Glob. Prods., Ltd. v. Samsung Elecs. Co.*, No. 2022-2156, 2024 WL 1564694 (Fed. Cir. Apr. 11, 2024) (a nonprecedential decision) for the proposition that "obviousness is 'not limited to the express disclosures of the prior art but instead involves what 'a person of ordinary creativity, not an automation,' would understand from the prior art.'" AOB at 22. However, that is not to say that express disclosures are irrelevant. In fact, the Supreme Court in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966) identified "scope and content of the prior art" as the first factor in a series of factors to consider in determining whether subject matter is obvious or nonobvious. *See, e.g., Graham*, 383 U.S. at 15-17.

## **SUMMARY OF THE ARGUMENT IN APPEAL 25-1022, -1051**

Appellants' appeal is limited to "the rendered first webpage" feature in limitation [1dii], arguing that the Board erred in construing this feature, which purported lead to an erroneous finding of not unpatentable for Claims 1-13. Appellants' argument is without merit as the Board's construction is not only

based on the plain and ordinary interpretation of the claim language but is consistent with embodiments disclosed in the specification.

The Board, applying well-settled canons of claim construction regarding the use of antecedent basis, correctly found that "the rendered first webpage" is "not referring to the webpage generally, but *the rendered version from which the corresponding image was captured*." Appx23 (emphasis in original).

In the FWD, the Board explained that its construction is the plain and ordinary meaning of this feature, as the claim term "'[r]endered' is in the past tense, suggesting a webpage that previously has been rendered," which "is a clear reference to limitation 1ci, 'rendering the first and second webpages.'" Appx20-21.

The Board also stated that "[t]he specification of the '048 patent is consistent with the ordinary meaning of claim 1," where the "replacing" step is accomplished by "revealing the 2D version of the webpage that was initially hidden or drawn off screen," which "is the 'old version' of the first webpage rendered, captured, and textured in other steps of claim 1, and not the new 'live' version." Appx20-22. As such, the Board correctly construed "the rendered first webpage" and concluded that Claims 1-13 were not unpatentable.

Appellants' other arguments are equally flawed and based on misrepresentations of the record. For example, Appellants argue that the Board

violated the Administrative Procedure Act ("APA") by refusing to consider arguments and evidence concerning Ground 1 and this construction. What Appellants fail to state is that these arguments and evidence were based *exclusively* on new prior art that was submitted together with the Reply—prior art that "was not included in the Petition" and was necessary "to make out a prima facie case of unpatentability" (*i.e.*, to "supply the missing teachings of web browser caching"). Appx46-47. As such, the Board properly found this new prior art and testimony based thereon to be "improper" and "will not be considered." Appx47.

Appellants' final argument that the Board applied an incorrect legal standard for obviousness is equally flawed. The Board did not require "express disclosure" of "the rendered first webpage" limitation as Appellants argue. Instead, the Board considered testimony from both experts on a POSITA's understanding of the prior art with respect to this limitation and found that Petitioner had not met their burden, as "the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence.'" Appx74-75.

## ARGUMENT IN APPEAL 25-1022, -1051

I. **THE BOARD PROPERLY CONSTRUED "THE RENDERED FIRST WEBPAGE" AND FOUND CLAIMS 1-13 NOT UNPATENTABLE**

Appellants' appeal focuses on the feature "the rendered first webpage" in limitation [1dii] (*i.e.*, the "replacing" limitation). Appellants argue that the Board erred in restricting this feature to a specific version of the first webpage as the

terms "rendered" and "first" are merely "adjectives," and therefore only recite "what must be displayed in 2D space (the first webpage) and the format in which it must be displayed (in a rendered format). AOB at 23-24.

This construction, however, completely ignores the claim's use of antecedent basis (*i.e.*, "the rendered") to refer back to the first webpage that was received in limitation [1b] and rendered in limitation [1ci]. It is also inconsistent with the specification, which supports the Board's construction and "introduce[s] the notion of different webpage versions." Appx22-23. Appellants other arguments concerning claim construction are equally unavailing.

## A. The Board's Construction of "the Rendered First Webpage" is Supported by the Claim's Use of Proper Antecedent Basis

Applying the well-settled canons of claim construction regarding the use of antecedent basis, the Board construed "the rendered first webpage" as "not referring to the webpage generally, but ***the rendered version from which the corresponding image was captured***." Appx23 (emphasis in original). In doing so, the Board focused on the claim's use of antecedent basis (*i.e.*, "the rendered") and preceding claim language: "Rendered, is in the past tense, suggesting a webpage that has been rendered. This is a clear reference to limitation 1ci, 'rendering the first and second webpage.'" Appx21.

This Court repeatedly has held that antecedent basis is a fundamental principle of claim construction where "[s]ubsequent use of the definite articles

33

'the' or 'said' in a claim refers back to the same term recited earlier in the claim." *Baldwin*, 512 F.3d at 1342. In *Baldwin*, this Court noted that there is a "need, in most cases, for claim terms to have proper antecedent basis." *Baldwin*, 512 F.3d at 1343 (quoting MPEP § 2173.05(e)) ("The lack of clarity could arise where a claim refers to 'said lever' or 'the lever,' where the claim contains no earlier recitation or limitation of a lever and where it would be unclear as to what element the limitation was making reference."). Relying on this "fundamental principle," this Court in *Baldwin* went on to find that the claim term "said fabric roll" was merely referring back to the earlier recitation of "a pre-soaked fabric roll" in the same claim. *Id.*

Applying the same principle here, the Board concluded that the use of "the rendered" in front of "first webpage" indicates that the claim is not referring to just any webpage, or any version thereof (*e.g.*, a new, live version), but the previously recited "first webpage" that was received and rendered, and from which the first image was captured. Appx20-23.

Appellants' construction does not consider the claim as a whole but instead views this feature in isolation, arguing that the terms "first" and "rendered" are merely adjectives dictating "*which* webpage must be displayed and the *format* in which that webpage must be displayed." AOB at 23 (emphasis in original). As this Court explained in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en

banc), "the context in which a term is used in the asserted claim can be highly instructive." *Id*. at 1314. When viewed in context, "the rendered first webpage" is not merely a rendered version of the first webpage, as Appellants argue, but "the" rendered version from limitation [1ci], *i.e.*, the "rendering" step.

As the Board explained, "'[r]endered' is in the past tense, suggesting a webpage that previously has been rendered," which "is a clear reference to limitation 1ci, 'rendering the first and second webpages.'" Appx20-21. Thus, the terms "rendered" and "first" are not merely adjectives, as Appellants suggest, but direct references to the "first webpage" as previously recited in the claim (at limitations [1b] and [1ci]).

This Court's precedent teaches that the use of "the" in the phrase "<u>the</u> rendered first webpage" means that the claimed rendered first webpage is not a newly received and/or rendered webpage (*i.e.*, the claim does not recite "<u>a</u> rendered first webpage") but refers to the previously recited version of the first webpage that was received and rendered, and from which the first image was captured. *See*, *e.g.*, *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016) ("This reference to 'the processor' [is] referring back to the 'a processor' recited in the preamble."); *Technical Consumer Prods., Inc. v. Lighting Science Group Corp.*, 955 F.3d 16, 22 (Fed. Cir. 2020) ("The antecedent basis for 'the heat sink' in the H/D limitation is found earlier in the claims."); and *Summit 6, LLC v.*

*Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Circ. 2015) ("The use of the term 'said' [in 'said one or more pre-processing parameters'] indicates that this portion of the claim limitation is a reference back to the previously claimed 'pre-processing parameters.'").

Not only is Appellants' argument not supported by the plain and ordinary meaning of the claim language, but it squarely contradicts the position they and their expert took before the Board. In particular, Petitioners argued that "[t]he claims require that the 'first webpage' of the 'replacing' step is ***the same* 'first webpage' from *the earlier recited* 'receiving,' 'rendering,' and 'displaying' steps**." Appx3792. Even their expert, Dr. Fuchs, admitted that "the … first webpage" recited in limitation [1dii] is "the same [one] from the earlier recited … steps," *i.e.*, it is not a "live" version. Appx4108-4109, [71].

### B. The Board's Construction of "the Rendered First Webpage" is Supported by the Specification

As the Board pointed out, not only is this construction consistent with the plain and ordinary interpretation of the claim language, but it is also supported by the specification where the "replacing" step is accomplished by "revealing the 2D version of the webpage that was initially hidden or drawn off screen," which "is the 'old version' of the first webpage rendered, captured, and textured in other steps of claim 1, and not the new 'live' version." Appx20-22 ("Petitioner does not address Patent Owner's reference to the specification, which does introduce the

notion of different webpage versions.”).

As shown and described in Figure 3 (reproduced below) at 128 and 130, if a user seeks to open a webpage, a browser will attempt to retrieve the webpage from the Internet and open the webpage (*e.g.*, within a browser window on the 2D desktop).  *See also* Appx132, 24:41-47 (“Based on program customization, the application will ‘Determine proper OS control to retrieve the kind of information requested’ by the end-user to the purpose at hand.  For example, this could include … opening a webpage … [or] executing any other program locally or over a network connection.”).



**FIG. 3**

Figure 3 further discloses that the open webpage on the 2D desktop "will act as a mirror to its 3D representation" (140), which is generated by bitmapping a visual output of the webpage (*e.g.*, an image of the webpage) "onto arbitrary 3D geometry" (*e.g.*, within a 3D GUI on the desktop) (142). To this end, the specification provides that "[b]y capturing the output of the user's traditional two-dimensional desktop, the GUI stages this output in a seamlessly 3D space by plotting the windows or other graphical representations of programs in 3D."

38

The specification then discloses two embodiments for interacting with individual webpages. In a first embodiment (not claimed), as shown in Figure 3, the user can interact with images in 3D space, where user inputs (*e.g.*, mouse clicks, keyboard inputs, etc.) are passed "to the mirror control running on 2D environment" (152). The output of the window in the 2D environment is then "periodically capture[d] … as a bit map image" (146) and mapped "onto arbitrary 3D geometry (142).

In a second embodiment (as claimed in the '048 Patent), *e.g.*, "if the end user is occupying an unfavorable viewpoint in the virtual space … the 3D GUI system uses a technique called 'Bind to HUD' which involves bringing a … webpage … into view" (Appx131, 21:20-28) by "revealing the 2D version of the webpage that was initially hidden or drawn off screen and positioning it in [on the 2D desktop] in a layer that is in front of the 3D virtual space (Appx131, 21:45-49).

In other words, it is this "hidden or drawn off screen" webpage, which was ***previously received and rendered***, that replaces the objects in 3D space in limitation [1dii]. According to the specification, this can be accomplished by "revealing the 2D version" (as drawn off screen) in a window ***on the 2D desktop in front of the 3D GUI***. *See* Appx131, 21:45-49; *see also* Appx132, 24:34-36 ("We say off-screen because the 2D desktop or operating system control is hidden from the end user to focus attention on the 3D virtual space.") and Appx135, 30:36-38

("the Internet Explorer window will open *in front of the 3D virtual space* in a 2D window *as part of the desktop*"). Thus, Appellants are incorrect in stating that there is no support in the specification for the Board's construction. AOB at 25-26.

Appellants argue that "the specification *does not require*" the construction provided by the Board (AOB at 26) and that "[t]he Board's restriction of the claims to a single embodiment in the specification was error" (AOB at 32). As to the prior, the Board never stated that the specification *required* this construction but is merely *consistent* with the Board's construction. *See, e.g.*, Appx22 ("The specification of the '048 patent is consistent with the ordinary meaning of claim 1."). As to the latter, the Board's interpretation is clearly in accordance with this Court's canons of claim construction concerning embodiments disclosed within the specification. *See, e.g.*, *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification."); *see also Baran v. Medical Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010) ("It is not necessary that each claim read on every embodiment.").

### C. Appellants' Other Arguments Concerning Claim Construction are Equally Unavailing

Appellants remaining arguments on claim construction are also without merit. For example, Appellants argue that "the word 'rendered' … is merely an

adjective that describes the display format for the webpage" and that without this adjective "[t]he webpage may be *displayed* in its unformatted format, where its unprocessed, raw HTML code or instructions are shown." AOB at 24. This argument, however, is contradicted by Appellants' own evidence.

For example, Dr. Fuchs, testified that a skilled artisan would have known that "[w]ebpage rendering is a core functionality of virtually all web browsers" and that rendering is necessary for "converting raw HTML code received from a web server *into visible content*." Appx715, [104]. Gralla also teaches that "[a] Web browser *displays* information on your computer by *interpreting* the Hypertext Markup Language (HTML)" (Appx1048), where "[t]his 'interpretation' is commonly referred to as 'rendering'" (Appx3505, [97]) (Dr. Schaefer). Thus, according to both Dr. Fuchs and Gralla, only a rendered version of HTML code can be displayed on the user's computer.

Even statements made in Appellants' opening brief acknowledge this understanding. For example, Appellants admit that in order for "a webpage … to be displayed and function properly" the webpage must first be rendered. AOB at 24-25. The '048 Patent similarly explains that "in a typical window on the 2-D desktop of the end user's computer, the language of that webpage (HTML) must be read by an operating system program or CONTROL in order for the webpage in question *to be displayed and function properly*" where "one such control is called

41

MSHTML/web-browser control for *rendering HTML webpages* and other content on the Window's desktop within a window." Appx131, 22:61-23:6.

As such, Appellants' argument lacks any evidentiary basis that one skilled in the art would have understood that if the term "rendered" were missing, the webpage would be displayed unrendered as "unprocessed, raw HTML code." AOB at 24. On the other hand, all of the evidence in the record, including Appellants' admissions that only a rendered version of the webpage can be "displayed and function properly," demonstrate that a POSITA would understand that the claim's use of the term "rendered" must be a reference back to step [1cii]. As the Board explained, "if 'the rendered first webpage' were simply a reference to the first webpage generally, 'rendered' would be superfluous, as 'the first webpage' would identify that webpage generally." Appx22.

Appellants also argue that at the core of the Board's construction "was an incorrect and unsupported conflation of the word 'rendered' and 'version'" (AOB at 27) that is inconsistent with "the testimony of Apple's expert that the Board ignored" (AOB at 25). On the contrary, the Board relied on the testimony of Appellants' expert, Dr. Fuchs, that the steps of "capturing" [1cii] and "texturing" [1cii] "require the prerequisite step of rendering a particular version of the first webpage; thus they require the version of the first webpage rendered in the 'rendering' step of limitation 1ci." Appx22.

Appellants argument that the "rendering" step "relates to the process by which webpages are displayed in *a 3D space* … [which] is separate and distinct from how a webpage is displayed in *2D space*" is equally unavailing.  AOB at 29. As discussed with reference to Figure 3 above in Section III(B), before an image of a webpage can be captured and textured (or mapped) onto an object in 3D space (142), proper OS control must be executed (140).  According to the specification, "one such control is called MSHTML/web-browser control for ***rendering HTML webpages*** … ***on the Windows [2D] desktop within a window***."  Appx132, 23:4-6. Thus, before an image can be captured for display in 3D space, it is necessary to render the webpage for display on the user's 2D desktop in the first instance.

Finally, Appellants argue that the Board erred by "importing a limitation from the specification into the claims" as "the claims do not use the words 'old,' 'live,' 'version,' or 'previous version.'"  AOB at 33.  First, the Board's construction does not include the terms 'old,' 'live,' or "previous version," but instead "the rendered version from which the corresponding image was captured." Appx23.  Second, the Board addressed this issue in its FWD by stating that "while we agree with Petitioner that claim 1 does not recite 'the rendered ***old version of*** the first webpage,' the 'rendered first webpage' is the 'old version' of the first webpage rendered, captured, and textured in other steps of claim 1, and not the new 'live' version." Appx23 (emphasis in original).

In light of the foregoing, this Court should affirm the Board's construction of "the rendered first webpage" feature in limitation [1dii] as "the rendered version from which the corresponding image was captured" and affirm the Board's findings that Claims 1-13 are not unpatentable.

**D.    This Court Should Affirm the Board's Finding of Not Unpatentable Even if it Reverses the Board's Claim Construction of "the Rendered First Webpage"**

Appellants argue that "if the Court reverses the Board's construction of 'rendered first webpage,' reversal of the Board's finding of no unpatentability should be granted." AOB at 35. First, as discussed in Section II below, there are other claimed features that are missing from Grounds 1 and 2 which would support an affirmance of the Board's finding that Claims 1-13 are not unpatentable.

Second, affirmance of the Board's finding of not unpatentable is further supported under Appellants' proposed construction of "the rendered first webpage." Specifically, regardless of whether the term "rendered" is merely an adjective or a reference back to limitation [1ci], the term "the" is clearly a reference to the previous version of the first webpage, *i.e.*, the one previously received, rendered, and displayed, and not a "live" version.[3]

---

[3] Appellants' brief conveniently ignore the claim's usage of "the" in limitation [1dii] to refer to the prior version of the first webpage as received, rendered, and displayed.

In fact, Appellants admitted in their Reply that "[t]he claims require that the 'first webpage' of the 'replacing' step is the same 'first webpage' from the earlier recited 'receiving,' 'rendering,' and 'displaying' steps." Reply at 7; *see also* Appx4467, 28:18-21 ("Apple's position is that plain meaning is informed by simple grammar. The rendered first web page simply refers to the same first web page that is involved in the rendering step recited earlier in claim 1.") (Petitioners' Oral Arguments). Thus, even Appellants do not dispute that "the … first webpage" is the one "from earlier"—the one that was originally received "in response to said first and second inputs," and not the "live" or "current" version.

With respect to Ground 1, the Board found that both Robertson and Gettman teach replacing the objects in 3D space with a "live" or "current" webpage. *See*, *e.g.*, Appx44 ("Petitioner does not appear to dispute that this describes rendering the 'current' or 'live' webpage in response to the user's selection.") (quoting Appx686-687, [65] (Dr. Fuchs) and Appx1271, [83] (Gettman)).

With respect to Ground 2, Appellants argued that the version "replacing" the objects in 3D space is not the "live" version, but "the same version of the webpage that was originally loaded and used to create the thumbnail." Appx73-74. The Board found, however, that Petitioners' expert, Dr. Fuchs, was "virtually silent" on this issue in his original declaration and "does not explain the basis for the inferences that he draws" (*e.g.*, that "re-loading a new version of the webpage [in

45

Sauve] … would defeat the purpose of using a tabbed browser") in his supplement declaration. Appx73-74 (citing Appx782-783, [192]-[193]; Appx4126-4127, [102]-[103]). As such, the Board concluded that "[Petitioner] has not proved, by a preponderance of the evidence, that claim 1 would have been obvious over Sauve and Tsuda." Appx75.

Thus, even if this Court were to reverse the Board's construction of "the rendered first webpage" and find that the "first webpage" is merely the "earlier recited" webpage as argued by Petitioners (as opposed to a "live" version), this Court should still affirm the Board's finding of not unpatentable as to Claims 1-13.

## II. APPELLANTS' SECONDARY ARGUMENTS CONCERNING VACATEUR ARE EQUALLY UNAVAILING

### A. The Board did not Violated the APA in Refusing to Consider Petitioners' new Prior Art References Which Were Submitted for the First Time With Their Reply

Appellants argue that the Board violated the APA and therefore abused its discretion in finding that "Petitioner's new argument and new testimony is improper, has been forfeited, and will not be considered." Appx47. What Appellants omit is that the arguments and evidence that the Board found to be improper were based on new prior art that was submitted for the first time with their Reply and attempts to set forth a new prima facie case for unpatentability.

Specifically, in arguing that Robertson and Gettman teach limitation [1dii], Petitioners relied on the testimony of Dr. Fuchs that "selecting the thumbnail

causes [the] Internet Explorer to **retrieve, render, and display** the webpage represented by thumbnail." Appx686-687, [65] (Dr. Fuchs). In their Reply, however, Petitioners did a complete reversal and argued that the Internet Explorer in Robertson and Gettman would not "retrieve, render, and display the webpage," but would use "a built-in browser cache that stores copies of previously retrieved webpages." Appx3804. For support, Petitioners submitted and relied on new testimony from Dr. Fuchs (Appx4113-4115, [78]-[80]) (EX1060), who in turn relied on new prior art evidence (Appx3816-3976; Appx3977-3985) (EX1055; EX1056) that discloses the concept of "browser cache" (*i.e.*, a feature that was not disclosed in Robertson, Gralla, or Gettman). Critically, the Board highlighted that the "Petitioner does not even cite to evidence presented with the Petition to support this new argument." Appx47.[4]

In its FWD, the Board explained that Dr. Fuchs' new testimony "is directly contradicted by the testimony he submitted with the Petition" and therefore "all of Dr. Fuchs' testimony on this point, in both declarations, is inconsistent, unreliable, not credible, and entitled to little weight." Appx45-46. The Board went on to state, however, that "[e]ven if we were to find Dr. Fuchs' testimony credible …

---

[4] Patent Owner moved to exclude the new evidence (Appx4138-4142) and objected to the new evidence in its Sur-Reply, arguing that this evidence "is inadmissible as it was not identified in the Petition and is now being used as 'evidence that supports the ground for the challenge to each claim.'" Appx4177-4178 (citing 35 U.S.C. § 312(a)(3)); *see also* Appx82 (dismissing the motion at moot).

Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g., to make out a prima facie case of unpatentability." Appx46-47 (citing Consolidated Trial Practice Guide at 73, 84 Fed. Reg. 64,280 (Nov. 21, 2019), and *Intelligent Bio-Sys.*). In particular, the Board explained that:

> Petitioner's Reply argument is an attempt to present a new prima facie case of obviousness, i.e., that a skilled artisan would have known that web browsers such as those in Robertson and Gettman could present cached webpages and that it would have been obvious to do so when such pages are 'fresh' and not 'stale.' Reply at 19. Tellingly, ***Petitioner does not cite to evidence presented with the Petition*** to support this new argument; rather, Petitioner introduces ***new expert testimony and supporting exhibits that supply the missing teachings of web browser caching***. *Id*. citing Ex. 1060 ¶ 79 (citing Exs. 1055, 1056)). Petitioner's new argument and new testimony is improper, has been forfeited, and will not be considered.

Appx47.

Appellants argue that the Board's decision to exclude new evidence and arguments submitted for the first time in its Reply is "contrary to this Court's directive" in *Axonics* and *Apple Inc. v. Omni MedSci, Inc.*, No. 2023-1034, 2024 WL 3084509 (Fed. Cir. June 21, 2024) (a nonprecedential decision), "where a patent owner in an IPR first proposes a claim construction in a patent owner response, a petitioner must be given the opportunity in its reply to argue and present evidence of anticipation or obviousness under the new construction" AOB at 37 and 40.

*Axonics* does not support Appellants' position. In *Axonics*, the Petitioner addressed a new claim construction argument made in the Response by

"submitting a supplemental expert declaration … [that] cited additional disclosures in the prior art references pertaining to the same embodiments relied on in the petition," not new prior art that was submitted along with the Reply. *Axonics*, 75 F.4th at 1379.

More importantly, the Court in *Axonics* squarely refutes Appellants' attempt to use new prior art and held that "[t]hat is not to say a petitioner may rely on new prior art in response to a new claim construction presented in the patent owner's response." *Id.* In fact, "[w]e have held that a petitioner may not in reply rely on new prior art to teach a claim limitation. *Id.*, citing *Intelligent Bio-Sys.*; *see also* FWD at 46-47 (also citing to *Intelligent Bio-Sys*, 821 F.3d at 1369) (finding that the Board did not err in refusing the reply brief as improper when petitioner "supported its new theory of invalidity by reference to new evidence, citing 'a number of non-patent literature references which were not relied upon to support unpatentability in the Petition.'").

Here, the Board correctly determined that "Petitioner does not cite to evidence presented with the Petition to support this new argument; rather, Petitioner introduces ***new expert testimony and supporting exhibits*** that ***supply the missing teachings of web browser caching***." *See*, *e.g.*, Appx47; Appx3804; and Appx4113-4115, [78]-[80]. Thus, under *Axonics* and *Intelligent Bio-Sys*, the Board's finding of Petitioners' attempt to introduce new evidence in its Reply to

fill the gap in its prima facia obviousness argument to be improper was not an abuse of discretion. *See*, *e.g.*, *Axonics*, 75 F.4th at 1383 ("[T]hat is not the case here: *Axonics* did not rely on new prior art in its reply.").

Aside from misapplying this Court's holding in *Axonics*, Appellants also misrepresent the facts that led up to the Board's ruling on this issue. For example, Appellants argue that Patent Owner merely "suggested" its construction of "the rendered first webpage" in its Response (AOB at 38) and "clarified" its construction in its Sur-Reply by arguing that "the claims are not referring to the webpage generally, but the rendered version from which the corresponding image was captured" (AOB at 39), which, according to Appellants, is "the construction the Board ultimately adopted" (AOB at 41).

In reality, the Board's construction of "the rendered version from which the corresponding image was captured" (Appx23) is the same construction the Patent Owner argued in its Response, *i.e.*, "the version that was previously received and rendered (*e.g.*, stored in memory) from which the first image was captured") (Appx3414-3415).

Appellants also misrepresent Dr. Fuchs' supplemental declaration by arguing that while he stated that "selecting the thumbnail causes the Internet Explorer to retrieve, render, and display the webpage represented by the thumbnail" in his original declaration, he never "provide[d] additional details on

where [the] Internet Explorer 'retrieve[d]' the webpage from (e.g., from memory/cache or from an origin server/Internet)." AOB at 42. In other words, according to Appellants, his supplemental declaration was merely providing that Robertson could have "retrieved" the webpage from "memory/cache." Appellants' explanation, *i.e.*, attempt to reconcile Dr. Fuchs' contradictory testimony, finds no support in the record.

First, Dr. Fuchs does not reference or cite Robertson or Gettman in his Supplemental Declaration in his discussion concerning web browser caching; only the two new prior art references. Appx4113-4115, [78]-[80]; *see also* Appx47 ("Petitioner does not cite to evidence presented with the Petition to support this new argument; rather, Petitioner introduces new expert testimony and supporting exhibits that supply the missing teaching of web browser caching.").

Second, according to Dr. Fuchs' supplemental declaration, if the content is "fresh," "the browser presents the stored copy" from browser cache. Appx4113-4115, [79]. However, if the content is "stale," the browser will "retriev[e] a new ['live'] copy from the original server." *Id*. It is the latter, however, that is disclosed in Robertson, where "'live' objects within an associated application" are displayed in 3D space in response to an interaction. Appx686-687, [65]. Thus, if anything, Dr. Fuchs' supplement testimony confirms that the "live" webpage in Robertson is retrieved from the original server, not browser cache.

Clearly, Dr. Fuchs was not merely "clarifying" his prior testimony but relying on new evidence to support a new prima facie case of unpatentability. As such, the Board properly found Dr. Fuchs testimony to be "inconsistent, unreliable, not credible, and entitled to little weight," and found Petitioners new argument and new testimony to be "improper, has been forfeited, and will not be considered." Appx46-47.

## B. The Board did not Apply the Wrong Legal Standard for Obviousness

With respect to Ground 2, Appellants argue that "the Board focused on whether Sauve *expressly* disclosed 'the rendered web [sic] first webpage' limitation" and "failed to consider how a skilled artisan would have understood Sauve's disclosures." AOB at 44 (emphasis in original). This argument, as with others, misrepresents the Board's decision and the evidence of record.

Contrary to statements made by Appellant with respect to limitation [1dii], the Petition includes a *single paragraph* on this limitation and fails to even mention the feature "the rendered first webpage," let alone whether, and if so where, it is disclosed in the cited prior art:

> The Sauve-Tsuda Combination satisfies Element [1.d.ii]. As discussed at Element [1.d.i], the web browser of the Combination replaces the 3D space of the quick pick-user interface, which includes the (first/second) virtual 3D windows (objects), with a window within a 2D space including the (first) webpage of the selected tab, as shown in the visual aid below.

Appx230-231. The same brevity can be found in the Dr. Fuchs' original

declaration on this issue. Appx782-784, [192]-[193]. Hence the Board accurately stated that "the testimony Dr. Fuchs offers in support of the Petition is ***virtually silent*** as to whether Sauve displays a previously rendered version of a webpage or renders the webpage when a thumbnail is selected." Appx74.

Appellants also misrepresented the Response and Dr. Schaefer's testimony with respect to limitation [1dii] by stating that Patent Owner's "sole counterargument was limited to whether Sauve *expressly* taught 'the rendered first webpage'" and that "this was also the basis for the Board's finding on patentability." AOB at 48.

First, Patent Owner's Response was not limited to Sauve's "express" teachings. In fact, the term "express" (or any variation thereof) is not even mentioned in the Response with respect to limitation [1dii]. Second, Dr. Schaefer testified that "those skilled in the art would have understood that interacting with a thumbnail [in Sauve] results in the corresponding webpage being loaded (e.g., received and rendered) in tab window (312)." Appx3421; Appx3516, [116].

Dr. Schaefer also provided a detailed analysis of Sauve with citations to various figures and portions of the specification, including specific structures that are responsible for receiving and rendering "live" individual webpages. *See*, *e.g.*, Appx3516-3517, [117]-[118] ("As the tab UO (222) is responsible 'for implementing the functionality for the present quick pick mechanism,' a POSITA

would have understood that the URLs are used to load (retrieve and render) webpages in response to interactions with individual graphical representations (or thumbnails) in the quick pick user-interface.").

Dr. Schaefer also pointed out that while loading a plurality of "live" webpages in a tabbed browser could cause extensive delays (Appx3516, [116]; Appx1312, [0002]), Sauve disclosure the use of "multiple threads," which "prevents a potential bottleneck caused by having only one thread handling the messages *for all HTML rendering* across the multiple tabs" (Appx3516, [116]); Appx3421).  In fact, the Board cited to this same passage, stating that this "can be read to suggest" that Sauve *does not teach* "the rendered first webpage" feature as "maintaining several rendered webpages simultaneously could run up against resource constraints."  Appx74.

The Board then noted, however, that the burden of persuasion was not on Patent Owner, but on Petitioners.  With respect to Dr. Fuchs' supplemental testimony (Appx4126-4127, [103]) (*e.g.*, testifying that "[r]e-loading a page each time a user selects a new tab is *nonsensical* and would *defeat the purpose* of using a tabbed browser in the first place"), the Board stated that he "does not explain the basis for the interferences he draws from reading Sauve, rendering that testimony of little value."  Appx74.  This, coupled with the fact that the Petition and Dr. Fuchs' testimony in support thereof was "virtually silent" on this point (Appx74),

led the Board to conclude that "Petitioner has not proved, by a preponderance of the evidence, that claim 1 would have been obvious over Sauve not Tsuda" (Appx75) (citing 35 U.S.C. § 316(e) and *Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1378-79 (Fed. Cir. 2015) (quoting *Tech. Licensing Corp., v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008) ("Failure to prove the matter as required by the applicable standard means that the party with the burden of persuasion loses on that point—thus, *if the fact trier of the issue is left uncertain, the party with the burden loses*."")).

Thus, Appellants' argument that the Board "fail[ed] to meaningfully consider Dr. Fuchs' supplemental testimony, while narrowly focusing only on Suave's express disclosure" is without merit. AOB at 44. In determining obviousness (or in this case, non-obviousness), the Board considered all the evidence of record, including the scope and content of the prior art, differences between the prior art and the claims at issue, and the level of ordinary skill in the art.

Against this backdrop, the Board then considered "if the differences between the subject matter as a whole would have been obvious at the time of the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Appx23 (citing pre-AIA 35 U.S.C. § 103(a)). After considering the prior art itself and testimony from Dr. Fuchs and Dr. Schaefer (*i.e.*, testimony from

a person having ordinary skill in the art to which said subject matter pertains), the Board determined that "neither Sauve nor Tsuda teaches … 'the rendered first webpage,' as recited in claim limitation 1dii." Appx75. As such, the Board clearly applied the correct legal standard for obviousness and their findings that Claims 1-13 are not unpatentable should therefore be affirmed.

## SUMMARY OF THE ARGUMENT IN CROSS-APPEAL 25-1082

While the Board's construction of "the rendered first webpage" in limitation [1dii] is correct, the Board erred by failing to apply the same construction to limitation [14dii], which led to the erroneous finding that Claims 14-18 are unpatentable. Claim 14, like Claim 1, uses antecedent basis to identify that the "replacing" webpage is "<u>the</u> first webpage," or the previous version from which the corresponding image was generated.

While Claim 14 does not include a "rendering" step, the version from which the corresponding image was generated is clearly the rendered version. In fact, Petitioners' expert, Dr. Fuchs, testified that "a skilled artisan 'would have known that webpage rendering was *a ubiquitous process* for converting raw HTML code received from a web server into visible content,'" and that "***rendering is a prerequisite step to obtaining 'screen snapshots of actual web pages***.'" Appx21.

As such, the Board erred in not construing "the first webpage" in limitation [14dii] to be "the rendered version from which the corresponding image was

generated," or at the very least, "the previous version from which the corresponding image was generated," which led to erroneous findings that Claims 14-18 are unpatentable.

While the Board also committed other errors, including improperly construing the feature "a window within a two-dimensional (2D) space" in limitation [1dii] and adopting Dr. Fuchs' conclusions with respect to Ground 2 and the "foreground" and "background" features in limitation [1ciii]—conclusions that are conclusory and unsupported by any evidence, let alone substantial evidence, these errors only need to be addressed if the Court (a) reverses the Board's construction of "the rendered first webpage" and findings of not unpatentable with respect to Claims 1-13 or (b) affirms the Board's construction of "the first webpage" and findings of unpatentable in Claims 14-18.

## ARGUMENT IN CROSS-APPEAL 25-1082

I. **THE BOARD ERRED IN CONSTRUING "THE FIRST WEBPAGE" AND FINDING CLAIMS 14-18 UNPATENTABLE**

   A. **The Board Improperly Construed "the First Webpage" in Limitation [14dii]**

In construing "the rendered first webpage" the Board focused on the term "rendered," stating that "'[r]endering' is in the past tense, suggesting a webpage that previously has been rendered," and that "[t]his is a clear reference to limitation 1ci." Appx20-21. While this is true, it is equally true that the term "the" in "the

rendered first webpage" "indicates that this portion of the claim is a reference back to the previously claimed term." *Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1315 (Fed. Cir. 2023); *see also Baldwin*, 512 F.3d at 1343 (discussing "use of a definite article ('said' or 'the') to refer back to an initial indefinite article").

In fact, the antecedent nature of the term "the" was emphasized by Patent Owner in the Response. *See*, *e.g.*, Appx3374 ("'*the rendered first webpage*' is the webpage that was requested by the user via the 'first input' from which the 'first image' was captured") (emphasis in original), Appx3386 ("However, [in Robertson] this is accomplished by providing a URL to the browser to load (*i.e.*, receive and render) the current webpage from the Internet—not '*the [previously] rendered first webpage*' as claimed.") (emphasis in original), Appx3414 ("'*The rendered first webpage*' is the version that was previously received and rendered (*e.g.*, stored in memory) from which the first image was captured.") (emphasis in original), Appx3424 ("Clearly, receiving and rendering the current webpage is quite different from presenting '*the [previously] rendered first webpage*.'") (emphasis in original).

As this antecedent basis is recited in all independent claims, including Claim 14, which provides "the first webpage," Patent Owner's (and the Board's) construction for limitation [1dii] is equally applicable to limitation [14dii]. *See*, *e.g.*, Appx3418 ("In light of the foregoing, Petitioner has failed to show that

Robertson, Gralla, and Gettman, either alone or in combination, discloses each and every feature of Independent Claims 1, 8 and 14."); *see also* Appx3429 (with respect to Ground 2).

With respect to Claim 14, the Board stated that "limitation [14dii] does not recite that the window includes a 'rendered' first webpage; rather, it simply recites that the window includes the first webpage, which could be a version previously rendered or rendered in response to the receiving of limitation 14di." Appx50. Here, the Board erred by failing to acknowledge the claim's use of antecedent basis (*i.e.*, "<u>the</u> first webpage") to indicate a reference to the earlier version of the term "first webpage," which was received in [14b] (*i.e.*, "using first and second website addresses to retrieve *first and second webpages*") and used to generate the first image in [14ci] (*i.e.*, "generating first and second images of … *the first webpage* and … the second webpage." Appx140, 40:19-27. As such, the proper construction of "the first webpage" in limitation [14dii] is at least ***the previous version from which the corresponding image was generated***. Not only is this consistent with the claim language but the specification as well. *See*, *e.g.*, Appx22.

The Board also erred when it ignored Dr. Fuchs' admission that webpage rendering is a prerequisite to displaying and generating an image of a webpage, as recited in limitation [14dii]. Dr. Fuchs testified that "[a] POSITA would have known that webpage ***rendering was a ubiquitous process for converting raw***

59

*HTML code* received from a web server *into visible content*" (Appx715, [104]; Appx21) and that "[w]ebpage rendering is a core functionality of virtually all web browsers, and it would have been obvious to a POSITA that *rendering is a prerequisite step to obtaining 'screen snapshots of actual web pages*'" (Appx715, [105]; Appx21). Thus, with respect to Claim 14, a POSITA would have understood that the first webpage was rendered before a first image was generated in limitation [14ci]. As such, "the first webpage" in limitation [14dii] is properly construed as *the <u>rendered version</u> from which the corresponding image was generated*.

Either way, one thing is clear—the first webpage in limitation [14dii] is at least the version that was previously received *(e.g.*, stored in memory) from which the first image was generated, and not a "live" version. In fact, even Dr. Fuchs testified that "all the claims require is that the 'first webpage' of the 'replacing' step is the same 'first webpage' from the earlier recited 'receiving' … and 'displaying' steps." Appx4108-4109, [71].

## B. The Board's Finding of Unpatentable for Claims 14-18 is Based on an Erroneous Construction of "the First Webpage"

The Board's error in construing limitation [14dii] lead to an errant finding of unpatentability with respect to Claims 14-18. For example, with respect to Ground 1, Dr. Fuchs admitted that in Robertson, "selecting the thumbnail causes Internet Explorer to retrieve, render, and display the webpage represented by thumbnail"

(Appx686-687, [65]) and that "this functionality [is] also disclosed in Gettman (Appx687, [66]). As such, interacting with a thumbnail in 3D space in the Robertson-Gettman combination results in a "live" version of the first webpage replacing the objects in 3D space and not the previous version from which the first image was generated (*i.e.*, "the first webpage" in limitation [14dii]).

The same is true with respect to Ground 2. Here, Dr. Fuchs argued that "the content displayed upon selection of an object thumbnail is the same version of the webpage that was originally loaded and used to create the thumbnail" and "does not require re-loading a new ["live'] version of the webpage from the origin server." Appx74; Appx4126-4127, [102]-[103]. The Board disagreed, stating that Dr. Fuchs "does not explain the basis for the inference he draws from reading Sauve, rendering the testimony of little value." Appx74. This, together with the fact that Dr. Fuchs' original testimony was "virtual silent" with respect to this issue, led the Board to conclude that Petitioners failed to meet their burden of persuasion (*i.e.*, failed to prove that the "replacing" webpage is the old or previous version and not a new or "live" version). Appx75.

Thus, regardless of whether the proper construction of "the first webpage" in limitation [14dii] is the *previous version* from which the corresponding image was generated or the *rendered version* from which the corresponding image was generated (based on Dr. Fuchs' testimony that "rendering is a prerequisite step to

obtaining 'screen snapshots of actual web pages") (Appx21), this Court should

reverse the Board's finding of unpatentability with respect to Claims 14-18.

## II. THE BOARD ERRED IN FINDING OTHER CLAIMED FEATURES OBVIOUS OVER PRIOR ART CITED IN GROUNDS 1 AND 2

### A. The Board's Obviousness Findings With Respect to "a Window Within a Two-Dimensional (2D) Space" in Limitation [1dii] are Based on an Erroneous Claim Construction

In addition to "the rendered first webpage," limitation [1dii] further provides

"replacing the first and second objects within the 3D space with *a window within a*

*two-dimensional (2D) space* in response to receiving the interaction [on the first

image]." Appx139, 38:7-10. While both parties agreed that "2D space" is "a finite

graphical area defined by a two-dimensional coordinate system" (Appx11-12), the

parties disputed over what constitutes a window within a 3D space. Patent Owner

argued that "a 2D browser does not define the space in which a [browser] window

exists" (*i.e.*, a 2D browser could reside in a 2D or 3D space). Appx12. The Board

disagreed, finding that "[a] browser defines a finite working 2D graphical area of

the desktop and includes a window that displays a 2D window." *Id*.

This error in claim construction—that a web browser defines a 2D space that

includes a browser window—appears to stem from the Board's mistaken

understanding that the terms "web browser" and "browser window" have different

definitions, when the evidence of records illustrates that they are one in the same.

In fact, Petitioner uses these terms *interchangeably*. *See*, *e.g.*, Appx702, [86]

("Robertson and Gettman both describe 3D-GUIs with functionality to *launch 2D browser windows* that facilitate conventional user interaction with webpages (e.g., web surfing).") and Appx733, [128] ("Robertson and Gettman teach the concept of *launching a web browser* (e.g., Internet Explorer or Mozilla) for the user to interact with in a convention way."). Thus, a web browser does not define a 2D space that includes a browser window, as the Board argues.

This is consistent with the use of the term "browser window" in the specification. For example, a "window" is a rectangular area on a display screen that shows the output of a program or application and allows user interaction. *See, e.g.*, Appx121, 1:67-2:13 ("Most computer operating systems incorporate a GUI that utilizes two-dimensional graphics to capture, process, and output all input from an end user in a 2D form—having height and width only. This output is usually *confined within a window* that is drawn on a finite-sized desktop, i.e., the working area of a computer that has a *given length and width*." A "browser window" is merely a window that shows the output of a browser, such as Internet Explorer. Appx123, 5:22-25 ("The 3D GUI can run as an Active X control within *a browser window* on the desktop of a computer (in conjunction with *a web-browser program, such as Internet Explorer*).

Thus, even if Dr. Fuchs arguments concerning "2D space" are correct, *i.e.*, "conventional web browsers [or browser windows] like Internet Explorer were

63

built to render those webpages in 2D spaces defined by 2D coordinate systems" Appx730-731, [125]), as cited by the Board in construing this phrase (Appx12), that merely means that the space <u>inside</u> the browser window is 2D—***it does not identify the space in which the browser window resides***.

The Board stated that its construction is consistent with the specification, which discloses "a browser window in front of the 3D virtual space that allows the user to interact with a 2D version of a webpage." Appx14. First, the claim language requires *the window* to be within 2D space, not *the webpage*. Second, those skilled in the art would have understood the specification to disclose not only a browser window that is ***in front of the 3D virtual space***, but further ***on the 2D desktop*** (*i.e.*, within a 2D space). *See Supra* at 11, Demonstrative 2 and corresponding discussion of the 3D GUI that creates the 3D space being displayed *on the 2D desktop*. *See, e.g.*, Appx124, 7:66-8:1.

The specification then explains that the "replacing step," *i.e.*, limitation [1dii], "is accomplished by revealing the 2D version of the webpage that was initially hidden or drawn off screen and positioning it [on the 2D desktop] in a layer that is in front of the 3D virtual space such that the end user can interact with this layer in 2D." Appx131, 21:45-49. *See Supra* at 13, Demonstrative 3 and the corresponding discussion that the window is "revealed" in front of the 3D-GUI and on the 2D desktop (*i.e.*, within a two-dimensional (2D) space"). *See, e.g.*,

Appx135, 30:36-38 ("the Internet Explorer window will open *in front of the 3D virtual space* in a 2D window *as part of the desktop*").

As such, the Board erred in concluding that "a window within a two-dimensional (2D) space" can be met by "a conventional web browser displaying a 2D webpage in its window" without further considering the space in which the web browser resides. Appx15.

With respect to Ground 1, Dr. Fuchs testified that, in Robertson, "when the user selects an object thumbnail, Robertson's 3D-GUI presents a ''live' object' that is 'in its associated application,' such as 'the Internet Explorer™ Internet browser … [for] rendering a [first] web page.'" Appx729, [123]. Dr. Fuchs further testified that "[i]f there is any doubt that Robertson's disclosure on this replacing feature … Gettman describes an embodiment where 'the result of the interaction [with a 3D display window in the virtual city] may cause the target [w]eb site to open in a conventional two-dimensional web browser.'" Appx731, [126].

Patent Owner argued in its Response that both of these browser windows (*i.e.*, Internet Explorer in Robertson and the conventional 2D browser in Gettman) are displayed within the 3D space, not a 2D space. *See*, *e.g.*, Appx3403-3413. For example, Dr. Schaefer testified that "[a]ccording to Robertson, '[t]he selected object thumbnail 902 is displayed in a preferred viewing position, in this case, at

the center foreground *in the three-dimensional environment*." Appx3529-3530, [142] (citing Appx897, 13:55-62 (Robertson); *see also* Appx3530, [143] ("Robertson provides that in one embodiment, the selected webpage may be presented in an Internet Explorer™ Internet browser in 3D space.") (citing Appx897, 13:64-14:10) (Robertson). With respect to Gettman, Dr. Scheafer testified that "the 'live' webpage is presented in a conventional, 2D browser *in the 3D space*." Appx3534, [152] (citing Appx1274, [0128]) (Gettman). Thus, in both Roberston and Gettman, *the browser windows* that (according to the Petition) replace the objects in 3D *are displayed within the 3D space, not a 2D space as claimed*.

Given the Board's flawed claim construction, the Board concluded that the Robertson-Gettman combination teaches this feature through the mere use of a "browser rendering a webpage in its window." *See, e.g.*, Appx39 ("We find that an Internet Explorer browser rendering a webpage in its window is 'a finite graphical area defined by a two-dimensional coordinate system' Thus, it is a 2D space, as we construe the term, as discussed above.") and Appx40 ("We find that a 'two dimensional, conventional-style browser display box' rendering a webpage is 'a finite graphical area defined by a two-dimensional coordinate system.' Thus, it is a 2D space, as we construe the term.").

As the Board's erroneous construction of "a window within a two-

dimensional (2D) space" led to an incorrect finding that this feature is taught in Robertson and Gettman, for this independent reason with respect to Ground 1, this Court should affirm the Board's finding of not unpatentable with respect to Claims 1-13 and reverse the Board's finding of unpatentable with respect to Claims 14-18.

**B. The Board Erred in Finding That Substantial Evidence Supports a Finding of Obviousness With Respect to the "Foreground" and "Background" Features in Limitation [1ciii]**

Limitation [1ciii] provides "the first object being displayed in *a foreground* of the 3D space and the second object being displayed i*n a background* of the 3D space." With respect to Ground 2, Petitioner argues that this feature is disclosed in Figure 11B of Tsuda. *See Supra* at 20-22, showing Figure 11B and the Sauve-Tsuda combination. *See also* AOB at 46.

With respect to the proposed combination, Dr. Fuchs testified that this "visual aid … demonstrates a horizontal stack of Tsuda's windows applied in the context of Sauve's quick pick user interface" where "the rightmost window in the stack occupies a plane that is forward in the stack (first object in the *foreground*) relative to the plane of a window further to left (second object in the *background*)." Appx774, [180]; *see also* Petitioners' annotations in the "visual aid" reproduced *Supra* at 22.

Dr. Fuchs' opinion, however, was not based on one of ordinary skill in the art, but solely "based on [his] understanding from Petitioner's counsel [as to what]

Patent Owner has apparently alleged in the co-pending litigation," even though Dr. Fuchs is "not involved in the district court litigation and has no direct knowledge of the events that of that proceeding." Appx775, [181] and fn. 17. This is consistent with arguments made in the Petition, where "Petitioner's analysis regarding Tsuda's horizontal stack is based on Petitioner's understanding of Patent Owner's district court litigation position."[5] Appx226, fn. 7. Counsel's understanding is not evidence, much less substantial evidence that Dr. Fuchs could reasonably rely upon.

Not only is the Board's finding of obviousness with respect to limitation [1ciii] in Claim 1 (Appx69-70) not supported by substantial evidence, but contrary to the evidence of record. As Dr. Fuchs admits, the stack in the proposed combination is "horizontal," not vertical like the ones illustrated in Figure 10 of the '048 Patent, where certain objects are in a foreground of the 3D space and certain objects are in a background of the 3D space. Appx754-755, [154]. A vertical stack is where "each new webpage occupies an x,y,z coordinate … and is drawn further into the distance along the z axis (where it appears smaller from the given perspective." Appx129, 17:45-54. This is not the case with the proposed combination, where the objects are arranged "horizontally," of identical size. Appx1392, 18:11-15 (Tsuda).

---

[5] Not only is Petitioners' "understanding" not evidence, but it does not accurately

In fact, Tsuda provides that in Figure 11B (the embodiment cited in the Petition) "the windows are stacked horizontally an equal distance apart with the left side of each window appearing near the front and the right half overlapped by the next window." Appx1392, 18-12-14. Thus, a POSITA would have understood that all objects are (at least partially) in the foreground of the 3D space.

This is consistent with the Background Art where Tsuda criticizes "a virtual 3D space, with windows positioned deep within the 3D space reduced in size … making it impossible to distinguish any of the display content of the window." Appx1384, 1:23-32. Tsuda's solution to this problem is positioning windows "inclined in the depth direction, so that the key part of the display content is near the front of the 3D space." Appx1384, 2:18-26. This is what is depicted in Figure 11B and Petitioners' proposed combination, where each window is (at least partially) in the foreground, inclined in the depth direction, so that the key part of the display content is near the front of the 3D space.

As the Board's findings concerning the "foreground" and "background" features in limitation [1ciii] are not supported by substantial evidence, for this independent reason with respect to Ground 2, this Court should affirm the Board's finding of not unpatentable with respect to Claims 1-13 and reverse the Board's finding of unpatentable with respect to Claims 14-18.

---

represent statements made by Patent Owner in the co-pending litigation.

# CONCLUSION

This Court should affirm the Board's holdings that Claims 1-13 are not unpatentable and reversed its holdings that Claims 14-18 are unpatentable.  At a minimum, the judgment concerning Claims 14-18 should be vacated and the case remanded for further proceedings with respect to these claims.

Respectfully submitted,

Date:  June 10, 2025

*/s/ Todd E. Fitzsimmons*
Todd Fitzsimmons
  *Principle Attorney*
FITZSIMMONS IP LAW, P.C.
P.O. Box 199
Gardena, CA 90248
(571) 210-8000
todd@fitziplaw.com

*Counsel for SpaceTime3D, Inc.*

# CERTIFICATE OF COMPLIANCE

I certify that this brief is complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5), the type-style requirements of Federal Rules of Appellate Procedure 32(a)(6), and the type-volume requirements of Federal Rules of Appellate Procedure 28.1(e)(2)(B) and Federal Circuit Rules 28.1(b)(2) as it contains 14,854 words, excluding the parts authorized by Federal Rules of Appellate Procedure 32(f) and Federal Circuit Rules 32(b)(2). Appellant has relied on the word count feature of the word processing software used to create this paper in making this certification.

Date: June 10, 2025                    /Todd Fitzsimmons/
                                       Todd Fitzsimmons